**FILED UNDER SEAL**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

U.S. Commodity Futures Trading Commission, )  05 CV 2181
)
                       Plaintiff, )
)
                  v. )
)
Richmond Global Associates, LLC, ) COMPLAINT FOR INJUNCTIVE
Richmond Global Director, LLC, ) AND OTHER EQUITABLE
Richmond Global MCA, LLC, ) RELIEF AND FOR PENALTIES
Richmond Global Managed Account, LLC, ) UNDER THE COMMODITY
Richmond Global, Ltd., ) EXCHANGE ACT, AS
RG Group Holdings, LLC, ) AMENDED, 7 U.S.C. §§ 1-25
Vincenzo Danio, )
Joseph Pappalardo, )
Ronald Turner, and )
Miron Vinokur, )
)
                  Defendants. )
)

---

## I.

## SUMMARY

1. At various times between December 2001 and the present (the "relevant time period"), Richmond Global Associates, LLC ("RG Associates"), Richmond Global Director, LLC ("RG Director"), Richmond Global MCA, LLC ("RG MCA"), Richmond Global Managed Account, LLC ("RG Managed"), Richmond Global, Ltd. ("RG Ltd."), RG Group Holdings, LLC ("RG Group") (collectively, the "Richmond Global Entities"), Vincenzo Danio ("Danio"), Joseph Pappalardo ("Pappalardo"), Ronald Turner ("Turner"), and Miron Vinokur ("Vinokur") (collectively, including the Richmond Global Entities, the "Defendants") solicited funds from

customers purportedly to be used for trading foreign currency ("forex") contracts, which in fact, were forex futures contracts.

2. During the relevant time period, Defendants and others under their control acted as a common enterprise in a scheme to defraud retail customers. The Defendants and others under their control made misrepresentations to customers to induce them to open accounts with and provide funds to the Richmond Global Entities in order to trade in the forex market. Through this scheme, Defendants fraudulently solicited and obtained more than $3.5 million dollars from at least 160 customers and used at least $981,500 of these funds for their own purposes.

3. The Defendants made false promises of high returns, failed to disclose hidden commission charges and concealed these charges as trading losses in customer account statements, made false representations regarding the Defendants' experience and past performance in trading forex, and misappropriated customer funds. Defendants also falsely represented to customers that they had the ability to minimize trading losses through the use of stop-loss mechanisms.

4. Through the conduct described above, Defendants violated Section 4b(a)(2) of the Commodity Exchange Act (the "Act"), 7 U.S.C. § 6b(a)(2) (2002).

5. Defendants Danio, Pappalardo and Turner are liable as controlling persons for the violations by the Richmond Global entities and others they controlled of Section 4b(a)(2) of the Act, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2002).

6. The Richmond Global Entities are liable for the violations of Section 4b(a)(2) of the Act by their officers, directors, managers, employees, and agents, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2002), and Section 1.2 of the Commission's Regulations

promulgated thereunder (the "Regulations"), 17 C.F.R. § 1.2 (2004), as all such violations were within the scope of their office or employment with the Richmond Global entities.

7. The Defendants are also jointly and severally liable for the acts and practices of one another as participants in an illegal common enterprise.

8. Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and in similar acts and practices, as more fully described below.

9. Accordingly, pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1 (2002), Plaintiff U.S. Commodity Futures Trading Commission (the "Commission") brings this action to enjoin the unlawful acts and practices of Defendants, and to compel their compliance with the provisions of the Act. In addition, the Commission seeks civil penalties, an *ex parte* statutory restraining order, a preliminary injunction, and the appointment of a receiver over any funds frozen to maintain the status quo for the victims of the Defendants. Furthermore, this action will ultimately seek permanent injunctive relief, other relief, including restitution, disgorgement, and civil monetary penalties, and such other equitable relief as the Court may deem necessary or appropriate.

## II.

## JURISDICTION AND VENUE

10. The Act prohibits fraud in connection with the trading of commodity futures contracts and establishes a comprehensive system for regulating the purchase and sale of such futures contracts. This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, which authorizes the Commission to seek injunctive relief against any person whenever it shall appear that such person has engaged, is engaging, or is about to engage in any

3

act or practice constituting a violation of any provision of the Act or any rule, regulation or order thereunder. In addition, Sections 2(c)(2)(B) and 2(c)(2)(C) of the Act, 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C) (2002) provide that the Commission has jurisdiction over certain retail transactions in foreign currency for future delivery, including the transactions alleged in this complaint.

11. Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2002), in that Defendants are found in, inhabit, or transact business in this district, and the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this district, among other places.

### III.

### THE PARTIES

**A.  Plaintiff**

12. The U.S. Commodity Futures Trading Commission is an independent federal regulatory agency that is charged with responsibility for administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1 et seq. (2002), and the Regulations, 17 C.F.R. §§ 1 et seq. (2004).

**B.  Defendants**

13. Richmond Global Ltd. was incorporated in August 2001, as a New York domestic business corporation with offices located at 106 New Dorp Plaza, Suite 2b, Staten Island, New York. RG Ltd. has never been registered with the Commission in any capacity. RG Ltd. is not a futures commission merchant ("FCM"), an affiliate of a FCM, a broker or dealer, an associated person of a broker or dealer, an insurance company, a regulated subsidiary of an insurance

company, a financial holding company or an investment bank holding company (collectively, an "enumerated counterparty").

14. <u>Richmond Global Director LLC</u> became a New York limited liability company in April 2002, with offices located at the same Staten Island address. RG Director was registered with the Commission as a commodity pool operator between April 2002 and October 2002. RG Director is not an enumerated counterparty.

15. <u>Richmond Global MCA LLC</u> became a New York limited liability company in June 2003, with offices located at the same Staten Island address. RG MCA has never been registered with the Commission in any capacity and was not an enumerated counterparty.

16. <u>Richmond Global Managed Account LLC</u> became a New York limited liability company in April 2002, with offices located at the same Staten Island address. RG Managed has never been registered with the Commission in any capacity and is not an enumerated counterparty.

17. <u>Richmond Global Associates, LLC</u> became a New York limited liability company in February 2003, with offices at the same Staten Island address, and was purportedly created as a "branch office" of Richmond Global. RG Associates has never been registered with the Commission in any capacity and is not an enumerated counterparty.

18. <u>RG Group Holdings, LLC</u> became a New York limited liability company in November 2003, with offices at the same Staten Island address. RG Group has never been registered with the Commission in any capacity and is not an enumerated counterparty.

19. <u>Vincenzo Danio</u>, who resides in Staten Island, New York, has held himself out as the President of RG Director, RG MCA and RG Managed, the bookkeeper of RG Ltd, and the Senior Account Manager of RG Associates. Danio was a signatory on six of the seven of the

Richmond Global Entities bank accounts. On monthly and quarterly statements sent to the Richmond Global Entities customers, Danio was identified as the Director of Client Services. Danio has never been registered with the Commission in any capacity.

20. <u>Joseph Pappalardo</u> who resides in Staten Island, New York, has held himself out as the Vice President and Senior Account Manager of RG Associates. He is also a signatory on RG Associates' bank accounts. Pappalardo has never been registered with the Commission in any capacity.

21. <u>Ronald Turner</u> who resides in Staten Island, New York, has held himself out as President of RG Associates. He is a signatory on bank accounts maintained by RG Associates. Turner has never been registered with the Commission in any capacity.

22. <u>Miron Vinokur</u> who resides in Staten Island, New York, has held himself as a Senior Vice President of RG Associates and a Vice President of RG Director. Vinokur has never been registered with the Commission in any capacity.

## IV.

## **STATUTORY BACKGROUND**

23. Section 2(c)(2)(B)(i)-(ii) of the Act, 7 U.S.C. § 2(c)(2)(B)(i)-(ii) (2002), provides that the Commission shall have jurisdiction over an agreement, contract or transaction in foreign currency that is a sale of a commodity for future delivery, and is "offered to, or entered into with, a person that is *not* an eligible contract participant, unless the counterparty, or the person offering to be the counterparty, of the person is" a regulated entity, as defined therein (emphasis added). Section 2(c)(2)(B)(i)-(ii) of the Act was enacted by Congress as part of the Commodity Futures Modernization Act of 2000 ("CFMA"), CFMA § 2(5), Pub. L. No. 106-554, 114 Stat. 2763 (2000), in an effort "to clarify the jurisdiction of the Commodity Futures Trading Commission

over certain retail foreign exchange transactions and bucket shops that may not be otherwise regulated."

24. Section 1a(12)(A)(xi) of the Act, 7 U.S.C. § 1a(12)(A)(xi) (2002), defines an "eligible contract participant" as, *inter alia*, an individual who has total assets exceeding: (a) $10 million; or (b) $5 million and who enters into the agreement, contract, or transaction in order to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred by the individual. Thus, persons whose total assets are below those levels are not eligible contract participants.

25. Section 2(c)(2)(B) of the Act, 7 U.S.C. § 2(c)(2)(B)(ii)(I) through (VI) (2002), further provides in pertinent part that the Commission shall have jurisdiction over an agreement, contract, or transaction in foreign currency involving persons that are not eligible contract participants unless the counterparty, or the person offering to be the counterparty, of the person is a counterparty enumerated in that section.

26. Section 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(C) (2002), however, provides that the Commission retains jurisdiction over such agreements, contracts, or transactions in foreign currency where one of the counterparties is an FCM for purposes of enforcing section 4b of the Act, 7 U.S.C. §6b (2002), among others.

27. Section 4b(a)(2) of the Act, 7 U.S.C. § 6b(a)(2) (2002), provides, in pertinent part, it is unlawful for any person in or in connection with any sale of any futures contract of any commodity that is or may be used for hedging or determining the price basis of any transaction or for delivering any commodity in interstate commerce for or on behalf of any other person (i) to cheat or defraud or attempt to cheat or defraud such other person, (ii) willfully to make or cause to be made any false report or statement thereof, or to enter or cause to be entered any false

record, to or for such other person, or (iii) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract.

28. Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2002), and Section 1.2 of the Regulations, 17 C.F.R. § 1.2 (2004), provide that the act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent or other person.

29. Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2002), provides that any person who, directly or indirectly, controls any person who has violated any provision of the Act may be held liable for such violation in any action brought by the Commission to the same extent as the controlled person.

V.

FACTS

A. **The Richmond Global Entities Acted as a Common Enterprise**

30. The Richmond Global Entities held themselves out to the public, through a website and in customer documentation, as a unitary financial services company that managed funds for retail customers in the forex market through a Managed Currency Trading Account.

31. The Richmond Global Entities shared office space, telephone numbers, a website, personnel, officers and customers. Retail customers dealt with one entity, which they knew as "Richmond Global."

32. Funds of the various Richmond Global Entities, including customer funds, were often commingled.

33. The Richmond Global Entities therefore acted as a common enterprise, and are jointly and severally liable for one anothers' violations of law.

**B.    The Richmond Global Entities' Fraudulent Operation**

34. Defendants, through their website, telephone solicitations and other materials, made false and fraudulent representations to prospective customers to induce these individuals to open accounts with the Richmond Global Entities.

35. To open a managed currency trading account, customers completed and signed account opening documents, as provided by and instructed by the Defendants, and sent them with their funds directly to the Richmond Global Entities. Included with the account opening documentation was a power of attorney authorizing the Richmond Global Entities to trade on behalf of, or for the benefit of their customers.

36. The Defendants promised their customers that they would be in regular telephone contact with customers about their account status, and would provide customers with account statements.

37. After receiving the customers' funds, Defendants sent these funds, after deducting a disclosed two percent management fee, to one of three futures commission merchants ("FCMs"), after which the FCMs executed trades on behalf of the Defendants' customers.

38. At rates set by the Richmond Global Entities, the FCMs deducted additional commissions on executed transactions from the customer funds they held. These commissions, which were never disclosed to customers, were then paid directly to Richmond Global.

39. Each of the FCMs provided the Richmond Global Entities with transaction records showing the profit/loss from each executed forex futures trade and the commission charged on the transaction and returned to the Richmond Global Entities.

40. The account statements issued by the Richmond Global Entities to the customers detailed only the customers' net cash position: the balance at the beginning of the period, customer deposits, customer withdrawals, profit or loss, management fees, and the balance at the end of the period. The statements did not provide any information regarding the forex futures trading executed on the customer's behalf or for the customer's benefit.

**C.   Defendants Cheated and Defrauded Customers**

41. Defendants or others under their control made misrepresentations to customers to induce them to open accounts with and provide funds to the Richmond Global Entities in order to trade in the forex market. Specifically, the Defendants made false promises of high returns, failed to disclose hidden commission charges and made false representations regarding the Defendants' experience and past performance in trading forex and the purported minimal risks of trading forex.

42. Defendants falsely represented to customers that the Richmond Global Entities employed as many as twelve researchers and analysts and had between $10 and 12 million under management in the forex market, when in fact they did not employ researchers or analysts, and never had more than $1.2 million under management in the forex market.

43. Defendants falsely represented to retail customers that the Richmond Global Entities generated profits as high as 40% annually, and that they would, in the future, generate profits of 45% annually, when in fact they seldom generated any net profits for their customers trading in the forex market.

44. Defendants falsely represented to retail customers that money invested in the forex market was like money placed in a bank account, when Defendants knew that investments in the forex market were, in fact, highly speculative and volatile.

45. Defendants further misrepresented that stop-loss mechanisms were in place to limit trading losses to 10% of the customers' investments, when in fact customer losses far larger than that were common.

46. Defendants falsely represented to retail customers that the Richmond Global Entities charged customers only a 2% management fee and 10% of any profits generated through trading. Defendants, however, charged customers undisclosed commission fees ranging from approximately 16% to 39%.

47. Defendants received these funds by instructing the FCMs executing the trades to deduct a portion of the customers' funds and to return those funds to the Defendants as commissions. Commissions totaling approximately $981,500 were returned from the FCMs to the Defendants and the Defendants then used these funds for their own purposes.

48. In order to conceal the unauthorized commissions, Defendants issued false account statements to customers that falsely and misleadingly characterized the undisclosed commissions as trading losses.

49. Defendants therefore misappropriated customer funds.

50. Defendants agreed to receive, and received, $30,000 from an undercover FBI agent ("UCA") posing as a hedge fund manager seeking to invest funds in the forex market with the Richmond Global entities. Defendants agreed with the UCA that they and the UCA would charge the fund undisclosed commissions on trades, and that Defendants and the UCA would split the commissions secretly charged to the hedge fund's account.

### D. Richmond Global Traded Futures Contracts on Behalf of Their Customers

51. Defendants, for or on behalf of their customers, entered into foreign currency futures contracts with one of three FCMs. The contracts traded were for Japanese yen, British pounds, Euros, and other foreign currencies, with the price set at the time the contract was entered into. Subsequent to the time a contract position was established (or, in some cases, the same date the position was entered into), the position in the currency was terminated, presumably offset at a price that reflected market conditions at that time. The contract between the FCMs and the Richmond Global Entities, which was entered into for and on behalf of, and for the benefit of, the ultimate customers, provided explicitly that the contracts could be offset.

52. Customers were required to maintain certain margin requirements.

53. There was no indication in any of the customer records and materials that physical currency was ever actually bought or sold for the customers. None of these customer accounts were opened for a business or personal need to make or take delivery of foreign currencies, and there was no indication that customers were required to hold, or possessed the requisite bank accounts or necessary credit to acquire or deliver, currency against any of the contracts purchased on their behalf. There is no indication that customers ever intended that their contracts be used to take delivery of any foreign currencies.

54. The contracts traded for these customers were traded in multiples of ten units of currency and delivery specifications such as location and timing were identical across the various contracts, and they were effectively standardized and interchangeable with one another. The transactions offered to customers were entirely paper transactions. As such, the contracts contain the characteristics of a futures contract.

55. Neither the known customers to the forex transactions nor the Richmond Global Entities appear to be eligible contract participants, because their assets are less than $5 million and they opened their accounts in order to speculate on price changes in foreign currencies.

E. **Controlling Persons**

56. Danio acted as a controlling person. He was a signatory on six of the seven known Richmond Global bank accounts. On the two RG MCA bank accounts, Danio's title was listed as President. On the two RG Ltd. bank accounts, his title was listed as bookkeeper. On the RG Director bank account, he was identified as an authorized signer. On the RG Managed Account bank account, he was initially identified as an authorized signer and was later identified as Secretary. An undated signature card also identifies him as President of RG Managed. On a letter sent to at least one customer, Danio signed as the President of RG Director. On monthly and quarterly statements sent to the Richmond Global Entities' customers prior to January 2004, Danio was identified as the Director of Client Services for RG Director. On monthly and quarterly statement sent to retail customers after January 2004, Danio was identified as the Director of Client Services for "Richmond Global." Danio signed at least one letter sent to customers of the Richmond Global Entities as Senior Account Manager of RG Associates. Danio also dealt with customer complaints and inquiries for the Richmond Global Entities.

57. Danio failed to act in good faith, or knowingly induced, directly or indirectly, the the acts constituting the violations alleged herein, in that he fraudulently solicited customers.

58. Pappalardo acted as a controlling person. He was a signatory on the RG Associates account, where his title was listed as Vice President. In addition, he signed at least one loan agreement as Vice President of RG Associates. In addition, Pappalardo signed at least one letter sent to customers as Vice President Senior Account Manager of RG Associates.

59. Pappalardo failed to act in good faith, or knowingly induced, directly or indirectly, the the acts constituting the violations alleged herein, in that he fraudulently solicited customers.

60. Turner acted as a controlling person. Turner is President of RG Associates and is a signatory on bank accounts maintained by RG Associates. Turner signed at least one letter sent to customers as President of RG Associates.

61. Turner failed to act in good faith, or knowingly induced, directly or indirectly, the acts constituting the violations alleged herein, in that he fraudulently solicited customers.

## VI.

## VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT I

**Fraud in the Sale of Futures Contracts**

62. Paragraphs 1 through 61 are re-alleged and incorporated herein.

63. During the relevant time period, Defendants cheated or defrauded or attempted to cheat or defraud customers or prospective customers of the Richmond Global Entities and willfully deceived or attempted to deceive customers or prospective customers by, among other things: making false promises of high returns, failing to disclose hidden commission charges, issuing false reports which conceal the undisclosed commission charges as trading losses, and making false representations regarding the Defendants' experience, past performance in trading forex and the purported minimal risks of trading forex, and misappropriated customer funds, all in violation of Section 4b(a)(2) of the Act, 7 U.S.C. § 6b(a)(2) (2002). Defendants' conduct alleged above was in connection with the orders to make, or the making of, contracts of sale of commodities for future delivery, made or to be made, for or on behalf of any other persons, and

such contracts for future delivery were or could be used for the purposes set forth in Section 4b(a)(2) of the Act, 7 U.S.C. § 6b(a)(2) (2002).

64.  During the relevant time period, Defendants Danio, Pappalardo and Turner directly or indirectly controlled the Richmond Global Entities, their employees, and others and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations described in this Count I. Thus, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2002), as described in this Count, Defendants Danio, Pappalardo and Turner are liable for the violations described in this Count, to the same extent as the Richmond Global Entities.

65.  Pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2002), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2004), the Richmond Global Entities are liable for any violations of Section 4b(a)(2), 7 U.S.C. § 6b(a)(2) (2002), of the Act by their officers, directors, managers, employees, and agents, in that all such violations were within the scope of their office or employment with the Richmond Global Entities.

66.  The Richmond Global Entities acted as a common enterprise, and therefore are jointly and severally liable for the actions of one another.

67.  Each material misrepresentation or omission made during the relevant period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(2) of the Act, 7 U.S.C. § 6b(a)(2) (2002).

## VII.

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2002), and pursuant to the Court's own equitable powers:

A.      Find that Defendants violated Section 4b(a)(2) of the Act, 7 U.S.C. § 6b(a)(2) (2002);

B.      Enter an *ex parte* statutory restraining order and orders of preliminary and permanent injunctions restraining and enjoining Defendants and all persons insofar as they are acting in the capacity of their agents, servants, successors, assigns, and attorneys, and all persons insofar as they are acting in active concert or participation with them who receive actual notice of such order by personal service or otherwise, from directly or indirectly:

1.      destroying, mutilating, concealing, altering or disposing of any books and records, documents, correspondence, brochures, manuals, electronically stored data, tape records or other property of Defendants, wherever located, including all such records concerning Defendants' business operations;

2.      refusing to permit authorized representatives of the Commission to inspect, when and as requested, any books and records, documents, correspondence, brochures, manuals, electronically stored data, tape records or other property of Defendants, wherever located, including all such records concerning Defendants' business operations; and

3.      withdrawing, transferring, removing, dissipating, concealing, or disposing of, in any manner, any funds, assets, or other property, wherever situated, including but not limited to, all funds, personal property, money or securities held in safes, safety deposit boxes and all funds on deposit in any financial institution, bank or savings and loan account held by, under the control, or in the name of any of the Defendants for the amounts indicated in this complaint; and

C. Enter an *ex parte* statutory restraining order and order of preliminary injunction appointing a temporary receiver to take into his or her immediate custody, control, and possession all cash, cashier's checks, funds, assets, and property of Defendants, including funds or property of investors wherever found, whether held in the name of any of the Defendants or otherwise, including, but not limited to, all books and records of account and original entry, electronically stored data, tape recordings, all funds, securities, contents of safety deposit boxes, metals, currencies, coins, real or personal property, commodity futures trading accounts, bank and trust accounts, mutual fund accounts, credit card line-of-credit accounts and other assets, of whatever kind and nature and wherever situated, and authorizing, empowering and directing such receiver to collect and take charge of and to hold and administer the same subject to further order of the Court, in order to prevent irreparable loss, damage and injury to investors, to conserve and prevent the dissipation of funds, and to prevent further evasions and violations of the federal commodity laws by Defendants; and

D. Enter an *ex parte* statutory restraining order and orders of preliminary and permanent injunctions prohibiting Defendants and any other person or entity associated with them, including any successor thereof, from:

1. engaging in conduct, in violation of Section 4b(a)(2) of the Act, 7 U.S.C. § 6b(a)(2) (2002); and

2. soliciting funds for, engaging in, controlling, or directing the trading of any commodity futures or options accounts for or on behalf of any other person or entity, whether by power of attorney or otherwise;

E.  Enter an *ex parte* statutory restraining order and orders of preliminary and permanent injunctions directing Defendants to provide Plaintiff immediate and continuing access to their books and records;

F.  Enter an order appointing a permanent equity receiver to take into his or her immediate custody and control, all cash, cashier's checks, funds, assets, and property of Defendants, including funds or property of investors wherever found, whether held in the name of any of the Defendants or otherwise, including, but not limited to, all books and records of account and original entry, electronically stored data, tape recordings, all funds, securities, contents of safety deposit boxes, metals, currencies, coins, real or personal property, commodity futures trading accounts, bank and trust accounts, mutual fund accounts, credit card line-of-credit accounts and other assets, of whatever kind and nature and wherever situated, and authorizing, empowering and directing such receiver to collect and take charge of and to hold and administer the same subject to further order of the Court, in order to prevent irreparable loss, damage and injury to investors, to conserve and prevent the dissipation of funds, and to prevent further evasions and violations of the federal commodity laws by Defendants;

G.  Enter an *ex parte* statutory restraining order and orders of preliminary and permanent injunctions directing Defendants to take such steps as are necessary to transfer possession of all assets including the repatriation to the territory of the United States all funds and assets of Defendants' customers described herein which are held by Defendants or are under their direct or indirect control, jointly or singly, and deposit such funds into the Registry of this Court or otherwise as the Court may order, and provide the Commission, the Receiver, and the Court with a written description of the funds and assets so repatriated;

H.  Enter an order of permanent injunction directing Defendants, and any successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act as described herein, including pre-judgment interest thereon from the date of such violations;

I.  Enter an order of permanent injunction directing Defendants to make full restitution to every customer whose funds were received by them as a result of acts and practices which constituted violations of the Act and Regulations, as described herein, and interest thereon from the date of such violations;

J.  Enter an order of permanent injunction assessing a civil monetary penalty against each defendant in the amount of not more than the higher of $120,000 for each violation of the Act committed on or before October 23, 2004, and $130,000 for each violation committed thereafter or triple the monetary gain to the defendant;

K.  Enter an *ex parte* statutory restraining order and orders of preliminary and permanent injunctions directing that Defendants make an accounting to the court of all their assets and liabilities, together with all funds they received from and paid to clients and other persons in connection with commodity futures transactions or purported commodity futures transactions, and all disbursements for any purpose whatsoever of funds received from commodity transactions, including salaries, commissions, interest, fees, loans and other disbursements of money and property of any kind, from, but not limited to, December 2001 through and including the date of such accounting;

L.  Enter an order of permanent injunction requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2002);

M.   Order such other and further remedial ancillary relief as the Court may deem appropriate.

Respectfully submitted,

Dated: New York, NY

February 15, 2005

ATTORNEYS FOR PLAINTIFF
COMMODITY FUTURES TRADING
COMMISSION

Stephen J. Obie
Regional Counsel

By: *Karin A. Roth*
Karin Roth [KR-2669]
Senior Trial Attorney

Steven Ringer [SR-9491]
Chief Trial Attorney

David W. MacGregor
Chief Trial Attorney

Division of Enforcement
U.S. Commodity Futures Trading Commission
Eastern Regional Office
140 Broadway, 19th Floor
New York, New York 10005
(646) 746-9764
(646) 746-9940 (facsimile)
kroth@cftc.gov