**JUDGE SCHEINDLIN**

# 05 CV 2181

U.S. Commodity Futures Trading Commission,          )          05 CV _____
                                                    )
                              Plaintiff,            )
                                                    )
                      v.                            )
                                                    )
Richmond Global Associates, LLC,                    )
Richmond Global Director, LLC,                      )
Richmond Global MCA, LLC,                           )
Richmond Global Managed Account, LLC,               )     **DECLARATIONS**
Richmond Global, Ltd.,                              )
RG Group Holdings, LLC,                             )
Vincenzo Danio,                                     )
Joseph Pappalardo,                                  )
Ronald Turner, and                                  )
Miron Vinokur,                                      )
                                                    )
                                                    )
                              Defendants.           )
                                                    )

**TAB A -- Declaration of Robert J. Conrad**

**TAB B -- Declaration of Ronald A. Carletta**

**TAB C -- Declaration of Ronald B. Hobson**

**TAB D -- Declaration of Philip D. Rix**

**DECLARATION OF ROBERT J. CONRAD**
**PURSUANT TO 28 U.S.C. § 1746**

I, Robert J. Conrad, do hereby declare under penalty of perjury as follows:

1.      I am making this statement voluntarily, and I authorize its use by the Commodity Futures Trading Commission ("Commission") or its representatives for any purpose pertaining to the matters described herein.

2.      I am a Special Agent of the Federal Bureau of Investigation ("FBI"). I am assigned to Squad C-1, the FBI's Securities and Commodities Fraud Investigation unit located at 26 Federal Plaza in New York, New York.

3.      Since June 2004, I have been the case agent assigned to a FBI undercover operation targeting fraud in the foreign currency ("forex") market.

4.      The statements I am making in this declaration are based upon my debriefings of confidential sources and fellow FBI agents, as well as my reviewing of audiotapes that were made during this undercover operation.

**BACKGROUND**

5.      At various time in or about December 2001 to in or about January 2005, Vincenzo Danio, Joseph Pappalardo, Ronald Turner and Miron Vinokur (collectively called the "Defendants") operated the following entities: 1) Richmond Global Associates, LLC; 2) Richmond Global Director, LLC; 3) Richmond Global MCA, LLC; 4) Richmond Global Managed Account, LLC; 5) Richmond Global, Ltd.; and 6) RG Group Holdings, LLC (collectively called the "Richmond Global entities"). The Richmond Global entities held themselves out to the retail public as firms that managed funds for retail customers in the forex market. The Richmond

Exhibit A    Exhibit B    Exhibit C    Exhibit D    Exhibit E    Exhibit F

Global entities in turn sent customer funds to various futures commission merchants ("FCMs") to execute forex trades on behalf of their customers.

6.      For the purposes of this undercover operation, a FBI agent ("UCA") was given an undercover identity as the manager of a fictitious hedge fund seeking to trade funds in the forex market with the Richmond Global entities. Two other FBI agents acting in an undercover capacity were given identities as retail customers seeking to trade funds in the forex market with the Richmond Global entities. These two FBI agents opened accounts and deposited $10,000 each into each account. The assets for each of these undercover accounts were less than $5,000,000 and they were opened in order to speculate on price changes in foreign currencies. None of these undercover accounts were opened for a business or personal need to make or take delivery of foreign currencies, and it was never intended that they were to be used to take delivery of any foreign currencies. In addition, none of these undercover accounts had the capability to take delivery of foreign currency.

**SCHEME**

7.      Since December 2001, the Defendants and others under their control have engaged in an illegal scheme to defraud customers. The Defendants and others under their control have been making misrepresentations to customers to induce them to open accounts with and provide funds to the Richmond Global entities in order to trade in the forex market.

8.      The Defendants have misrepresented the number of persons employed by the Richmond Global entities as forex traders and forex research specialists, the Richmond Global entities' history of generating profits for customers, the level of

2

risk involved in forex trading and the commissions charged to customers by the

Richmond Global entities.

9.      The defendants falsely represented that the Richmond Global entities employed as many as twelve researchers and analysts when in fact they never employed any researchers or analysts.

10.     The defendants falsely represented that the Richmond Global entities generated profits as high as 40% annually, and that Richmond Global would in the future generate profits at 45% annually, when in fact they seldom generated any profits for their customers trading in the forex market. The defendants further falsely stated that they could earn $30,000 on a $100,000 investment.

11.     The defendants falsely represented that money invested in the forex market was like money placed in a bank account, when the defendants knew that investments in the forex market were highly speculative and volatile. The defendants further misrepresented that stop-loss mechanisms were in place to limit trading losses when in fact the defendants knew that such losses could not be limited.

12.     The defendants falsely represented that the Richmond Global entities charged customers only a 2% management fee and 10% of any profits generated through trading. The defendants also misrepresented that the Richmond Global entities did not charge commissions on trades executed on their behalf in the forex market. The defendants, however, knew that customers were charged undisclosed commissions. The defendants instructed various FCMs used to execute trades for their Richmond Global customers to deduct portions of the amounts invested by their customers, and to return those amounts to Richmond Global as commissions.

3

13.    In order to conceal the unauthorized commissions, the defendants created statements to its customers that falsely characterized the undisclosed commissions as trading losses.

14.    The defendants agreed to and received $30,000 from the UCA posing as a hedge fund manager seeking to invest funds in the forex market with the Richmond Global entities. The defendants agreed with the UCA that they and the UCA would charge the fund undisclosed commissions on trades, and that the defendants and the UCA would split the commissions secretly charged to the hedge funds' account.

15.    This statement is being made voluntarily and I authorize its use by the Commodity Futures Trading Commission or its representatives in any judicial proceeding pertaining to the matters described herein. I have personal knowledge of the facts stated herein, and if called as a witness, I could competently testify to these facts.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at New York, NY on 2/14/ 2005,

Robert J. Conrad

4

employ standard audi

I, Ronald A. Carletta, hereby make the following declaration

knowledge.

## BACKGROUND

1.    I am employed as a Supervisory Auditor with the Audit and Financial Review Branch of the Division of Clearing and Intermediary Oversight of the Commodity Futures Trading Commission ("Commission"). I am assigned to the Commission's Eastern Regional Office located at 140 Broadway, New York, New York 10005. I have served as an auditor with the Commission since October 1991.

2.    In 1968, I earned a bachelor's of science degree in Commerce (accounting major) from Rider College (now Rider University). Since 1977, I have been a certified public accountant licensed in the State of New Jersey. Before joining the Commission, I was employed in various management positions with American Express Company including Vice President & General Manager-Credit Union and Vice President-Corporate Audit Operations from 1979 until 1991. Before joining American Express Company, I was an auditor with various financial services firms including: Chemical Bank (now J.P. Morgan Chase) (Assistant Secretary & Quality Control Officer (1978-1979); Weeden Holding Corp. (Manager of Accounting: 1977-1978); and Haskin & Sells (now Deloitte & Touche: 1968-1977).

3.    My responsibilities as a Supervisory Auditor for the Commission include the regular review of financial documents and required filings by registered and unregistered commodity firms and individuals in order to ensure compliance with the Commodity Exchange Act (the "Act") and the rules and regulations promulgated thereunder. In that role, I regularly

THE RECORDS AND MONEY OF THE

**4.** I have been assigned to assist the Commission's Division of Enforcement in its investigation of the Richmond Global entities ("Richmond Global"),[1] Vincenzo Danio ("Danio"), Joseph Pappalardo ("Pappalardo"), Ronald Turner ("Turner") and Miron Vinokur ("Vinokur") (collectively referred to as the "Defendants") by determining the disposition of customer funds by the Defendants.

## RECORDS REVIEWED

5. I have reviewed and analyzed the following documents and items in connection with the preparation of this declaration:

- HSBC bank records for the Richmond Global entities for the period of September 2001 through July 2004;

- Statements from the three futures commission merchants ("FCM"),[2] which executed foreign currency transactions for the benefit of Richmond Global customers for the period of June 2002 through July 2004;[3]

- Richmond Global sample account opening documents available on Richmond Global's website, www.richmondglobal.com, and provided to prospective customers;

- Sample Richmond Global account statements sent to retail customers reflecting their account balance; and

- Incorporation documents for the Richmond Global entities.

---

[1] It appears that Richmond Global utilized several different variations of the same name in conducting its business including: Richmond Global Ltd., Richmond Global Director LLC, Richmond Global Managed Account LLC, Richmond Global Associates, LLC and Richmond Global MCA LLC. Collectively, these entities are referred to as "Richmond Global." Richmond Global appears to have opened bank accounts in the name of the various Richmond Global entities with HSBC.

[2] A futures commission merchant as defined by the Act, is an entity that solicits or accepts orders for the purchase or sale of any commodity for future delivery and that accepts payment from or extends credit to those whose orders are accepted.

[3] Richmond Global executed forex transactions with three different FCMs: FCM#1 from December 2001 through July 2003; FCM#2 from July 2003 through January 2004 and FCM#3 from February 2004 through July 2004.

2

Exhibit A    Exhibit B    Exhibit C

**ANALYSIS OF THE RECORDS AND MONEY FLOW**

6. My review of Richmond Global's sample account opening documents indicates that Richmond Global held itself out as a financial services company that trades foreign currency ("forex") contracts through managed currency trading accounts.

7. My review of the records received from HSBC and the FCMs demonstrates that Richmond Global deposited funds from apparent retail customers for trading forex. The purpose of my review of these records was to determine whether the deposited customer funds were, in fact, used for transactions in forex.

### FCM RECORDS (JUNE 2002 THROUGH JULY 2004)

8. My analysis of the FCM records indicates that approximately $3.4 million was transferred from Richmond Global bank accounts to the FCMs. These funds were then used to execute forex transactions.

9. On a monthly basis, the FCMs never had more than $1.17 million under management by Richmond Global.

10. Richmond Global sustained losses on behalf of its customers of about $1.2 million. These losses are comprised of at least $981,500 in commissions, and an additional $235,600 in losses, fees and other charges from executed forex transactions. The $981,500 in commissions were deducted from the funds on deposit with the FCMs and transferred to Richmond Global bank accounts at HSBC.

11. It appears that virtually all of the Richmond Global retail customers lost money trading forex. (There are, however, three numbered accounts at one of the FCMs that made a

3

management and other fees that would reduce these negligible profits.)

**12.** **The FCMs deducted commissions ranging from a low of 16.33% to a high of** 39.74% on executed forex transaction of the customer funds on deposit.

BANK RECORDS (JUNE 2002 THROUGH JULY 2004)

13. My analysis of the HSBC bank records indicates a 2% up-front management fee was deducted from the customer funds before the monies were transferred to the FCMs for forex trading. These management fees amount to approximately $69,000. Funds received from Richmond Global customers total approximately $3.5 million. This $3.5 million figure is comprised of the approximately $3.4 million in customer funds that Richmond Global transferred to the FCMs plus the approximately $69,000 in management fees.

14. Based on the size, nature and description on specific deposits into Richmond Global's bank account, it appears there may have been at least 160 accounts belonging to retail forex customers. Additionally, I was able to trace certain of these customers' deposits (less the up-front 2% management fee) to separately numbered sub-accounts of the Richmond Global managed account at one of the FCMs.

15. The bank records demonstrate that the $981,500 charges, discussed above in paragraph 10, were used by Richmond Global to pay salaries, expenses and commissions to Richmond Global employees.

16. Richmond Global paid Danio, Pappalardo, Turner and Vinokur from the funds deposited in the HSBC bank accounts. Danio received payments from the HSBC bank accounts totaling in excess $52,600 for the period of December 2002 through January 2004. Pappalardo received, for the period of March 2003 to January 2004, payments totaling in excess of $79,300.

4

received in excess of $25,300 in payments during April 2003 to February 2004. These payments to these four individuals total $271,500.

17.     It appears that Richmond Global customer funds were commingled. Funds from distinct Richmond Global HSBC bank accounts were transferred into a limited number of accounts at the FCMs. Additionally, it appears that Richmond Global did not always deposit and return customer funds from the same distinct Richmond Global entity.

********

On this 28th day of January 2005, I declare under penalty of perjury that the foregoing is true and correct.

Ronald Carletta

Ronald. A. Carletta

5

Exhibit A          Exhibit B          Exhibit C          Exhibit D          Exhibit E          Exhibit F

I, Ronald B. Hobson, declare as follows:

## EXPERIENCE AND QUALIFICATIONS

1. My name is Ronald B. Hobson. I have a master's degree in economics that I received from the University of California at Los Angeles in 1971. Since that time, I have taken several graduate courses at George Washington University and the Institute for Advanced Technology, primarily in quantitative economic methods.

2. I am currently an Industry Economist in the Office of the Chief Economist at the Commodity Futures Trading Commission (CFTC). I have been employed in this Division of the Commission since December 1976 (with a three-year hiatus described below).

3. Specific projects and activities with which I have been significantly involved at the CFTC include:

- Oversaw review of all new financial futures contracts proposed for trading in US between 1979 and 1984.
- Oversaw the production of the CFTC's 1993 report to Congress on over-the-counter derivatives and its 1994 report to Congress on global competition in futures trading.
- Member of the CFTC's Off-Exchange Task Force.
- Member of task force selected by the President's Working Group on Financial Markets to study systemic risk issues (1995).
- CFTC Staff liaison to the joint CFTC/USDA Risk Management Education Project mandated by the Federal Agriculture Improvement and Reform Act of 1996.

4. From November 1987 through July 1990, I was self-employed as a private financial consultant. Much of my consulting work involved sub-contracting with

Exhibit A    Exhibit B    Exhibit C    Exhibit D    Exhibit E    Exhibit F

the Federal Savings and Loan Insurance Corporation (FSLIC) and the Federal Deposit Insurance Corporation (FDIC) in cases where bankrupt savings and loan associations (S&Ls) were extensively involved with financial futures and options prior to their demise. The general objective of these projects was to determine the impact of such futures and option trading activity on the institution's overall risk exposure. Additional projects included serving as an economic expert in CFTC reparations cases and in NYSE arbitration cases on behalf of individuals who had been involved in trading futures or options contracts.

5.     Prior to my experience with the Commission, I was employed as an economist at the U.S. Treasury Department (econometric forecasting of U.S. foreign trade and travel); USDA Economic Research Service (analysis of U.S. food and fiber consumption levels and patterns); General Electric TEMPO (a consulting firm specializing in economic analyses of the causes and consequences of and the remedies for rapid population growth in less developed countries); the U.S. Cost of Living Council (a principal part of the apparatus that administered the U.S. price control program of the early seventies); and USDA Agricultural Marketing Service (economic analysis of issues arising under the operation of U.S. federal milk marketing orders).

6.     Over much of this employment period I also taught economics and futures and options courses and seminars at Northern Virginia Community College, Frederick Community College (Frederick, MD), the University of Maryland, and the USDA Graduate School.

7.     My publications include Futures Trading in Financial Instruments, October 1978, CFTC, Washington, DC; Survey of Interest Futures Markets (with Naomi Jaffe), December 1979, CFTC, Washington, DC; "The CFTC's Hedging Definition: Development and Contemporary Issues" (with Blake Imel and Paula Tosini), October 1985, Working Paper 119, Center for the Study of Futures Markets,

2

Columbia University, New York; and "Designing a Derivatives Complement to Cash Markets in Developing Countries," in Focus on Capital, Kenroy Dowers and Petro Masci, eds., Inter-American Development Bank, Washington D.C., 2003.

8.    I have testified as an expert witness in the *CFTC v. Giovanni Fleury and Giovanni Fleury Investments, Inc.* (2003), *CFTC v. Southern Thumb Co-op, Inc.* (1998), and in *CFTC v. Chicago Mercantile Exchange and the Chicago Board of Trade* (a 1979 CFTC action to prevent the listing of certain Treasury futures contracts) as well as in two New York Stock Exchange arbitration cases involving futures and options in 1989.

9.    I have prepared this declaration as part of my normal CFTC position duties and have not been separately compensated for it.

## MATERIALS REVIEWED

10.    In preparing this declaration, I have reviewed and relied upon information from the following sources:

A. Hot Spot Documents:
1) Account statements
2) Profit and Loss Summaries
3) Client Reports: Trade Activity
4) Customer Account Applications
5) Customer Account Agreements
6) Risk Disclosure Statements
7) Trading Policies
8) Managed Account Agreements and Limited Powers of Attorney
9) Commissions and Fees Schedule
10) Tax Form W-9
11) Certificate of Incorporation
12) Articles of Incorporation
13) e-mail correspondence

B. IFSCL USA Inc. Documents:
1) Account Statements
2) Client Information Forms

3

Exhibit A    Exhibit B    Exhibit C    Exhibit D    Exhibit E    Exhibit F

3) Client Account Letters
4) Client Agreeements
5) Disclosure Statements for Non-Cash Margin
6) Corporate Resolution Forms
7) Risk Disclosure Forms
8) Articles of Organization
9) Tax Form W-9

C. FX Solutions Documents:
1) Account Statements
2) Introducing Agreement
3) Corporate Account Agreement
4) Wire Transfer Deposits
5) Account Agreements
6) Risk Disclosure Statements
7) e-mail correspondence
8) checks

## FUTURES, FORWARD AND CASH SPOT TRANSACTIONS

11.     The principal distinctions among futures, forward and spot transactions relate
to their respective purposes.  Futures contracts are entered into primarily for the
purpose of transferring price risk over a period of time.  Forward contracts are entered
into primarily for the purpose of transferring ownership of a commodity or asset in the
future.  Spot transactions are entered into for the immediate transfer of ownership.

12.     Futures Contracts.  Futures contracts are agreements between parties for the
future delivery of a commodity at a price agreed upon today.  The principal
purpose of futures contracts is the transfer of price risks rather than the transfer of
ownership of the underlying commodity.  Although transfer of the actual
commodity may take place through futures contracts, it rarely happens.  This is
because trading in such contracts involves some type of mechanism that permits
either party to avoid the delivery process.  Such mechanisms include cash
settlement provisions and/or the ability to offset the contract through its

4

Exhibit A          Exhibit B          Exhibit C

repurchase or resale. These mechanisms facilitate the price-risk transfer process by "unbundling" it from the transfer of ownership.

13.    The physical delivery requirement of futures contracts actually exists to force convergence between the physical commodity price and the futures contract price during the delivery period. Thus, the possibility of physical delivery of commodity serves to facilitate the risk-transfer function by assuring that futures and cash prices move together. The value of a long contract usually rises when the price of the underlying commodity rises and usually falls when the price falls. Short contracts behave in an opposite fashion. Thus, a futures contract allows a hedger who holds a commodity to protect against price declines without having to sell the commodity. Similarly, a speculator with an opinion regarding the direction of future price changes may take a position in the futures market without having to actually go out and purchase or short sell the commodity.

14.    The holder of a futures contract generally is permitted to offset the contract, allowing the contract holder to realize immediately any accumulated change in the value of the contract. Offset occurs when the holder of a long (short) position in the market sells (buys) a matching quantity of the commodity for the same delivery period. Because the contracts offset each other, the original obligation to take (make) delivery is extinguished and the contract holder has no further obligation in the market. The gains or losses on the contract are a function of the prices at which the initial and offsetting contracts were entered into. This offset of contracts is facilitated by an exchange through the standardization of contract terms and conditions and the provision of a centralized trading facility.

15.    If the terms of a futures contract specify cash settlement, contracts held to expiration are settled by reference to a specified settlement price that serves as the basis for determining gains and losses on the contract.  In this way, futures and cash prices are forced to converge at contract expiration.  Thus, as long as a suitably

5

reliable and acceptable cash price series exists that can be used for this purpose, cash settlement is a perfect substitute for futures contract delivery provisions. A seemingly contradictory result of the use of cash settlement is that futures contracts, which are defined in part as contracts for future <u>delivery</u>, may not require delivery. The contradiction is eliminated, however, once it is recognized that cash settlement and delivery serve the same purpose, *viz.*, to force futures and cash market price convergence.

16.    Additional characteristics of futures markets that are not essential to their definition but that "facilitate" the futures risk transfer process are standardization and margining. Standardization of futures contracts for the same commodity for quality, quantity, delivery date, and delivery locations makes them interchangeable with one another and hence makes them easier to offset by significantly reducing the costs of finding a counter trading party. Margining requires traders to post, as a prerequisite for trading, a small amount of money relative to the value of the commodity underlying a futures contract and therefore reduces trading costs generally. This stimulates market liquidity and, as a result, also reduces offset search costs.

17.    <u>Forward Contracts</u>. A forward contract also represents a contract for the future delivery of a commodity at a price agreed upon today. Unlike a futures contract, however, the primary economic purpose of a forward contract is to facilitate the sale and delivery of commodity. That is, forward contracts are typically used by producers, handlers or users to merchandize commodities that will be needed or ready for sale at some future time. They are used for the purposes of assuring future availability, securing a sales outlet or locking in a favorable sale or purchase price for the commodity. As a merchandizing vehicle, forward contracts typically do not require mechanisms that allow for offset or cash settlement of the contract. To the extent that such a provision does exist, it is

6

meant to deal with unusual circumstances where one of the parties is unable to perform on the contract.

18.    To summarize, while futures and forward contracts share common pricing and valuation features, the difference between the contracts essentially comes down to the merchandizing and delivery aspects of the contracts. To the extent that they require delivery, futures contracts generally employ a mechanism allowing parties to the contract to avoid delivery, thereby making them primarily a price-shifting vehicle. This characteristic feature of futures contracts allows users of the contracts to speculate on future price changes absent a physical position in the commodity or to hedge the risk of price changes of commodities the user holds or is committed to purchase. In contrast to futures contracts, forward contracts generally result in delivery of the commodity. Their primary purpose is to set a price and transfer ownership of a commodity from one party to another. In this sense, forward contracts serve a merchandizing purpose that futures contracts routinely do not serve.

19.    Spot Transactions. Cash or spot transactions are like forward contracts in that they also serve a merchandizing purpose. Unlike forward contracts, however, they are transactions for immediate delivery of the commodity. In practice, there is a two-day settlement period for foreign currency spot transactions so that delivery of currency normally takes place two days following the date of the buy or sell transaction. While individuals holding a cash commodity may experience gains or losses in the value of the commodity, and thus may speculate on such price movements, there is no counterparty holding the opposite price risk as there is with a futures or forward contract. Thus, there is no contemporaneous price risk shifting in a cash transaction as there is with a forward or futures contract. In addition, a speculator who purchases and holds a commodity in the spot market for

7

*the purpose of speculation also takes on the costs and risks attendant to holding a*
Case 1:05-cv-02181-SAS     Document 10     Filed 02/17/2005     Page 18 of 36
physical position, such as storage costs and the risk of theft and deterioration.

## THE MARKETS IN FOREIGN EXCHANGE (FOREX)

20.     The market in foreign currency is enormous. A 2001 survey of foreign exchange turnover conducted by the Bank for International Settlements estimated transactions in the market to be about \$1.2 trillion per day.[1] The Federal Reserve Bank of New York, in its 1998 survey of forex brokers and dealers, estimated that the average deal size for spot and forward transactions was \$3.4 million and \$4 million, respectively.[2]

21.     While any transaction involving the exchange of one country's currency for that of another's currency is a foreign currency transaction, the vast majority of transactions in foreign currency are carried out by large foreign currency dealers. The market in foreign currency may be viewed at two levels. At the basic level are transactions that occur between customers (*i.e.,* individuals or businesses) and banks or foreign currency dealers. For example, an importer in the U.S. holding dollars may need to arrange for the purchase of goods using Japanese yen. Such a company might rely on its commercial bank to handle the exchange of dollars into yen in order to complete the purchase. Tourists exchanging currency for an overseas trip would represent another type of transaction at this level. Transactions at this level may involve a few hundred dollars or millions of dollars depending on the needs of the customer (the size of a transaction in the interbank market is negotiated by parties to the trade as opposed to being standardized), and usually involve the immediate exchange of currency. At this level of the foreign

---

[1] *Central Bank Survey of Foreign Exchange and Derivatives Market Activity,* Bank for International Settlements, March 2002, p. 1.

[2] *Foreign Exchange and Interest Rate Derivatives Markets Survey Turnover in the United States,* Federal Reserve Bank of New York, September 1998, p.9.

Exhibit A     Exhibit B     Exhibit C     Exhibit D     Exhibit E     Exhibit F

exchange market, the purpose of the transactions is to expedite the actual transfer of currency (or, more typically, currency deposits) from one party to another.

22.     In the process of expediting currency transfers, the commercial banks and dealers involved in these transactions have a need to accumulate and manage positions in foreign currencies. In the example above, in order for the bank to convert the U.S. company's dollars into yen, it needs to either have or obtain yen deposits that it can deliver to the Japanese company (or more likely its bank). As a result of the enormous amount of currency trading that occurs throughout the world, banks find themselves having to move and manage huge portfolios of foreign currencies. This movement of deposits, and the transactions that banks enter into to manage their foreign exchange exposures, represent a second tier of trading that exists in the foreign exchange market, and is typically what is referred to as the interbank or interdealer market.[3]

23.     While commercial banks are the dominant participants in the interbank market, investment banks and other financial institutions have entered the market over the past 25 years. Although there are no formal requirements imposed on institutions that may participate in this market, an institution would have to be of sufficient size and creditworthiness to enable it to be accepted by other participants in the market. As noted, the average size of a spot or forward transaction in this market is approximately $4 million dollars. Thus, small participants would have difficulty gaining access to the market because the larger institutions would find it inefficient to have to break up large trades in order to accommodate the smaller participants. Moreover, larger entities would likely be leery of the ability of small entities to stand good on their commitments.

---

[3] Originally the term "interbank" market was used to describe the market for foreign exchange as this market was exclusively the domain of commercial banks. More recently, investment banks and other financial institutions have entered the market as dealers. Thus, the term interdealer market has come into more common

9

include spot and forward contracts as well as foreign currency options and foreign currency swaps. While forex options generally are structured in the same way as stock and other types of financial options, there are two distinct types of forex swaps. In one type, parties to the transaction actually exchange currencies for a period of time and subsequently "swap" them back. The second type of currency swap more resembles an interest rate swap done in two currencies rather than one and does not generally involve the actual exchange of currencies.

25.    In addition to the over-the-counter market for foreign currency, there exists a much smaller foreign exchange futures market on organized exchanges. In the United States, the most significant of these exchanges is the Chicago Mercantile Exchange (CME) upon which both forex futures contracts and options on forex futures contracts trade. In contrast to the interbank market, transactions on the CME are standardized in size but much smaller, with contract sizes on the order of $100,000 to $150,000. Moreover, counterparty creditworthiness is not an issue on the exchanges because of the market's reliance on margining and the interposition of the clearinghouse between all trades.

## THE RICHMOND GLOBAL CONTRACTS

26.    Through its relationship with three FCMs specializing in foreign currency futures (Hot Spot FX, FX Solutions, and IFSCL), Richmond Global offers contracts in Japanese yen, Euros, British pounds, Canadian dollars and Australian dollars.    The price of the currency is set at the time the contract is entered into. Long positions are denoted as a "B" and short positions are shown as an "S." Subsequent to the time a currency position is established (in many cases, the same date the position is entered into), the position in the currency is closed, presumably

---

use as an alternative to describe the market in foreign currency.

10

exposure is maintained over periods ranging from a few minutes to several days. Currency exposure that is maintained beyond two days appears to be effected by the rollover of positions prior to their settlement date. In this regard, the Richmond Global open positions are consistent with futures trading where contracts are closed (offset) at some opportune future date.

27. The materials that I examined characterize the Richmond Global transactions as over-the-counter spot foreign currency transactions. The firm's customer agreement, however, provides that cash settlement, as opposed to actual delivery, is the default means of settling such transactions. Furthermore, there is no indication in any of the customer records and materials that I examined that physical currency is ever actually bought or sold. Also absent from the materials examined is any indication that Richmond Global actually holds any currency that it purchased on behalf of customers. Similarly, there is no indication that customers are required to hold or have a capacity to acquire or deliver currency against transactions made through Richmond Global.

28. Richmond Global utilizes two trading features that are commonly used in exchange traded futures markets but not in forex spot markets: margining of positions and stop-loss orders. Forex spot trading generally relies upon the use of collateral arrangements to assure performance since spot trades involve near term delivery of some significant quantity of currency and do not remain "open" as futures positions often do. Similarly, stop loss orders are not useful when quick delivery is the rule and positions need not be marked to market. Both margining and the use of stop loss orders are most useful in a futures type trading situation where delivery of an underlying asset or interest is not contemplated and positions remain open and exposed to the market over time.

29. Consistent with the structure of all forex contracts on the same currency, the

11

Richmond Global contracts in each currency are based on a fungible underlying asset. Moreover, the contracts trade in multiples of ten units of currency and delivery specifications such as location and timing are identical across contracts. Consequently the Richmond Global contracts are effectively standardized and interchangeable with one another. As noted above, this is a characteristic of futures contracts that facilitates their offset.

30.     Based on the above observations, the transactions offered to customers through Richmond Global are entirely paper transactions. This is a hallmark of trading in futures contracts, where delivery of the commodity rarely if ever occurs.


## THE RICHMOND GLOBAL CONTRACTS ARE FUTURES CONTRACTS

31.     The Richmond Global contracts therefore possess all of the characteristics of a futures contract. They represent contracts for future delivery at a price set today. Moreover, as noted earlier, the contracts do not involve actual delivery of the underlying commodity but rather are closed out by some other means. The contracts therefore would be useful for forex risk transfer but not for the transfer of currencies *per se.*


## THE RICHMOND GLOBAL CONTRACTS ARE NOT SPOT OR FORWARD FOREX CONTRACTS

32.     The transactions Richmond Global offers its customers are not spot transactions in foreign currency since actual currency is never acquired or sold through such transactions. For the same reason, the Richmond Global transactions are not forward currency transactions.


12

| Exhibit A | Exhibit B | Exhibit C | Exhibit D | Exhibit E | Exhibit F |

33.   I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, executed at Washington, DC.

*Ronald B. Hobson*

Ronald B. Hobson

Dated: January 26, 2005

13

Exhibit A        Exhibit B        Exhibit C        Exhibit D        Exhibit E        Exhibit F

DECLARATION OF PHILIP D. RIX
PURSUANT TO 28 U.S.C. §1746

I, Philip D. Rix, do hereby declare under penalty of perjury as follows:

1.   I am a Futures Trading Investigator in the Division of Enforcement ("Division") of the United States Commodity Futures Trading Commission ("Commission"). I have been so employed since 1975. My responsibilities as a Futures Trading Investigator include investigating commodity firms and individuals located throughout the United States in order to ensure compliance with and enforcement of the Commodity Exchange Act and the rules and regulations promulgated thereunder. I make this declaration in support of the Commission's application for the issuance of an *ex parte* order and the entry of a preliminary injunction.

2.   I have been assigned to the Commission's investigation of Richmond Global Associates LLC ("RG Associates"), Richmond Global Director, LLC ("RG Director"), Richmond Global MCA LLC ("RG MCA"), Richmond Global Managed Account LLC ("RG Managed"), Richmond Global Ltd. ("RG Ltd."), RG Group Holdings, LLC ("RG Group"), Vincenzo Danio ("Danio"), Joseph Pappalardo ("Pappalardo"), Ronald Turner ("Turner"), and Miron Vinokur ("Vinokur")(collectively, the "Defendants").

3.   I am fully familiar with the facts related to and documents obtained during the Commission's investigation of the Defendants discussed in this declaration.

4.   During this investigation, other Division staff members and I have spoken to customers of the six Richmond Global entities listed in paragraph 2 above, and I have reviewed and analyzed the documents those customers sent to the Division. I have also reviewed and analyzed documents that Division staff subpoenaed from HSBC Bank ("HSBC") and three

1

Exhibit A    Exhibit B    Exhibit C    Exhibit D    Exhibit E    Exhibit F

registered futures commission merchants ("FCM's") through which the six Richmond Global

entities conducted foreign currency trading.

    5.   Based upon my interviews of customers and review of documents, it appears that

many customers dealt with more than one of the Richmond Global entities, and it was frequently

unclear which particular entity customers were dealing with.  In addition, many documents sent

to customers by the six Richmond Global entities contained only the name "Richmond Global."

Therefore, throughout this declaration the term "Richmond Global" will be used to refer to any

of the six entities.

**Backgrounds of the Defendants**

    6.   The principal place of business of Richmond Global, according to its website and the

correspondence it sends to customers, is 106 New Dorp Plaza, Suite 2B, Staten Island, New

York 10306.

    7.   The corporation and business entity database contained in the website

(www.dos.state.ny.us) of the Division of Corporations of the New York Department of State

("NYDOS") contains the following information:

> Richmond Global Ltd. ("RG Ltd.") was incorporated in New York as a domestic business
>
> corporation on August 2, 2001 and has an address, for service of process purposes, of 106
>
> New Dorp Plaza, Suite 2B, Staten Island, New York 10306.
>
> Richmond Global Director, LLC ("RG Director") became a domestic limited liability
>
> company in New York on April 26, 2002, and listed an address of 106 New Dorp Plaza,
>
> Staten Island, New York 10306.

2

Richmond Global Managed Account LLC ("RG Managed") became a domestic limited

liability company in New York on April 29, 2002, and listed an address of 106 New Dorp

Plaza, Staten Island, New York 10306.

Richmond Global Associates LLC ("RG Associates") became a domestic limited liability

company in New York on February 23, 2003, and listed its address as being c/o Ronald

Turner, 82 Macon Avenue, Staten Island, New York 11419.

Richmond Global MCA LLC ("RG MCA") became a domestic limited liability company

in New York on June 11, 2003, and listed an address of 1000 South Avenue, Staten

Island, New York 10314.

RG Group Holdings, LLC ("RG Group") became a domestic limited liability company in

New York on November 26, 2003, and listed an address of 106 New Dorp Plaza, Staten

Island, New York 10314.

A printout of the NYDOS website information concerning RG Ltd., RG Director, RG Managed,

RG Associates, RG MCA, and RG Group is attached as Exhibit A.

    8.  Attached as Exhibit B is an RG Associates loan agreement which was sent to the

Division by a customer who loaned money to Richmond Global. The loan agreement, dated

June 12, 2003 and signed by Pappalardo as Vice President of RG Associates, states, among other

things, that RG Associates "is a newly formed corporation, created for the purpose of

establishing a branch office of an existing foreign currency trading firm," Richmond Global.

    9.  National Futures Association ("NFA") is registered with the Commission as a futures

association, and the Commission has delegated to NFA the responsibility to act as the custodian

of the Commission's registration records. Attached as Exhibit C is a certification signed by

3

Exhibit A      Exhibit B      Exhibit C      Exhibit D      Exhibit E      Exhibit F

Director was registered as a commodity pool operator ("CPO") from April 17, 2002 until October 20, 2002, at which time it withdrew its registration.

10. I have examined NFA's website (www.nfa.futures.org) and determined that RG Associates, RG Managed, RG MCA, RG Ltd., and RG Group have never been registered with the Commission.

11. I have searched the NFA website and determined that Danio has never been registered with NFA. According to documents furnished to the Division by HSBC Bank pursuant to subpoena, Danio was a signatory on six of the seven Richmond Global bank accounts. On the two RG MCA bank accounts, Danio's title was listed as President. On the two RG Ltd. bank accounts, his title was listed as bookkeeper. On the RG Director bank account, he was identified as an authorized signer. On the RG Managed bank account, at various times he was identified as an authorized signer, Secretary, and President. Danio signed a letter sent to at least one customer as the President of RG Director. On monthly and quarterly statements sent to Richmond Global customers prior to January 2004, Danio was identified as the Director of Client Services for RG Director. On monthly and quarterly statements sent to Richmond Global customers after January 2004, Danio was identified as the Director of Client Services for "Richmond Global." Danio signed at least one letter sent to customers as Senior Account Manager of RG Associates.

12. My search of the NFA website has revealed that Pappalardo has never been registered with NFA. According to documents furnished to the Division by HSBC Bank pursuant to subpoena, Pappalardo was a signatory on the RG Associates account at HSBC, where his title was listed as Vice President. In addition, as described in paragraph 8 above, he signed a

4

Exhibit A    Exhibit B    Exhibit C    Exhibit D    Exhibit E    Exhibit F

*2003 loan agreement as Vice President of RG Associates. Pappalardo has signed at least one letter sent to customers as "Vice President Senior Account Manager" of RG Associates.*

13. My search of the NFA website has revealed that Turner has never been registered with NFA. According to documents furnished to the Division by HSBC Bank pursuant to subpoena, Turner was a signatory on the RG Associates bank account at HSBC, where his title was listed as President. Turner signed at least one letter sent to customers as President of RG Associates.

14. My search of the NFA website has revealed that Vinokur has never been registered with NFA. Attached as Exhibit D are copies of a business card and two letters that Vinokur sent to customers. The business card identifies Vinokur as "Senior Vice President of Investments" of RG Associates. One letter identifies Vinokur as "VP Investments" of RG Director, and the other letter identifies him as "VP Investments" of RG Associates.

15. I have searched the website of the National Association of Securities Dealers ("NASD"), which contains the records of NASD's Central Registration Depository, and determined that RG Associates, RG Director, RG Managed, RG MCA, RG Ltd., and RG Group have never been registered with NASD. I have also searched the Commission's records and determined that none of the Richmond Global entities has been designated as a contract market for the sale of foreign currencies or for any other commodities, is registered as a derivatives transaction execution facility, or is an enumerated counterparty that is excluded from the Commission's jurisdiction under Section 7 U.S.C. § 2(c)(2)(B)(ii). I have found no evidence during this investigation that the Defendants conducted their purported foreign currency futures transactions on or subject to the rules of a board of trade that has been designated by the Commission as a contract market, or that their transactions were executed or consummated by or

5

Exhibit A    Exhibit B    Exhibit C    Exhibit D    Exhibit E    Exhibit F

*through a contract market.* In addition, there is no evidence that the Defendants conducted transactions on a facility registered as a derivatives transaction execution facility.

**Customers of Richmond Global**

16.    Attached as Exhibit E is a copy of the customer agreement, entitled "NEW ACCOUNT DOCUMENTS AND APPLICATION FORM," furnished by Richmond Global to its customers. Paragraph 5 of the agreement states that customers will pay an annual management fee of 2 percent of the account's net asset value. Paragraph 6 provides that 10 percent of the customer account's net profits each month "shall be reallocated to" Richmond Global.

17.    In July 2004, Division staff interviewed Dennis Weichert ("Weichert"), a 49-year-old machine shop owner from Pennsylvania who invested $5,000 with RG Managed in May 2003 after receiving cold call telephone solicitations from Vinokur. Vinokur told Weichert that Richmond Global engaged in foreign currency transactions for its customers and that, because of the stop loss procedures utilized by Richmond Global, Weichert could not lose more than 15 percent to 20 percent of the money he invested. Vinokur also told him that Richmond Global would double Weichert's money in one year. Vinokur failed to inform Weichert that he would be charged commissions on each foreign currency trade, and it was Weichert's understanding that the only expense his currency account would incur would be a one-time fee that would be deducted from Weichert's investment.

18.    In June 2003, Pappalardo telephoned Weichert and said that if Weichert loaned money to RG Associates, he would receive quarterly interest payments totaling 15 percent of the loan amount within one year. Weichert subsequently loaned RG Associates $10,000 and signed a loan agreement with RG Associates.

6

19. In or about August 2003, Weichert received a letter stating that RG Director would be "transferring its trade authority and fiduciary responsibilities to" RG Associates. After investing $5,000 with RG Managed and loaning $10,000 to RG Associates, Weichert left numerous telephone messages with Richmond Global asking that Vinokur or Pappalardo telephone him, but neither of them returned his calls. In November 2003, Weichert received a check from RG Associates in the amount of $375, representing interest on the $10,000 loan. He has not received any further interest payments from Richmond Global. In July 2004, Weichert received a check from Richmond Global in the amount of $156.66, representing the balance remaining in his $5,000 foreign currency account at RG Managed. Attached as Exhibit F are copies of the materials Weichert sent to and received from the various Richmond Global entities, which include, among other things, the following documents: the RG Associates loan agreement, which was signed by Pappalardo as Vice President of RG Associates; an RG Director customer agreement; an RG Director letter, signed by Vinokur as "VP Investments," welcoming Weichert as a client of RG Director; and monthly and quarterly account statements sent by Richmond Global to Weichert.

20. On June 1, 2004, Division staff interviewed Frank Hofstetter ("Hofstetter"), age 69, of Santa Fe, New Mexico. Hofstetter invested $10,000 with RG Managed in November 2003 after receiving several cold call telephone solicitations from Danio and Vinokur beginning in September 2003. Danio told Hofstetter that Richmond Global was in the business of dealing in currencies and that Hofsteller could make big money. Danio stated that Hofstetter couldn't lose money because Richmond Global had stop losses in place and because the risk involved in trading foreign currencies was minimal. Vinokur told Hofstetter that he would make a profit of 2 percent to 3 percent each month.

Exhibit A    Exhibit B    Exhibit C    Exhibit D    Exhibit E    Exhibit F

21. After sending $10,000 to RG Managed, Hofstetter received only one account statement from Richmond Global. According to that account statement, which Hofstetter received in early April 2004, during the first three months of 2004 his $10,000 account had suffered a loss of $3,848.99 and been charged a management fee of $45.80, leaving a balance of $6,105.21. Hofstetter subsequently left repeated messages at Richmond Global requesting that Danio or Vinokur telephone him, but no one returned his calls. In June 2004, Hofstetter received $5,607.62 from Richmond Global, representing the balance remaining in his $10,000 account. Attached as Exhibit G is the account statement Hofstetter received from Richmond Global and a copy of the $10,000 check he sent to RG Managed.

22. On February 6, 2004 and February 4, 2005, I interviewed Gerald Murphy ("Murphy"), a 71-year-old owner of an industrial supplies company in Ohio who invested a total of $40,000 with Richmond Global in October and November 2003. In cold call telephone solicitations, Danio told Murphy that he could expect to make profits of 2 to 3 percent per month, and possibly as much as 5 percent in some months, by investing in a Richmond Global Managed Currency Trading Account. Danio also told Murphy that the spot forex trading engaged in by Richmond Global was less volatile than futures trading and that Richmond Global used stop losses to limit losses. In addition, Danio informed Murphy that his account would not be charged any fees until the account made a profit, at which time Murphy and Richmond Global would each receive 50 percent of the profits.

23. Sometime in October 2003, Murphy sent a check for $2,500 to Richmond Global After receiving several more phone calls from Danio in November 2003, Murphy had his bank wire transfer a total of $37,500 more to Richmond Global. Murphy's decision to invest more money was also influenced by a fax he received from Danio on November 10, 2003. The fax

8

Exhibit A        Exhibit B        Exhibit C        Exhibit D

listed five profitable Euro trades that Richmond Global had executed for its customers on November 7, 2003. On the fax cover sheet, Danio wrote that "This is a show of trades on 7[th] of how we're making money here. If these positions had gone against us a stop loss would have been triggered." I have examined the trading records of Richmond Global's account at the registered futures commission merchant that it was utilizing in November 2003, and I have determined that Danio's fax to Murphy did not list the sixth Euro trade executed by Richmond Global on November 7, 2003. That sixth Euro trade lost more money than the five winning Euro trades combined, which means that, despite Danio's representation to the contrary to Murphy, Richmond Global lost money trading Euros on November 7, 2003.

24.    In early January 2004, Murphy finally received an account statement from Richmond Global. Even though Danio had repeatedly told Murphy that his account was making money, the account statement indicated that Murphy's $40,000 account had suffered trading losses totaling $20,871.74 during the period from October 1 to December 31, 2003. In addition, even though Danio had told Murphy that his account would not be charged any fees until the account made a profit, the account statement indicated that $571.03 had been deducted from his account as a management fee. In February 2004, Murphy directed Richmond Global to close his account, and he subsequently received a check for $11,429 from Richmond Global. Despite contacting Richmond Global several times since that time and asking why he received back only $11,429 instead of the $18,557.23 balance in his account as of December 31, 2003, Murphy has not yet received any written or verbal explanation concerning the missing funds. When Murphy telephoned Richmond Global on February 7, 2005, he was told that Richmond Global had been "bought out by" a company by the name of RG Group Holdings. Attached as Exhibit H are copies of the materials Murphy sent to and received from various Richmond Global entities.

9

Exhibit A    Exhibit B    Exhibit C    Exhibit D    Exhibit E    Exhibit F

44-year-old from Maryland who invested $5,000 after receiving unsolicited cold calls from John Andino ("Andino"), an employee of Richmond Global. During Andino's cold call solicitations, he told Wigley that the risk of investing in a Managed Currency Trading Account was limited to 10 percent of the amount invested. After Wigley sent an E-mail to Andino declining to invest because the investment looked too risky and because Richmond Global was not registered with the NFA, Andino again telephoned him and reiterated that his risk would be limited to 10 percent. Andino also said that if Wigley's account went down 10 percent in value, someone from Richmond Global would telephone him and ask him if he wanted to close his account. Andino also put Danio, whom he referred to as his boss, on the phone with Wigley, and Danio repeated what Andino had said about Wigley's risk being limited to 10 percent and being contacted by someone from Richmond Global if his account declined 10 percent. In addition, Andino faxed Wigley an account statement showing that a customer had made $918.79 in April 2003 and that Richmond Global had deducted 10% of that amount as a "Profit Share."

26.  On or about November 19, 2003, Wigley sent a $5,000 check to Richmond Global. A short time later, Wigley received a telephone call from Pappalardo, who said that Wigley's account had gone up 4 percent in a short time and asked Wigley if he wanted to invest any more money. Wigley declined Pappalardo's invitation to invest additional funds.

27.  In late December 2003, Pappalardo telephoned Wigley and said that his account was up 6.5 percent. Pappalardo asked Wigley if he wanted to close the account or leave it open, and Wigley told him to leave it open. On or about January 20, 2004, Wigley received an account statement for the month of December 2003. Contrary to what Andino and Pappalardo had told him about his account being profitable, the December account statement indicated that

10

his $5,000 account had suffered a loss of $2,061.83. Enclosed with the account statement was a

check from Richmond Global in the amount of $2,923.17, which represented the amount

remaining in the account after Richmond Global had deducted a $15 management fee and the

$2,061.83 trading loss. When Wigley telephoned Pappalardo to complain, Pappalardo told him

that he should have known that forex trading was risky. Pappalardo also said that when he told

Wigley in late December that his account was up 6.5 percent, he had made a mistake because he

thought he was speaking to another customer who had a name very similar to Wigley's.

Attached as Exhibit I are copies of the materials Wigley sent to and received from various

Richmond Global entities.

28.    In addition to Weichert, Hofstatter, Murphy, and Wigley, Division staff and I have

also interviewed other Richmond Global customers, all of whom stated that their investments at

Richmond Global had lost money even though they had been led to believe that the accounts of

past and present customers had been profitable.

29.    Kevin Malley of Michigan, who was interviewed by Division staff in July 2004,

received a letter, dated December 11, 2002, from Richmond Global which stated in part that "on

all transactions made in your account a 2-3 % stop loss order will be placed to protect your

downside." A copy of the December 11, 2002, Richmond Global letter is attached as Exhibit J.

Malley opened a $50,000 account at Richmond Global in December 2002, and when he closed

the account in October 2003, it was worth only $7,314.20.

30.    James Goodson of California, whom I interviewed on May 3, 2004, invested $2,500

in November 2003 after receiving unsolicited cold calls from Vinokur, who told Goodson that a

Richmond Global Managed Currency Trading Account was a low risk investment that was safer

than the stock market. Despite Vinokur's representations that Goodson could expect returns of 2

11

Exhibit A          Exhibit B          Exhibit C          Exhibit D          Exhibit E          Exhibit F

*to 3 percent per month,* Goodson's account was worth only $829 when he closed it in February 2004.

31.    Alexander Volanis ("Volanis") of Massachusetts, whom I interviewed on February 3, 2005, invested a total of $20,000 in March and April 2003 after Vinokur told him that investing in a Richmond Global Managed Currency Trading Account was better than the stock market and that Volanis would realize a 15% return on his investment.  Volanis also loaned a total of $50,000 to RG Associates, which included $10,000 that was transferred from his Managed Currency Trading Account to RG Associates.  When he closed his trading account in or about April 2004, his $10,000 account was worth only about $290.  In addition, to date RG Associates has repaid Volanis only about $6,400 of the $50,000 he loaned it.

32.    Eli Sadownick ("Sadownick") of New York, who was interviewed by Division staff in June 2004, invested a total of $10,000 in October and November 2003 after a broker represented to him, among other things, that opening a Richmond Global Managed Currency Trading Account was the closest thing to a "sure thing" because Richmond Global's traders were so experienced.  When Sadownick's account was closed in March 2004, he received back only $1,437.67 of the $10,000 he had invested.

33.    All of the customers I have spoken to who sent money to open a Managed Currency Trading Account at Richmond Global did so in order to speculate on price movements in foreign currency.  There were no negotiations between the customers and Richmond Global concerning any of the terms of the foreign currency contracts offered by Richmond Global.  None of these customers had any business or personal need to make or take delivery of any foreign currency, they never intended or anticipated taking delivery of any foreign currencies, and they did not set up banking relationships to facilitate delivery of any foreign currencies.  In addition, all of the

12

Exhibit A    Exhibit B    Exhibit C    Exhibit D    Exhibit E    Exhibit F

customers I have spoken to have indicated to me that their personal assets are worth less than

*$5,000,000.*

**Richmond Global's Website**

    34. Attached as Exhibit K is a copy of the contents of Richmond Global's website,

www.richmondglobal.com. The website has remained largely unchanged since its creation.

However, the website formerly contained, on a page entitled "Who Regulates Richmond

Global?," the statement that Richmond Global "substantially adheres to the rules and regulations

of" the Commission and NFA. Attached as Exhibit L is a copy of the aforementioned website

page. Even though, as discussed above in paragraphs 9 and 10, RG Associates, RG Managed,

and RG MCA have never been registered and RG Director and RG Ltd. were not registered with

NFA after October 20, 2002, the aforementioned statement appeared on the website at least

through September 21, 2004.

*    *    *    *

    I declare under penalty of perjury that the foregoing is true and correct.

    Executed at New York, New York on February 14, 2005.

*Philip D. Rix*

Philip D. Rix

13

Exhibit A     Exhibit B     Exhibit C     Exhibit D     Exhibit E     Exhibit F