# ⨍ 12

**FILED UNDER SEAL**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 05 CV 2181

U.S. Commodity Futures Trading Commission,  )
)
            Plaintiff,  )  **MEMORANDUM OF LAW IN**
)  **SUPPORT OF PLAINTIFF'S**
      v.  )  **APPLICATION FOR AN *EX PARTE***
)  **STATUTORY RESTRAINING**
)  **ORDER, PRELIMINARY**
Richmond Global Associates, LLC,  )  **INJUNCTION AND TEMPORARY**
Richmond Global Director, LLC,  )  **RECEIVER**
Richmond Global MCA, LLC,  )
Richmond Global Managed Account, LLC,  )
Richmond Global, Ltd.,  )
RG Group Holdings LLC  )
Vincenzo Danio,  )
Joseph Pappalardo,  )
Ronald Turner, and  )
Miron Vinokur,  )
)
)
)
)
          Defendants.  )
)
)
)

U.S. COMMODITY FUTURES TRADING
COMMISSION
Stephen J. Obie
Regional Counsel

Karin N. Roth [KR-2669]
Senior Trial Attorney
Steven Ringer [SR-9491]
Chief Trial Attorney
David W. MacGregor
Chief Trial Attorney
Division of Enforcement
140 Broadway, 19th Floor
New York, New York 10005
(646) 746-9764
(646) 746-9940 (facsimile)

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.....................................................................................iii

I.      PRELIMINARY STATEMENT.......................................................................1

II.     THE PARTIES ................................................................................................2

        A.      Plaintiff .................................................................................................2

        B.      Defendants ............................................................................................3

III.    STATEMENT OF FACTS................................................................................5

        A.      The Richmond Global Entities Acted As a Common Enterprise ..................5

        B.      The Richmond Global Entities' Fraudulent Operation ...............................5

        C.      Evidence of Fraud ................................................................................8

                1.      Defendants' Misrepresentations Concerning Likelihood
                        of Profit.........................................................................................8

                2.      Defendants' Misrepresentations Regarding Commission
                        Charges..........................................................................................9

                3.      Defendants' Misrepresentations Concerning Past
                        Performance..................................................................................10

                4.      Defendants' Misrepresentations Concerning
                        Risk of Loss.................................................................................10

        D.      Futures Contracts Were Sold To Richmond Global
                Customers ...........................................................................................11

        E.      Controlling Persons...............................................................................12

IV.     LEGAL ANALYSIS.......................................................................................14

        A.      The Commission has Marshaled Persuasive Evidence
                of the Defendants' Violations of the Act
                Justifying the Issuance of an Ex Parte Order..........................................14

        B.      The Commission's Evidence Also Justifies the Entry
                of a Preliminary Injunction.....................................................................15

i

**TABLE OF CONTENTS (cont'd)**

|   |   |   |   |
|---|---|---|---|
| C. | | The Defendants' Activities are Subject to the Act's Jurisdiction | 15 |
| D. | | Defendants Defrauded Customers in Violation of Section 4b(a)(2) of the Act | 17 |
| | 1. | Defendants Cheated and Defrauded Customers and Willfully Deceived Customers | 17 |
| | 2. | Defendants Misappropriated Customer Funds | 19 |
| | 3. | The Defendants Willfully Made False Records | 19 |
| E. | | Controlling Person Liability | 20 |
| F. | | Richmond Global's Liability as Principal for the Acts of Its Agents | 21 |
| G. | | Contracts Traded on Behalf of Richmond Global Customers Were Futures Contracts | 21 |
| H. | | The Richmond Global Entities are Jointly and Severally Liable as a Common Enterprise | 24 |
| V. | | CONCLUSION | 25 |

## TABLE OF AUTHORITIES

**Cases**

*CFTC v. American Metal Exch. Corp.*, 693 F. Supp. 168 (D.N.J. 1988) ..................................... 22

*CFTC v. AVCO Financial Corp.*, 28 F. Supp. 2d 104 (S.D.N.Y. 1998), *aff'd in relevant part sub nom, CFTC v. Vartuli*, 228 F.3d 94 (2d Cir. 2000)..................................................................... 17

*CFTC v. Baragosh*, 278 F.3d 319 (4th Cir. 2002) ......................................................................... 20

*CFTC v. British American Options Corp.*, 560 F.2d 135 (2d Cir. 1977) ...................................... 15

*CFTC v. Cheung*, No. CIV. 5598, 1994 WL 583169 (S.D.N.Y. Oct. 21, 1994).......................…...19

*CFTC v. Co Petro Marketing Group, Inc.*, 680 F.2d 573 (9th Cir. 1982)..................................... 22

*CFTC v. Hanover Trading Corp.*, 34 F. Supp. 2d 203 (S.D.N.Y. 1999)....................................... 22

*CFTC v. Morse*, 762 F.2d 60 (8th Cir. 1985)…………………………………………………….19

*CFTC v. Muller*, 570 F.2d 1296 (5th Cir. 1978)…………………………………………………17

*CFTC v. National Coal Exchange, Inc.* [1980-1982 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,424 (W.D. Tenn. 1982) .................................................................................................... 22

*CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766 (9th Cir. 1995) ...................................................... 22

*CFTC v. Noble Wealth Data Information Servs., Inc.*, 90 F. Supp. 676 (D. Md. 2000) ....... 19, 24,

*CFTC v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321 (11th Cir. 2002).......................................... 21

*CFTC v. Skorupskas*, 605 F.Supp. 923 (E.D. Mich. 1985)..................................................... 17, 19

*CFTC v. Vartuli*, 228 F.3d 94 (2d Cir. 2000) ............................................................................... 18

*CFTC v. World Wide Currencies, Inc.*, 1996 WL 680273 (S.D.N.Y. 1996)................................. 14

*Do v. Lind-Waldock & Co.*, [1994-1996 Transfer Binder] Comm. Fut., L. Rep. (CCH) ¶ 26,516 (CFTC Sept. 27, 1995)................................................................................................................ 18

*Donohoe v. Consolidated Operating & Production Corp.*, 982 F.2d 1130 (7th Cir. 1992)......... 20

*FTC v. Wolf*, 1996 WL 812940 at * 7 (S.D. Fla. Jan. 31, 1996)................................................... 24

*Hammond v. Smith Barney, Harris Upham & Co.*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,617 (CFTC March 1, 1990) ........................................................................... 18

*In re Apache Trading Corp.,* [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,251 (CFTC Mar. 11, 1992) ................................................................................................................. 20

*In re Clancy*, [1980-1982 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,126 (CFTC Nov. 24, 1980)................................................................................................................................................19

*In re Spiegel*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,103 (CFTC Jan. 12, 1988) ......................................................................................................................................... 20

*In re Stovall*, [1977-1980 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,941  (CFTC 1979)22

*JCC, Inc. v. CFTC,* 63 F.3d 1557 (11th Cir. 1995) ........................................................................ 20

*Knight v. First Commercial Group, Inc.,* [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,942 (CFTC 1997) ................................................................................................... 21

*Monieson v. CFTC*, 996 F.2d 852 (7th Cir. 1993)................................................................... 20, 21

*Reddy v. CFTC,* 191 F.3d 109 (2d Cir. 1999)................................................................................. 19

*Saxe v. E.F. Hutton & Co., Inc.*, 789 F.2d 105 (2d Cir. 1986). ..................................................... 17

*SEC v. American Board of Trade*, 751 F.2d 529 (2d Cir. 1984) .................................................... 15

*SEC v. Antar*, 831 F. Supp. 380 (D.N.J. 1993) ............................................................................. 15

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) ........................................................................... 15

*SEC v. Infinity Group Co.*, 27 F. Supp. 2d 559 (E.D. Pa. 1998) ................................................... 15

*SEC v. Princeton Economic International Ltd.,* 73 F. Supp.2d 420 (S.D.N.Y. 1999) ................. 14

*Transnor (Bermuda) Ltd. V. BP North America*, 738 F. Supp. 1472 (S.D.N.Y. 1990)................ 22

**Statutes**

Section 13(b) of the Act, 7 U.S.C. § 13c(b)(2002) .................................................................... 1, 20

Section 1a(12)(A)(xi) of the Act, 7 U.S.C. § 1a(12)(A)(xi) (2002).............................................. 16

Section 1a(20) of the Act, 7 U.S.C. § 1a(2)(2002) ......................................................................... 7

Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2002) ..................................................... 1, 21

Section 2(c)(2)(B) of the Act, 7 U.S.C. § 2(c)(2)(B)(ii)(I) through (VI) (2002) ................. 3, 12,15

iv

Section 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(C) (2002). ....................................................... 16

Section 4b(a)(2) of the Act, 7 U.S.C. § 6b(a)(2) (2002)…………………....…14, 17, 18, 19, 20, 21

Section 6c of the Act, 7 U.S.C. § 13a-1 (2002) ......................................................................... 2, 14

**Other Authorities**

S. Rep. No. 384, 97th Cong., 2d Sess. 47 (1982) ......................................................................... 20

**Regulations**

Section 1.2 of the Regulations, 17 C.F.R. § 1.2 (2004)............................................................ 1, 21

## I.    PRELIMINARY STATEMENT

At various times between December 2001 and the present ("relevant time period"), Defendants Richmond Global Associates, LLC ("RG Associates"), Richmond Global Director, LLC ("RG Director"), Richmond Global MCA, LLC ("RG MCA"), Richmond Global Managed Account, LLC ("RG Managed"), Richmond Global, Ltd. ("RG Ltd."), RG Group Holdings, LLC ("RG Group") (collectively, the "Richmond Global Entities"), Vincenzo Danio ("Danio"), Joseph Pappalardo ("Pappalardo"), Ronald Turner ("Turner"), and Miron Vinokur ("Vinokur") (collectively, including the Richmond Global Entities, the "Defendants") fraudulently solicited and obtained more than $3.5 million dollars from at least 160 customers for the purpose of trading foreign currency ("forex") contracts which were, in fact, foreign currency futures contracts. The Defendants used at least $981,500 of these funds that were fraudulently solicited for their own purposes.

By these acts, all of the Defendants directly violated Section 4b(a)(2) of the Commodity Exchange Act (the "Act"), 7 U.S.C. § 6b(a)(2)(2002). In addition, although each of the four individual defendants is directly liable for having made material misrepresentations to customers, Danio, Pappalardo and Turner are also liable as controlling persons of the Richmond Global Entities for their violations of Section 4b(a)(2) of the Act pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b)(2002). The Richmond Global Entities are additionally liable for the on-going violations of Section 4b(a)(2) of the Act by their officers, directors, managers, employees, and agents, including those of the individual defendants, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2002), and Section 1.2 of the Commission's Regulations promulgated thereunder (the "Regulations"), 17 C.F.R. § 1.2 (2004), as all such violations were within the scope of their office or employment with the Richmond Global Entities.

1

Finally, as a common enterprise, the Defendants are liable jointly and severally for the acts of one another.

Pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2002), the U.S. Commodity Futures Trading Commission (the "Commission") has filed a Complaint for Injunctive and Other Equitable Relief (the "Complaint") for Defendants' violations of the Act. In light of Defendants' violations and the harm these violations pose to the investing public, the Commission also has filed for a Statutory *Ex Parte* Restraining Order seeking (i) to freeze Defendants' assets, (ii) to prohibit Defendants from destroying, altering or disposing of, or refusing to permit authorized representatives of the Commission to inspect, when and as requested, any books, records, electronically stored data or other documents wherever they may be, and (iii) the appointment of a temporary receiver. Finally, the Commission requests that the Court order Defendants to show cause why a preliminary injunction should not be issued enjoining Defendants from further violations of the Act, continuing the asset freeze, making the appointment of the temporary receiver permanent, ordering Defendants to repatriate funds and assets to the territory of the United States, and ordering any further relief that the Court deems appropriate.

This application for an *ex parte* restraining order, as well as the Commission's motion for a preliminary injunction, are fully supported by this Memorandum, the Complaint filed herewith, and the accompanying Declarations. Therefore, the Commission respectfully submits that the Court should grant the Commission's application for an *ex parte* restraining order.

## II.     THE PARTIES

### A.     Plaintiff

Plaintiff U.S. Commodity Futures Trading Commission is an independent federal regulatory agency that is charged with responsibility for administering and enforcing the

2

provisions of the Act, 7 U.S.C. §§ 1 *et seq.* (2002), and the Regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq.* (2004).

## B. Defendants

Richmond Global Ltd. was incorporated in August 2001 as a New York domestic business corporation with offices located at 106 New Dorp Plaza, Suite 2b, Staten Island, New York.[1]  RG Ltd. has never been registered with the Commission in any capacity.[2]  RG Ltd. is not a futures commission merchant ("FCM"), an affiliate of a FCM, a broker or dealer, an associated person of a broker or dealer, an insurance company, a regulated subsidiary of an insurance company, a financial holding company or an investment bank holding company (collectively, an "enumerated counterparty").[3]

Richmond Global Director LLC became in April 2002 a New York limited liability company with offices located at the same Staten Island address.[4]  RG Director was registered with the Commission as a commodity pool operator between April 2002 and October 2002.[5]  RG Director is not an enumerated counterparty.[6]

Richmond Global MCA LLC became in June 2003 a New York limited liability company with offices located at the same Staten Island address.[7]  RG MCA has never been registered with the Commission in any capacity and is not an enumerated counterparty.[8]

Richmond Global Managed Account LLC became in April 2002 a New York limited liability company with offices located at the same Staten Island address.[9]  RG Managed has

---

[1]     *See* Declaration of Philip Rix dated February 14, 2005 ("Rix Decl.") at ¶ 7.
[2]     *See* Rix Decl. at ¶ 10.
[3]     *See* Rix Decl. at ¶ 15. *See* Section 2(c)(2)(B) of the Act, 7 U.S.C. § 2(c)(2)(B)(ii)(I) through (VI) (2002)
[4]     *See* Rix Decl. at ¶ 7.
[5]     *See* Rix Decl. at ¶ 9.
[6]     *See* Rix Decl. at ¶ 15.
[7]     *See* Rix Decl. at ¶¶ 6, 7.
[8]     *See* Rix Decl. at ¶¶ 10, 15.
[9]     *See* Rix Decl. at ¶¶ 6, 7.

3

never been registered with the Commission in any capacity and is not an enumerated counterparty.[10]

Richmond Global Associates, LLC became in February 2003 a New York limited liability company with offices at the same Staten Island address,[11] was purportedly created as a "branch office" of Richmond Global.[12] RG Associates has never been registered with the Commission in any capacity and is not an enumerated counterparty.[13]

RG Group Holdings, LLC became in November 2003, a New York limited liability company with offices at the same Staten Island address.[14] RG Group has never been registered with the Commission in any capacity and is not an enumerated counterparty.[15]

Vincenzo Danio ("Danio"), who resides in Staten Island, New York, has never been registered with the Commission.[16]

Joseph Pappalardo ("Pappalardo"), who resides in Staten Island, New York, has never been registered with the Commission in any capacity.[17]

Ronald Turner ("Turner"), who resides in Staten Island, New York, has never been registered with the Commission in any capacity.[18]

Miron Vinokur ("Vinokur"), who resides in Staten Island, New York, has never been registered with the Commission in any capacity.[19]

---

[10]     See Rix Decl. at ¶¶ 10, 15.
[11]     See Rix Decl. at ¶¶ 6, 7.
[12]     See Rix Decl. at ¶ 8.
[13]     See Rix Decl. at ¶¶ 10, 15.
[14]     See Rix Decl. at ¶¶ 6, 7.
[15]     See Rix Decl. at ¶¶ 10, 15.
[16]     See Rix Decl. at ¶ 11.
[17]     See Rix Decl. at ¶ 12
[18]     See Rix Decl. at ¶ 13.
[19]     See Rix Decl. at ¶ 14.

4

## III.    STATEMENT OF FACTS

### A.    The Richmond Global Entities Acted As a Common Enterprise

The Richmond Global Entities include six distinct legal entities that functioned as a common enterprise.    Customers knew the enterprise as "Richmond Global."[20]    Further, the Richmond Global Entities were known by a single website[21] that operated episodically and also through customer account documents.[22]    The Richmond Global Entities identified themselves as a "financial services company" that manages funds, through its "Managed Currency Trading Account." [23]    The Richmond Global entities shared office space, telephone numbers, officers, a website, personnel, and customers.[24]    Funds of the various Richmond Global entities were often commingled.[25]    As a common enterprise, the Defendants are jointly and severally liable for one anothers' violations of law.

### B.    The **Richmond Global Entities' Fraudulent Operation**

The Defendants, through their website, telephone solicitations and other materials have made misrepresentations to customers to induce them to open accounts with and provide funds to the Richmond Global Entities in order to trade in the forex market. [26]    Specifically, the Defendants made false promises of high returns, failed to disclose hidden commission charges

---

[20]    *See e.g.* Rix Decl. at ¶ 26.

[21]    In an attempt to appear legitimate, the Richmond Global Entities claimed on its website, www.richmondglobal.com that it is "a New York Corporation that adheres to the rules and regulation of the (CFTC) [t]he Commodity Futures Trading Commission and the (NFA) Nation [sic] Futures Association." Its website was also linked NFA's website, www.nfa.futures.org and the Commission's website, www.cftc.gov. Annex A to the Richmond Global Entities' account opening documents states that it "adhere[s] to the privacy and security standards prescribed by the Commodity Futures Trading Commission (CFTC)," reinforcing the appearance that the Richmond Global Entities are a regulated entity. *See* Rix Decl. at ¶ 16, Exh. E and 33, Exh. L.

[22]    *See* Rix Decl. at ¶ 16.

[23]    *See* Rix Decl. at ¶¶ 16, 33; *See also* Declaration of Robert J. Conrad dated February 14, 2005 ("Conrad Decl.") at ¶ 5.

[24]    *See* Rix Decl. at ¶¶ 6, 11-14, 16, and 33.

[25]    Richmond Global did not always deposit and return customer funds from the same Richmond Global entities. *See* Declaration of Ronald A. Carletta dated January 28, 2005 ("Carletta Decl.") at ¶ 17. *See also* Rix Decl. 19, Exh. --.

[26]    Rix Decl. at ¶¶ 17-32; Conrad Decl. at ¶¶ 7-12.

and made false representations regarding the Defendants' experience and past performance in trading forex and the purported minimal risks of trading forex.

The Richmond Global Entities' primary method of solicitation was to make "cold calls" to potential investors.[27]   During their solicitation pitch, the Defendants, among other things, attempted to entice retail customers by falsely claiming the Richmond Global Entities employed a large number of forex traders and research specialists and they had $10- $12 million in funds under management.[28]  In actually, the Richmond Global Entities never employed any research specialists and never had more than $1.17 million under management in the forex market.[29]  In a similar misleading fashion, the Defendants also falsely represented that the Richmond Entities charged only an upfront 2% management fee and 10% of any profits generated, and did not charge commissions on executed transactions.[30]   Despite these representations, the Richmond Global Entities charged absorbent undisclosed commission.[31]

To open a managed currency trading account, customers completed and signed account opening documents, as provided by and instructed by the Defendants, and sent them with their funds directly to the Richmond Global Entities.[32]  Included with the account opening documents was a power of attorney authorizing the Richmond Global Entities to trade on behalf of, or for the benefit of their customers.[33]  The Defendants promised their customers that they would be in regular telephone contact to inform them of their account status and would provide account

---

[27]     *See* Rix Decl. at ¶ 17, 20, 22, and 25.

[28]     Conrad Decl. at ¶ 9.

[29]     Carletta Decl. at ¶ 9; Conrad Decl. at ¶ 9.

[30]     Rix Decl. at ¶¶ 16-17, and 22, Conrad Decl. at ¶ 12; *See* Carletta Decl. at ¶ 13

[31]     *See* Carletta Decl. at ¶¶ 10, 12.

[32]     *See e.g.* Rix Decl. at ¶ 21 and 23; *See* Conrad Decl. at ¶ 6.

[33]     Rix Decl. at ¶ 16. The Richmond Global Entities' opening account documents state that the Richmond Global Entities, as agent and attorney-in-fact, will purchase and sell foreign currency, "on behalf of and for the benefit of" its customer. The customer expressly authorizes the Richmond Global Entities to open accounts in its own name or the name of the customer for the purpose of trading forex. The opening account documents further state that any FCM utilized by the Richmond Global Entities is the agent of the customer, and not the Richmond Global Entities. Rix Decl. at ¶ 16, Exh. E.

6

statements.[34]  After receiving the customer's funds, the Defendants sent these funds, after deducting a disclosed 2% management fee, to one of three futures commission merchants[35] where Richmond Global executed forex futures trades on its customers' behalf.[36]  Then at rates set by the Richmond Global Entities, the FCMs deducted additional commissions on executed transactions from the customer funds they held.[37]  These commissions were paid directly to Richmond Global.[38]

Each of the FCMs provided the Richmond Global Entities with transaction records showing the profit/loss from each executed forex futures trade and the commission charged on the transaction.[39]  However, the account statements issued by the Richmond Global Entities to its customers detailed only the customers' net cash position:  balance beginning of period, customer deposits, customer withdrawals, profit or loss, management fee, profit share and the balance at end of period.[40]  The statements did not provide any information regarding the forex futures trading executed on the customer's behalf or for the customer's benefit.  In order to conceal the unauthorized commissions, the Defendants issued false account statements to customers that misleadingly characterized the undisclosed commissions as trading losses.[41]  The commissions deducted by the FCMs, ranging in amount of 16% to 39% of the funds deposited, were not disclosed to the Richmond Global Entities' customers.[42]  The Defendants misappropriated those funds for their own use.

---

[34]    See e.g. Rix Decl. at ¶ 19, 21, 24 and 26. Customers received account statements on an irregular basis. Certain customers received account statements monthly while others received them quarterly. Several customers initially received account statements monthly and then began to receive them quarterly or not at all.

[35]    A futures commission merchant, as defined by the Act, is an entity that solicits or accepts orders for the purchase or sale of any commodity for future delivery and that accepts payment from or extends credit to those whose orders are accepted. Section 1a(20) of the Act, 7 U.S.C. § 1a(2)(2002). See Carletta Decl. at ¶ 5, fn. 2.

[36]    Carletta Decl. at ¶13.

[37]    Carletta Decl. at ¶ 10; Conrad Decl. at ¶ 12.

[38]    Carletta Decl. at ¶ 10.

[39]    Carletta Decl. at ¶ 2.

[40]    See e.g. Rix Decl. at ¶ 19, Exh. F, 21, Exh. G, 24, Exh. H;and 27, Exh. I.

[41]    Conrad Decl. at ¶ 13.

[42]    Carletta Decl. at ¶ 12.

7

## C.     Evidence of Fraud

The Defendants have been taped fraudulently soliciting retail customers and undercover

Federal Bureau of Investigation ("FBI") agents posing as customers, to open managed foreign

currency trading accounts in an ongoing undercover operation being conducted by the FBI and

the United States Attorney's Office for the Southern District of New York.[43]   The Commission

has spoken with at least 30 additional retail customers of the Richmond Global Entities and has

reviewed and analyzed documents provided by those customers.   The evidence has revealed that

since at least December 2001, the Defendants have fraudulently solicited retail customers

nationwide to engage in the speculative trading of foreign currency futures contracts.   During

these solicitations, the Defendants make false promises of high returns, fail to disclose hidden

commission charges and make false representations regarding the Defendants' experience and

past performance in trading forex and the minimal risks of trading forex.[44]

### 1.     Defendants' Misrepresentations Concerning the Likelihood of Profit

The Defendants solicited members of the retail public to invest in foreign currency

futures contracts by promising the customers substantial profits, claiming, among other things:

- Customers averaged 2-4% per month profit;[45]

- Customers could expect a 20-40% annual return;[46]

- This is a conservative investment, safe just like a bank account;[47]

- Customers who invested $100,000 were guaranteed to earn $30,000 during the course of the year;[48]

Each of these representations was false.   Virtually all of the customer account managed

---

43       Conrad Decl. at ¶ 6.
44       *See* Rix Decl. at ¶¶ 17-32.Conrad Decl. at ¶¶ 8-12.
45       Rix Decl. at ¶ 20, 22, and 30.
46       Conrad Decl. at ¶ 10.
47       Rix Decl. at ¶ 29.
48       Conrad Decl. at ¶ 10.

8

by the Richmond Global Entities lost money.[49]  Richmond Global customers suffered net losses of approximately $1.2 million.[50]

## 2.    Defendants' Misrepresentations Regarding Commission Charges

The Defendants falsely represented that the Richmond Global Entities charged customers[51] only an upfront 2% management fee and 10% of any profits generated through trading.[52] Despite these representations, the Richmond Global Entities charged their customers additional undisclosed commissions ranging from 16 to 39% of the funds deposited at the FCMs.[53] These commissions were paid directly to the Richmond Global Entities by the FCMs.[54]

In order to conceal the unauthorized commissions, the Defendants created account statements, which were sent to the Richmond Global Entities customers, that falsely characterized the undisclosed commissions as trading losses or reduced trading gains.[55] The Defendants sent their customers these false and fraudulent account statements.

Total commissions of approximately $981,500 were paid to the Richmond Global Entities from customers' funds.[56] Commissions secretly charged to the Richmond Global Entities' retail customers were misappropriated by the Defendants and used to pay salaries, commissions and other expenses of the Defendants.[57]

---

[49]    There were three numbered accounts at one of the FCMs that made a slight trading profit of up to $11 each. These amounts were, however, subject to deductions for management and other fees that would reduce these negligible profits. Carletta Decl. at ¶ 13

[50]    Carletta Decl. at ¶ 10.

[51]    In addition to receiving funds directly from retail customers, the Defendants received an investment of $30,000 from an undercover FBI agent posing as a hedge fund manager. The Defendants agreed that they would charge the fund undisclosed commissions and the Defendants and the undercover FBI agent would share the commissions secretly charged to the hedge fund. Conrad Decl. at ¶ 14.

[52]    Rix Decl. at ¶ 16; Conrad Decl. at ¶ 12.

[53]    Carletta Decl. at ¶ 12.

[54]    Carletta Decl. at ¶ 10.

[55]    Conrad Decl. at ¶ 12.

[56]    Carletta. Decl. at ¶¶ 10, 15.

[57]    Carletta Decl. at ¶¶ 15, 16.

9

### 3.    Defendants' Misrepresentations Concerning Past Performance

The Defendants knowingly misrepresented that they had a successful trading record to prospective and actual customers, notwithstanding the fact that the Richmond Global Entities generated losses of 40%-50% of customers' investments.[58]  Although virtually every customer account lost money, the Defendants misrepresented to prospective customers that they had earned profits for customers of 40% during a two year period.[59]  In addition, the Defendants stated to the FBI undercover officer posing as a retail customer that the Richmond Global Entities would in the future generate profits as high as 45% annually, when in fact, as noted above, all customers lost money.[60]

For the entire period of June 2002 through July 2004, the Richmond Global Entities in fact lost $1.2 million of the customer funds deposited with the FCMs.[61]

### 4.    Defendants' Misrepresentations Concerning the Risk of Loss

The Defendants also misrepresented to customers the risk associated with trading forex futures contracts.  The Defendants falsely represented to customers that money invested in the forex market was like money placed in a bank account, when the Defendants knew that investments in the forex market were highly speculative and volatile.[62]  The Defendants also falsely claimed that they used a wide range of risk management tools including stop loss orders to limit a customer's downside risk, including representing that.

- supposed stop losses or limit orders to minimize trading losses;[63]

- purportedly placing stop loss orders on "every trade" and limiting customer losses to 5% -10%;[64]

---

[58]    Carletta Decl. at ¶¶ 8, 10.

[59]    *See* Rix Decl. at ¶¶ 30-31.

[60]    Conrad Decl. at ¶ 10.

[61]    Carletta Decl. at ¶ 10.

[62]    Rix Decl. at ¶ 29, Conrad Decl. at ¶ 11.

[63]    Rix Decl. at ¶¶ 17, 20, and 22.

[64]    Rix Decl. at ¶ 23, 29.

- if losses in an account exceeded 10%, the Richmond Global Entities would stop trading that customer's account until the customer agreed to allow trading to resume.[65]

In fact, the Defendants used stop loss or limit orders infrequently, if at all. The Defendants had no systematic method to limit losses and knew that such losses could not be limited.[66]

## D.   Futures Contracts Were Sold to Richmond Global Customers

Defendants, for or on behalf of their customers, entered into foreign currency futures contracts with various FCMs. .The contracts customers purchased were for Japanese yen, British pounds, Euros, and other foreign currencies, with the price set at the time the contract was entered into.[67] Subsequent to the time a contract position was established (or, in some cases, the same date the position was entered into), the position in the currency was terminated, presumably offset at a price that reflected market conditions at that time.[68] Customers were required to maintain certain margin requirements.[69] The contracts between the FCMs and the Richmond Global Entities, which were entered into for, on behalf of, and for the benefit of the ultimate customers, each explicitly contains provisions contemplating the offset of the parties' contracts.

There is no indication in any of the customer records and materials that physical currency was ever actually bought or sold.[70] None of these customer accounts was opened for a business or personal need to make or take delivery of foreign currencies, and there is no indication that customers were required to hold or possess the requisite bank accounts or necessary credit to acquire or deliver currency against any of the contracts purchased on their behalf.[71]

---

[65]   Rix Decl. at ¶ 25.
[66]   Conrad Decl. at ¶ 11.
[67]   *See* Declaration of Ronald Hobson dated January 26, 2005 ("Hobson Decl.") at ¶¶ 12, 26.
[68]   *See* Hobson Decl. at ¶ 26.
[69]   *See* Hobson Decl. at ¶ 28.
[70]   *See* Hobson Decl. at ¶ 27.
[71]   *See Id.*

11

The contracts traded for these customers were traded in multiples of ten units of currency and delivery specifications such as location and timing were identical across all these contracts. Thus, the contracts were effectively standardized and interchangeable with one another.[72] The transactions offered to customers were entirely paper transactions. As such, the contracts exhibit the characteristics of a futures contract.[73]

Neither the known customers to the forex transactions nor the Richmond Global Entities appear to be eligible contract participants because their assets are less than $5 million, and they opened their accounts in order to speculate on price changes in foreign currency.[74]

### E.   Controlling Persons[75]

In addition to being directly liable for fraudulently soliciting customers, Danio is also liable as a controlling person of the Richmond Global Entities. Danio was a signatory on six of the seven Richmond Global bank accounts. On the two RG MCA bank accounts, Danio's title was listed as President.[76] On the two RG Ltd. bank accounts, his title was listed as bookkeeper.[77] On the RG Director bank account, he was identified as an authorized signer.[78] On the RG Managed Account bank account, he was initially identified as an authorized signer and was later

---

[72]   *See* Hobson Decl. at ¶29.

[73]   *See* Hobson Decl. at ¶ 30.

[74]   Rix Decl. at ¶ 33; Conrad Decl. at ¶ 6. The assets of either the Richmond Global Entities or the ultimate retail customers may be relevant in determining whether the contracts are entered into with someone that is not an eligible contract participant, as required by Sec. 2(c)(2)(B) of the Act. The Richmond Global Entities had, in the aggregate, $1.2 million as their highest level of assets during the relevant period. That amount falls far below the $10 million threshold required for corporate entities to be considered eligible contract participants. The $1.2 high water mark of aggregate assets in those accounts also falls below the $5 million threshold for commodity pools to be considered eligible contract participants. Finally, the ultimate retail customers of whom we are aware appear not to have had assets exceeding $5 million. Thus, it appears that any persons or entities that might be considered to be counterparties to the FCMs' transactions were retail customers, rather than eligible contract participants.

[75]   Vinokur, who at this time is not being alleged to be a controlling person, has held himself out as a Senior Vice President of RG Associates and a Vice President of RG Director and has fraudulently, solicited customers. *See* Rix Decl. at ¶ 14.

[76]   Rix Decl. at ¶ 11.

[77]   *Id.*

[78]   *Id.*

identified as Secretary.[79]  An undated signature card for the RG Managed bank account identifies

Danio as President.  On a letter sent to at least one customer, Danio signed as the President of

RG Director.  On monthly and quarterly statements sent to Richmond Global customers, Danio

was identified as the Director of Client Services for RG Director.[80]  Danio signed at least one

letter sent to customers of the Richmond Global Entities as Senior Account Manager of RG

Associates.  Danio failed to act in good faith or knowingly induced, directly or indirectly, the

acts constituting violations alleged herein in that he fraudulently solicited customers.[81]

Additionally, Pappalardo is liable as a controlling person of the Richmond Global

Entities.  Pappalardo was a signatory on the RG Associates account, where his title was listed as

Vice President.[82]  In addition, he signed at least one loan agreement as Vice President of RG

Associates.[83]  Pappalardo also signed at least one letter sent to customers as Vice President

Senior Account Manager of RG Associates.  Pappalardo failed to act in good faith or knowingly

induced, directly or indirectly, the acts constituting violations alleged herein in that he

fraudulently solicited customers. [84]

Turner is also liable as a controlling person of the Richmond Global Entities.  Turner was

a signatory on the RG Associates bank account, where his title was listed as President.  Turner

signed at least one letter sent to customers as President of RG Associates.  Turner failed to act in

good faith or knowingly induced, directly or indirectly, the acts constituting violations alleged

herein in that he fraudulently solicited customers. [85]

---

[79]     *Id.*
[80]     *Id.*
[81]     *See* Rix Decl. at ¶ 22-25; Conrad Decl. at ¶ 7.
[82]     Rix Decl. at ¶ 12.
[83]     *Id.*
[84]     *See* Rix Decl. at ¶ 12, 26-27; Conrad Decl. at ¶ 7.
[85]     Rix Decl. at ¶ 13; Conrad Decl. at ¶ 7.

## IV.    LEGAL ANALYSIS

The Court should issue the *ex parte* order and grant the Commission's motion for a preliminary injunction.  The Commission has jurisdiction over the Defendants' activities as the Defendants fraudulently solicited customers to open managed accounts with the Richmond Global entities and foreign currency futures contracts were sold on their behalf.

**A.    The Commission has Marshaled Persuasive Evidence of the Defendants' Violations of the Act and Regulations Justifying the Issuance of an *Ex Parte* Order**

Whenever it appears that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of the Act or any rule, regulation, or order promulgated thereunder, Section 6c(a) of the Act, 7 U.S.C. § 13a-1 (2002), empowers a district court to issue an *ex parte* restraining order freezing defendants' assets, wherever situated, prohibiting the destruction of defendants' books and records, granting the Commission's agents immediate access to defendants' books and records, and appointing a temporary receiver.[86]  As discussed *infra*, the Defendants have violated Section 4b(a)(2) of the Act, 7 U.S.C. § 6b(a)(2) (2002).

An *ex parte* restraining order is necessary to protect evidence of the Defendants' wrongdoing from alteration or destruction until formal discovery can begin.   Moreover, immediate *ex parte* statutory relief is required to: (1) locate, identify, and freeze assets of Defendants, so that they can be preserved for restitution and/or civil monetary penalties should the Commission prevail on the merits; (2) preserve Defendants' books and records and provide the Commission with access to them so that the extent of Defendants' misconduct can be determined; and (3) appoint a temporary receiver to marshal assets for potential redress.

---

[86]      *See SEC v. Princeton Economic International Ltd.*, 73 F. Supp.2d 420 (S.D.N.Y. 1999) (where SEC and CFTC brought joint action); *CFTC v. World Wide Currencies, Inc.*, 1996 WL 680273 (S.D.N.Y. 1996).

14

**B.      The Commission's Evidence Also Justifies the Entry of a Preliminary Injunction**

The Commission's evidence of the Defendants' fraudulent conduct justifies the entry of a preliminary injunction continuing the relief granted in the *Ex Parte* Statutory Restraining Order and granting additional relief.  The Commission is entitled to preliminary injunctive relief upon a showing that (i) the Act has been violated and (ii) the violation is likely to continue absent the requested injunctive relief.[87]  Upon a showing that the Act has been violated, irreparable injury may be presumed.[88]  Moreover, the court may infer a likelihood of future violations from the Defendants' past misconduct.[89]

Injunctive relief is appropriate in this case because, among other things, Defendants engaged in fraud in connection with the sale of forex futures contracts.  Unless the Commission obtains an injunction preventing the Defendants from violating the Act, the Defendants are likely to continue their violations.  In addition, without preliminary remedial ancillary relief, such as an accounting, and the transferring of assets,[90] any final judgment granting relief such as disgorgement, restitution, and civil monetary penalties would likely be frustrated.  Accordingly, the Commission requests that the Court enter a preliminary injunction.

**C.      The Defendants' Activities are Subject to the Act's Jurisdiction**

Section 2(c)(2)(B) of the Act, 7 U.S.C. § 2(c)(2)(B) (2002), provides that the Commission shall have jurisdiction over an agreement, contract or transaction in foreign

---

[87]     *See SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998) (requirement of substantial likelihood of success that violation was committed and that it would continue); *SEC v. American Board of Trade*, 751 F.2d 529, 537 (2d Cir. 1984) (other standards noted including *prima facie* evidence of a violation and a "reasonable likelihood" or some "cognizable danger" that the violation will occur in the future).

[88]     It is a "now well-established rule that in actions for a statutory injunction, such as [an action brought by the Commission under Section 6c], the agency need not prove irreparable injury or the inadequacy of other remedies as required in private injunctive suits." *CFTC v. British American Options Corp.*, 560 F.2d 135, 141 (2d Cir. 1977).

[89]     *Id.* at 142.

[90]      *SEC v. Infinity Group Co.*, 27 F. Supp. 2d 559, 561 (E.D. Pa. 1998); *SEC v. Antar*, 831 F. Supp. 380, 398 (D.N.J. 1993).

15

FILED UNDER SEAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

05 CV 2181

U.S. Commodity Futures Trading Commission,   )
                                             )
                    Plaintiff,               )   **MEMORANDUM OF LAW IN**
                                             )   **SUPPORT OF PLAINTIFF'S**
         v.                                  )   **APPLICATION FOR AN *EX PARTE***
                                             )   **STATUTORY RESTRAINING**
                                             )   **ORDER, PRELIMINARY**
Richmond Global Associates, LLC,             )   **INJUNCTION AND TEMPORARY**
Richmond Global Director, LLC,               )   **RECEIVER**
Richmond Global MCA, LLC,                    )
Richmond Global Managed Account, LLC,        )
Richmond Global, Ltd.,                       )
RG Group Holdings LLC                        )
Vincenzo Danio,                              )
Joseph Pappalardo,                           )
Ronald Turner, and                           )
Miron Vinokur,                               )
                                             )
                                             )
                                             )
                                             )
                    Defendants.              )
                                             )
                                             )
                                             )

U.S. COMMODITY FUTURES TRADING
COMMISSION
Stephen J. Obie
Regional Counsel

Karin N. Roth [KR-2669]
Senior Trial Attorney
Steven Ringer [SR-9491]
Chief Trial Attorney
David W. MacGregor
Chief Trial Attorney
Division of Enforcement
140 Broadway, 19th Floor
New York, New York 10005
(646) 746-9764
(646) 746-9940 (facsimile)

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES………………………………………………………..…….iii

I.    PRELIMINARY STATEMENT………………………………………...…....1

II.   THE PARTIES …………………………………………………….………....…....2

      A.   Plaintiff ………………………………..……………………………2

      B.   Defendants …………………………………………………….…....3

III.  STATEMENT OF FACTS………………………………...…………………....5

      A.   The Richmond Global Entities Acted As a Common Enterprise ……………....5

      B.   The Richmond Global Entities' Fraudulent Operation ...……………………5

      C.   Evidence of Fraud ……………………………………………....8

           1.   Defendants' Misrepresentations Concerning Likelihood
                of Profit……………………………………………………………8

           2.   Defendants' Misrepresentations Regarding Commission
                Charges……………………………………………………………9

           3.   Defendants' Misrepresentations Concerning Past
                Performance………………………………………………....10

           4.   Defendants' Misrepresentations Concerning
                Risk of Loss……………………………………………...……………10

      D.   Futures Contracts Were Sold To Richmond Global
           Customers …………………………………………….....................................11

      E.   Controlling Persons………......………………………..………………12

IV.   LEGAL ANALYSIS……………...………………….……………………14

      A.   The Commission has Marshaled Persuasive Evidence
           of the Defendants' Violations of the Act
           Justifying the Issuance of an Ex Parte Order………………………………14

      B.   The Commission's Evidence Also Justifies the Entry
           of a Preliminary Injunction…………………………………...…15

i

## TABLE OF CONTENTS (cont'd)

C.    The Defendants' Activities are Subject to the Act's Jurisdiction....................15

D.    Defendants Defrauded Customers in Violation of
      Section 4b(a)(2) of the Act ……………………………………………….....17

      1.    Defendants Cheated and Defrauded Customers
            and Willfully Deceived Customers………………………………...……..17

      2.    Defendants Misappropriated Customer Funds…………………………...19

      3.    The Defendants Willfully Made False Records……………………......…..19

E.    Controlling Person Liability ………………..………………………........................20

F.    Richmond Global's Liability as Principal
      for the Acts of Its Agents…………………………………………………………...21

G.    Contracts Traded on Behalf of Richmond Global Customers
      Were Futures Contracts……………………………………………………….……....21

H.    The Richmond Global Entities are Jointly and Severally
      Liable as a Common Enterprise……………….......................................................24

V.    CONCLUSION………………………………………………………...……………....25

# TABLE OF AUTHORITIES

**Cases**

*CFTC v. American Metal Exch. Corp.*, 693 F. Supp. 168  (D.N.J. 1988) ..................................... 22

*CFTC v. AVCO Financial Corp.*, 28 F. Supp. 2d 104 (S.D.N.Y. 1998), *aff'd in relevant part sub nom, CFTC v. Vartuli*, 228 F.3d 94 (2d Cir. 2000)..................... 17

*CFTC v. Baragosh*, 278 F.3d 319 (4th Cir. 2002) ......................................................... 20

*CFTC v. British American Options Corp.*, 560 F.2d 135 (2d Cir. 1977) ..................................... 15

*CFTC v. Cheung*, No. CIV. 5598, 1994 WL 583169 (S.D.N.Y. Oct. 21, 1994)......................19

*CFTC v. Co Petro Marketing Group, Inc.*, 680 F.2d 573 (9th Cir. 1982)..................................... 22

*CFTC v. Hanover Trading Corp.*, 34 F. Supp. 2d 203 (S.D.N.Y. 1999)..................................... 22

*CFTC v. Morse*, 762 F.2d 60 (8th Cir. 1985)..................................................................19

*CFTC v. Muller*, 570 F.2d 1296 (5th Cir. 1978)..................................................................17

*CFTC v. National Coal Exchange, Inc.* [1980-1982 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,424 (W.D. Tenn. 1982) ........................................................ 22

*CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766 (9th Cir. 1995) ..................................... 22

*CFTC v. Noble Wealth Data Information Servs., Inc.*, 90 F. Supp. 676 (D. Md. 2000) ....... 19, 24,

*CFTC v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321 (11th Cir. 2002)......................... 21

*CFTC v. Skorupskas*, 605 F.Supp. 923 (E.D. Mich. 1985)..................................... 17, 19

*CFTC v. Vartuli*, 228 F.3d 94 (2d Cir. 2000) ................................................. 18

*CFTC v. World Wide Currencies, Inc.*, 1996 WL 680273 (S.D.N.Y. 1996)................................ 14

*Do v. Lind-Waldock & Co.*, [1994-1996 Transfer Binder] Comm. Fut., L. Rep. (CCH) ¶ 26,516 (CFTC Sept. 27, 1995)......................................................... 18

*Donohoe v. Consolidated Operating & Production Corp.*, 982 F.2d 1130 (7th Cir. 1992)......... 20

*FTC v. Wolf*, 1996 WL 812940 at * 7 (S.D. Fla. Jan. 31, 1996)..................................... 24

*Hammond v. Smith Barney, Harris Upham & Co.*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,617 (CFTC March 1, 1990) ......................................... 18

iii

*In re Apache Trading Corp.*, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,251 (CFTC Mar. 11, 1992) ............................................................................................ 20

*In re Clancy*, [1980-1982 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,126 (CFTC Nov. 24, 1980)............................................................................................................................19

*In re Spiegel*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,103 (CFTC Jan. 12, 1988) ................................................................................................................ 20

*In re Stovall*, [1977-1980 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,941  (CFTC 1979)22

*JCC, Inc. v. CFTC,* 63 F.3d 1557 (11th Cir. 1995) ...................................................... 20

*Knight v. First Commercial Group, Inc.,* [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,942 (CFTC 1997) ................................................................................... 21

*Monieson v. CFTC,* 996 F.2d 852 (7th Cir. 1993) ................................................. 20, 21

*Reddy v. CFTC,* 191 F.3d 109 (2d Cir. 1999)................................................................ 19

*Saxe v. E.F. Hutton & Co., Inc.*, 789 F.2d 105 (2d Cir. 1986). ...................................... 17

*SEC v. American Board of Trade*, 751 F.2d 529 (2d Cir. 1984) .................................... 15

*SEC v. Antar*, 831 F. Supp. 380 (D.N.J. 1993) .............................................................. 15

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) ............................................................ 15

*SEC v. Infinity Group Co.*, 27 F. Supp. 2d 559 (E.D. Pa. 1998) ................................... 15

*SEC v. Princeton Economic International Ltd.,* 73 F. Supp.2d 420 (S.D.N.Y. 1999) ................. 14

*Transnor (Bermuda) Ltd. V. BP North America*, 738 F. Supp. 1472 (S.D.N.Y. 1990)................ 22

**Statutes**

Section 13(b) of the Act, 7 U.S.C. § 13c(b)(2002) .................................................... 1, 20

Section 1a(12)(A)(xi) of the Act, 7 U.S.C. § 1a(12)(A)(xi) (2002)................................ 16

Section 1a(20) of the Act, 7 U.S.C. § 1a(2)(2002) ......................................................... 7

Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2002) .................................... 1, 21

Section 2(c)(2)(B) of the Act, 7 U.S.C. § 2(c)(2)(B)(ii)(I) through (VI) (2002)................. 3, 12,15

Section 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(C) (2002). ....................................................... 16

Section 4b(a)(2) of the Act, 7 U.S.C. § 6b(a)(2) (2002)…………………..…14, 17, 18, 19, 20, 21

Section 6c of the Act, 7 U.S.C. § 13a-1 (2002) ....................................................................... 2, 14

**Other Authorities**

S. Rep. No. 384, 97th Cong., 2d Sess. 47 (1982) ......................................................................... 20

**Regulations**

Section 1.2 of the Regulations, 17 C.F.R. § 1.2 (2004) ............................................................ 1, 21

## I.  **PRELIMINARY STATEMENT**

At various times between December 2001 and the present ("relevant time period"), Defendants Richmond Global Associates, LLC ("RG Associates"), Richmond Global Director, LLC ("RG Director"), Richmond Global MCA, LLC ("RG MCA"), Richmond Global Managed Account, LLC ("RG Managed"), Richmond Global, Ltd. ("RG Ltd."), RG Group Holdings, LLC ("RG Group") (collectively, the "Richmond Global Entities"), Vincenzo Danio ("Danio"), Joseph Pappalardo ("Pappalardo"), Ronald Turner ("Turner"), and Miron Vinokur ("Vinokur") (collectively, including the Richmond Global Entities, the "Defendants") fraudulently solicited and obtained more than $3.5 million dollars from at least 160 customers for the purpose of trading foreign currency ("forex") contracts which were, in fact, foreign currency futures contracts. The Defendants used at least $981,500 of these funds that were fraudulently solicited for their own purposes.

By these acts, all of the Defendants directly violated Section 4b(a)(2) of the Commodity Exchange Act (the "Act"), 7 U.S.C. § 6b(a)(2)(2002). In addition, although each of the four individual defendants is directly liable for having made material misrepresentations to customers, Danio, Pappalardo and Turner are also liable as controlling persons of the Richmond Global Entities for their violations of Section 4b(a)(2) of the Act pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b)(2002). The Richmond Global Entities are additionally liable for the on-going violations of Section 4b(a)(2) of the Act by their officers, directors, managers, employees, and agents, including those of the individual defendants, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2002), and Section 1.2 of the Commission's Regulations promulgated thereunder (the "Regulations"), 17 C.F.R. § 1.2 (2004), as all such violations were within the scope of their office or employment with the Richmond Global Entities.

1

Finally, as a common enterprise, the Defendants are liable jointly and severally for the acts of one another.

Pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2002), the U.S. Commodity Futures Trading Commission (the "Commission") has filed a Complaint for Injunctive and Other Equitable Relief (the "Complaint") for Defendants' violations of the Act. In light of Defendants' violations and the harm these violations pose to the investing public, the Commission also has filed for a Statutory *Ex Parte* Restraining Order seeking (i) to freeze Defendants' assets, (ii) to prohibit Defendants from destroying, altering or disposing of, or refusing to permit authorized representatives of the Commission to inspect, when and as requested, any books, records, electronically stored data or other documents wherever they may be, and (iii) the appointment of a temporary receiver. Finally, the Commission requests that the Court order Defendants to show cause why a preliminary injunction should not be issued enjoining Defendants from further violations of the Act, continuing the asset freeze, making the appointment of the temporary receiver permanent, ordering Defendants to repatriate funds and assets to the territory of the United States, and ordering any further relief that the Court deems appropriate.

This application for an *ex parte* restraining order, as well as the Commission's motion for a preliminary injunction, are fully supported by this Memorandum, the Complaint filed herewith, and the accompanying Declarations. Therefore, the Commission respectfully submits that the Court should grant the Commission's application for an *ex parte* restraining order.

## II.    THE PARTIES

### A.    Plaintiff

Plaintiff U.S. Commodity Futures Trading Commission is an independent federal regulatory agency that is charged with responsibility for administering and enforcing the

provisions of the Act, 7 U.S.C. §§ 1 *et seq.* (2002), and the Regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq.* (2004).

## B.     Defendants

Richmond Global Ltd. was incorporated in August 2001 as a New York domestic business corporation with offices located at 106 New Dorp Plaza, Suite 2b, Staten Island, New York.[1]  RG Ltd. has never been registered with the Commission in any capacity.[2]  RG Ltd. is not a futures commission merchant ("FCM"), an affiliate of a FCM, a broker or dealer, an associated person of a broker or dealer, an insurance company, a regulated subsidiary of an insurance company, a financial holding company or an investment bank holding company (collectively, an "enumerated counterparty").[3]

Richmond Global Director LLC became in April 2002 a New York limited liability company with offices located at the same Staten Island address.[4]  RG Director was registered with the Commission as a commodity pool operator between April 2002 and October 2002.[5]  RG Director is not an enumerated counterparty.[6]

Richmond Global MCA LLC became in June 2003 a New York limited liability company with offices located at the same Staten Island address.[7]  RG MCA has never been registered with the Commission in any capacity and is not an enumerated counterparty.[8]

Richmond Global Managed Account LLC became in April 2002 a New York limited liability company with offices located at the same Staten Island address.[9]  RG Managed has

---

[1]     *See* Declaration of Philip Rix dated February 14, 2005 ("Rix Decl.") at ¶ 7.
[2]     *See* Rix Decl. at ¶ 10.
[3]     *See* Rix Decl. at ¶ 15.  *See* Section 2(c)(2)(B) of the Act, 7 U.S.C. § 2(c)(2)(B)(ii)(I) through (VI) (2002)
[4]     *See* Rix Decl. at ¶ 7.
[5]     *See* Rix Decl. at ¶ 9.
[6]     *See* Rix Decl. at ¶ 15.
[7]     *See* Rix Decl. at ¶¶ 6, 7.
[8]     *See* Rix Decl. at ¶¶ 10, 15.
[9]     *See* Rix Decl. at ¶¶ 6, 7.

never been registered with the Commission in any capacity and is not an enumerated counterparty.[10]

Richmond Global Associates, LLC became in February 2003 a New York limited liability company with offices at the same Staten Island address,[11] was purportedly created as a "branch office" of Richmond Global.[12] RG Associates has never been registered with the Commission in any capacity and is not an enumerated counterparty.[13]

RG Group Holdings, LLC became in November 2003, a New York limited liability company with offices at the same Staten Island address.[14] RG Group has never been registered with the Commission in any capacity and is not an enumerated counterparty.[15]

Vincenzo Danio ("Danio"), who resides in Staten Island, New York, has never been registered with the Commission.[16]

Joseph Pappalardo ("Pappalardo"), who resides in Staten Island, New York, has never been registered with the Commission in any capacity.[17]

Ronald Turner ("Turner"), who resides in Staten Island, New York, has never been registered with the Commission in any capacity.[18]

Miron Vinokur ("Vinokur"), who resides in Staten Island, New York, has never been registered with the Commission in any capacity.[19]

---

[10]    *See* Rix Decl. at ¶¶ 10, 15.
[11]    *See* Rix Decl. at ¶¶ 6, 7.
[12]    *See* Rix Decl. at ¶ 8.
[13]    *See* Rix Decl. at ¶¶ 10, 15.
[14]    *See* Rix Decl. at ¶¶ 6, 7.
[15]    *See* Rix Decl. at ¶¶ 10, 15.
[16]    *See* Rix Decl. at ¶ 11.
[17]    *See* Rix Decl. at ¶ 12
[18]    *See* Rix Decl. at ¶ 13.
[19]    *See* Rix Decl. at ¶ 14.

4

## III.    STATEMENT OF FACTS

### A.    The Richmond Global Entities Acted As a Common Enterprise

The Richmond Global Entities include six distinct legal entities that functioned as a common enterprise.    Customers knew the enterprise as "Richmond Global."[20]    Further, the Richmond Global Entities were known by a single website[21] that operated episodically and also through customer account documents.[22]    The Richmond Global Entities identified themselves as a "financial services company" that manages funds, through its "Managed Currency Trading Account." [23]    The Richmond Global entities shared office space, telephone numbers, officers, a website, personnel, and customers.[24]    Funds of the various Richmond Global entities were often commingled.[25]    As a common enterprise, the Defendants are jointly and severally liable for one anothers' violations of law.

### B.    The **Richmond Global Entities' Fraudulent Operation**

The Defendants, through their website, telephone solicitations and other materials have made misrepresentations to customers to induce them to open accounts with and provide funds to the Richmond Global Entities in order to trade in the forex market. [26]    Specifically, the Defendants made false promises of high returns, failed to disclose hidden commission charges

---

[20]    *See e.g.* Rix Decl. at ¶ 26.

[21]    In an attempt to appear legitimate, the Richmond Global Entities claimed on its website, www.richmondglobal.com that it is "a New York Corporation that adheres to the rules and regulation of the (CFTC) [t]he Commodity Futures Trading Commission and the (NFA) Nation [sic] Futures Association." Its website was also linked NFA's website, www.nfa.futures.org and the Commission's website, www.cftc.gov. Annex A to the Richmond Global Entities' account opening documents states that it "adhere[s] to the privacy and security standards prescribed by the Commodity Futures Trading Commission (CFTC)," reinforcing the appearance that the Richmond Global Entities are a regulated entity. *See* Rix Decl. at ¶ 16, Exh. E and 33, Exh. L.

[22]    *See* Rix Decl. at ¶ 16.

[23]    *See* Rix Decl. at ¶¶ 16, 33; *See also* Declaration of Robert J. Conrad dated February 14, 2005 ("Conrad Decl.") at ¶ 5.

[24]    *See* Rix Decl. at ¶¶ 6, 11-14, 16, and 33.

[25]    Richmond Global did not always deposit and return customer funds from the same Richmond Global entities. *See* Declaration of Ronald A. Carletta dated January 28, 2005 ("Carletta Decl.") at ¶ 17. *See also* Rix Decl. 19, Exh. --.

[26]    Rix Decl. at ¶¶ 17-32; Conrad Decl. at ¶¶ 7-12.

5

and made false representations regarding the Defendants' experience and past performance in trading forex and the purported minimal risks of trading forex.

The Richmond Global Entities' primary method of solicitation was to make "cold calls" to potential investors.[27] During their solicitation pitch, the Defendants, among other things, attempted to entice retail customers by falsely claiming the Richmond Global Entities employed a large number of forex traders and research specialists and they had $10- $12 million in funds under management.[28] In actually, the Richmond Global Entities never employed any research specialists and never had more than $1.17 million under management in the forex market.[29] In a similar misleading fashion, the Defendants also falsely represented that the Richmond Entities charged only an upfront 2% management fee and 10% of any profits generated, and did not charge commissions on executed transactions.[30] Despite these representations, the Richmond Global Entities charged absorbent undisclosed commission.[31]

To open a managed currency trading account, customers completed and signed account opening documents, as provided by and instructed by the Defendants, and sent them with their funds directly to the Richmond Global Entities.[32] Included with the account opening documents was a power of attorney authorizing the Richmond Global Entities to trade on behalf of, or for the benefit of their customers.[33] The Defendants promised their customers that they would be in regular telephone contact to inform them of their account status and would provide account

---

[27]     See Rix Decl. at ¶ 17, 20, 22, and 25.
[28]     Conrad Decl. at ¶ 9.
[29]     Carletta Decl. at ¶ 9; Conrad Decl. at ¶ 9.
[30]     Rix Decl. at ¶¶ 16-17, and 22, Conrad Decl. at ¶ 12; See Carletta Decl. at ¶ 13
[31]     See Carletta Decl. at ¶¶ 10, 12.
[32]     See e.g. Rix Decl. at ¶ 21 and 23; See Conrad Decl. at ¶ 6.
[33]     Rix Decl. at ¶ 16. The Richmond Global Entities' opening account documents state that the Richmond Global Entities, as agent and attorney-in-fact, will purchase and sell foreign currency, "on behalf of and for the benefit of" its customer. The customer expressly authorizes the Richmond Global Entities to open accounts in its own name or the name of the customer for the purpose of trading forex. The opening account documents further state that any FCM utilized by the Richmond Global Entities is the agent of the customer, and not the Richmond Global Entities. Rix Decl. at ¶ 16, Exh. E.

statements.[34]    After receiving the customer's funds, the Defendants sent these funds, after deducting a disclosed 2% management fee, to one of three futures commission merchants[35] where Richmond Global executed forex futures trades on its customers' behalf.[36]  Then at rates set by the Richmond Global Entities, the FCMs deducted additional commissions on executed transactions from the customer funds they held.[37]  These commissions were paid directly to Richmond Global.[38]

Each of the FCMs provided the Richmond Global Entities with transaction records showing the profit/loss from each executed forex futures trade and the commission charged on the transaction.[39]  However, the account statements issued by the Richmond Global Entities to its customers detailed only the customers' net cash position:  balance beginning of period, customer deposits, customer withdrawals, profit or loss, management fee, profit share and the balance at end of period.[40]  The statements did not provide any information regarding the forex futures trading executed on the customer's behalf or for the customer's benefit.  In order to conceal the unauthorized commissions, the Defendants issued false account statements to customers that misleadingly characterized the undisclosed commissions as trading losses.[41]  The commissions deducted by the FCMs, ranging in amount of 16% to 39% of the funds deposited, were not disclosed to the Richmond Global Entities' customers.[42]  The Defendants misappropriated those funds for their own use.

---

[34]    See e.g. Rix Decl. at ¶ 19, 21, 24 and 26.  Customers received account statements on an irregular basis. Certain customers received account statements monthly while others received them quarterly.  Several customers initially received account statements monthly and then began to receive them quarterly or not at all.

[35]    A futures commission merchant, as defined by the Act, is an entity that solicits or accepts orders for the purchase or sale of any commodity for future delivery and that accepts payment from or extends credit to those whose orders are accepted.  Section 1a(20) of the Act, 7 U.S.C. § 1a(2)(2002).  See Carletta Decl. at ¶ 5, fn. 2.

[36]    Carletta Decl. at ¶13.

[37]    Carletta Decl. at ¶ 10; Conrad Decl. at ¶ 12.

[38]    Carletta Decl. at ¶ 10.

[39]    Carletta Decl. at ¶ 2.

[40]    See e.g. Rix Decl. at ¶ 19, Exh. F, 21, Exh. G, 24, Exh. H;and 27, Exh. I.

[41]    Conrad Decl. at ¶ 13.

[42]    Carletta Decl. at ¶ 12.

7

## C.     Evidence of Fraud

The Defendants have been taped fraudulently soliciting retail customers and undercover Federal Bureau of Investigation ("FBI") agents posing as customers, to open managed foreign currency trading accounts in an ongoing undercover operation being conducted by the FBI and the United States Attorney's Office for the Southern District of New York.[43]   The Commission has spoken with at least 30 additional retail customers of the Richmond Global Entities and has reviewed and analyzed documents provided by those customers.   The evidence has revealed that since at least December 2001, the Defendants have fraudulently solicited retail customers nationwide to engage in the speculative trading of foreign currency futures contracts.   During these solicitations, the Defendants make false promises of high returns, fail to disclose hidden commission charges and make false representations regarding the Defendants' experience and past performance in trading forex and the minimal risks of trading forex.[44]

### 1.     Defendants' Misrepresentations Concerning the Likelihood of Profit

The Defendants solicited members of the retail public to invest in foreign currency futures contracts by promising the customers substantial profits, claiming, among other things:

- Customers averaged 2-4% per month profit;[45]

- Customers could expect a 20-40% annual return;[46]

- This is a conservative investment, safe just like a bank account;[47]

- Customers who invested $100,000 were guaranteed to earn $30,000 during the course of the year;[48]

Each of these representations was false.   Virtually all of the customer account managed

---

43     Conrad Decl. at ¶ 6.
44     *See* Rix Decl. at ¶¶ 17-32.Conrad Decl. at ¶¶ 8-12.
45     Rix Decl. at ¶ 20, 22, and 30.
46     Conrad Decl. at ¶ 10.
47     Rix Decl. at ¶ 29.
48     Conrad Decl. at ¶ 10.

by the Richmond Global Entities lost money.[49]  Richmond Global customers suffered net losses of approximately $1.2 million.[50]

### 2.    Defendants' Misrepresentations Regarding Commission Charges

The Defendants falsely represented that the Richmond Global Entities charged customers[51] only an upfront 2% management fee and 10% of any profits generated through trading.[52]  Despite these representations, the Richmond Global Entities charged their customers additional undisclosed commissions ranging from 16 to 39% of the funds deposited at the FCMs.[53]  These commissions were paid directly to the Richmond Global Entities by the FCMs.[54]

In order to conceal the unauthorized commissions, the Defendants created account statements, which were sent to the Richmond Global Entities customers, that falsely characterized the undisclosed commissions as trading losses or reduced trading gains.[55]  The Defendants sent their customers these false and fraudulent account statements.

Total commissions of approximately $981,500 were paid to the Richmond Global Entities from customers' funds.[56]  Commissions secretly charged to the Richmond Global Entities' retail customers were misappropriated by the Defendants and used to pay salaries, commissions and other expenses of the Defendants.[57]

---

[49]    There were three numbered accounts at one of the FCMs that made a slight trading profit of up to $11 each. These amounts were, however, subject to deductions for management and other fees that would reduce these negligible profits.  Carletta Decl. at ¶ 13

[50]    Carletta Decl. at ¶ 10.

[51]    In addition to receiving funds directly from retail customers, the Defendants received an investment of $30,000 from an undercover FBI agent posing as a hedge fund manager.  The Defendants agreed that they would charge the fund undisclosed commissions and the Defendants and the undercover FBI agent would share the commissions secretly charged to the hedge fund.  Conrad Decl. at ¶ 14.

[52]    Rix Decl. at ¶ 16; Conrad Decl. at ¶ 12.

[53]    Carletta Decl. at ¶ 12.

[54]    Carletta Decl. at ¶ 10.

[55]    Conrad Decl. at ¶ 12.

[56]    Carletta. Decl. at ¶¶ 10, 15.

[57]    Carletta Decl. at ¶¶ 15, 16.

### 3.    Defendants' Misrepresentations Concerning Past Performance

The Defendants knowingly misrepresented that they had a successful trading record to prospective and actual customers, notwithstanding the fact that the Richmond Global Entities generated losses of 40%-50% of customers' investments.[58]  Although virtually every customer account lost money, the Defendants misrepresented to prospective customers that they had earned profits for customers of 40% during a two year period.[59]  In addition, the Defendants stated to the FBI undercover officer posing as a retail customer that the Richmond Global Entities would in the future generate profits as high as 45% annually, when in fact, as noted above, all customers lost money.[60]

For the entire period of June 2002 through July 2004, the Richmond Global Entities in fact lost $1.2 million of the customer funds deposited with the FCMs.[61]

### 4.    Defendants' Misrepresentations Concerning the Risk of Loss

The Defendants also misrepresented to customers the risk associated with trading forex futures contracts.  The Defendants falsely represented to customers that money invested in the forex market was like money placed in a bank account, when the Defendants knew that investments in the forex market were highly speculative and volatile.[62]  The Defendants also falsely claimed that they used a wide range of risk management tools including stop loss orders to limit a customer's downside risk, including representing that.

- supposed stop losses or limit orders to minimize trading losses;[63]

- purportedly placing stop loss orders on "every trade" and limiting customer losses to 5% -10%;[64]

---

[58]    Carletta Decl. at ¶¶ 8, 10.
[59]    See Rix Decl. at ¶¶ 30-31.
[60]    Conrad Decl. at ¶ 10.
[61]    Carletta Decl. at ¶ 10.
[62]    Rix Decl. at ¶ 29, Conrad Decl. at ¶ 11.
[63]    Rix Decl. at ¶¶ 17, 20, and 22.
[64]    Rix Decl. at ¶ 23, 29.

- if losses in an account exceeded 10%, the Richmond Global Entities would stop trading that customer's account until the customer agreed to allow trading to resume.[65]

In fact, the Defendants used stop loss or limit orders infrequently, if at all. The Defendants had no systematic method to limit losses and knew that such losses could not be limited.[66]

### D.    Futures Contracts Were Sold to Richmond Global Customers

Defendants, for or on behalf of their customers, entered into foreign currency futures contracts with various FCMs. .The contracts customers purchased were for Japanese yen, British pounds, Euros, and other foreign currencies, with the price set at the time the contract was entered into.[67] Subsequent to the time a contract position was established (or, in some cases, the same date the position was entered into), the position in the currency was terminated, presumably offset at a price that reflected market conditions at that time.[68] Customers were required to maintain certain margin requirements.[69] The contracts between the FCMs and the Richmond Global Entities, which were entered into for, on behalf of, and for the benefit of the ultimate customers, each explicitly contains provisions contemplating the offset of the parties' contracts.

There is no indication in any of the customer records and materials that physical currency was ever actually bought or sold.[70] None of these customer accounts was opened for a business or personal need to make or take delivery of foreign currencies, and there is no indication that customers were required to hold or possess the requisite bank accounts or necessary credit to acquire or deliver currency against any of the contracts purchased on their behalf.[71]

---

[65]    Rix Decl. at ¶ 25.
[66]    Conrad Decl. at ¶ 11.
[67]    *See* Declaration of Ronald Hobson dated January 26, 2005 ("Hobson Decl.") at ¶¶ 12, 26.
[68]    *See* Hobson Decl. at ¶ 26.
[69]    *See* Hobson Decl. at ¶ 28.
[70]    *See* Hobson Decl. at ¶ 27.
[71]    *See Id.*

The contracts traded for these customers were traded in multiples of ten units of currency and delivery specifications such as location and timing were identical across all these contracts. Thus, the contracts were effectively standardized and interchangeable with one another.[72]  The transactions offered to customers were entirely paper transactions.  As such, the contracts exhibit the characteristics of a futures contract.[73]

Neither the known customers to the forex transactions nor the Richmond Global Entities appear to be eligible contract participants because their assets are less than $5 million, and they opened their accounts in order to speculate on price changes in foreign currency.[74]

## E.    Controlling Persons[75]

In addition to being directly liable for fraudulently soliciting customers, Danio is also liable as a controlling person of the Richmond Global Entities.  Danio was a signatory on six of the seven Richmond Global bank accounts.  On the two RG MCA bank accounts, Danio's title was listed as President.[76]  On the two RG Ltd. bank accounts, his title was listed as bookkeeper.[77] On the RG Director bank account, he was identified as an authorized signer.[78]  On the RG Managed Account bank account, he was initially identified as an authorized signer and was later

---

[72]     *See* Hobson Decl. at ¶29.

[73]     *See* Hobson Decl. at ¶ 30.

[74]     Rix Decl. at ¶ 33; Conrad Decl. at ¶ 6.  The assets of either the Richmond Global Entities or the ultimate retail customers may be relevant in determining whether the contracts are entered into with someone that is not an eligible contract participant, as required by Sec. 2(c)(2)(B) of the Act.  The Richmond Global Entities had, in the aggregate, $1.2 million as their highest level of assets during the relevant period.  That amount falls far below the $10 million threshold required for corporate entities to be considered eligible contract participants.  The $1.2 high water mark of aggregate assets in those accounts also falls below the $5 million threshold for commodity pools to be considered eligible contract participants.  Finally, the ultimate retail customers of whom we are aware appear not to have had assets exceeding $5 million.  Thus, it appears that any persons or entities that might be considered to be counterparties to the FCMs' transactions were retail customers, rather than eligible contract participants.

[75]     Vinokur, who at this time is not being alleged to be a controlling person, has held himself out as a Senior Vice President of RG Associates and a Vice President of RG Director and has fraudulently, solicited customers. *See* Rix Decl. at ¶ 14.

[76]     Rix Decl. at ¶ 11.

[77]     *Id.*

[78]     *Id.*

identified as Secretary.[79]  An undated signature card for the RG Managed bank account identifies Danio as President.  On a letter sent to at least one customer, Danio signed as the President of RG Director.  On monthly and quarterly statements sent to Richmond Global customers, Danio was identified as the Director of Client Services for RG Director.[80]  Danio signed at least one letter sent to customers of the Richmond Global Entities as Senior Account Manager of RG Associates.  Danio failed to act in good faith or knowingly induced, directly or indirectly, the acts constituting violations alleged herein in that he fraudulently solicited customers.[81]

Additionally, Pappalardo is liable as a controlling person of the Richmond Global Entities.  Pappalardo was a signatory on the RG Associates account, where his title was listed as Vice President.[82]  In addition, he signed at least one loan agreement as Vice President of RG Associates.[83]  Pappalardo also signed at least one letter sent to customers as Vice President Senior Account Manager of RG Associates.  Pappalardo failed to act in good faith or knowingly induced, directly or indirectly, the acts constituting violations alleged herein in that he fraudulently solicited customers. [84]

Turner is also liable as a controlling person of the Richmond Global Entities.  Turner was a signatory on the RG Associates bank account, where his title was listed as President.  Turner signed at least one letter sent to customers as President of RG Associates.  Turner failed to act in good faith or knowingly induced, directly or indirectly, the acts constituting violations alleged herein in that he fraudulently solicited customers. [85]

---

79    *Id.*
80    *Id.*
81    *See* Rix Decl. at ¶ 22-25; Conrad Decl. at ¶ 7.
82    Rix Decl. at ¶ 12.
83    *Id.*
84    *See* Rix Decl. at ¶ 12, 26-27; Conrad Decl. at ¶ 7.
85    Rix Decl. at ¶ 13; Conrad Decl. at ¶ 7.

13

## IV.    LEGAL ANALYSIS

The Court should issue the *ex parte* order and grant the Commission's motion for a preliminary injunction. The Commission has jurisdiction over the Defendants' activities as the Defendants fraudulently solicited customers to open managed accounts with the Richmond Global entities and foreign currency futures contracts were sold on their behalf.

### A.    The Commission has Marshaled Persuasive Evidence of the Defendants' Violations of the Act and Regulations Justifying the Issuance of an *Ex Parte* Order

Whenever it appears that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of the Act or any rule, regulation, or order promulgated thereunder, Section 6c(a) of the Act, 7 U.S.C. § 13a-1 (2002), empowers a district court to issue an *ex parte* restraining order freezing defendants' assets, wherever situated, prohibiting the destruction of defendants' books and records, granting the Commission's agents immediate access to defendants' books and records, and appointing a temporary receiver.[86]  As discussed *infra*, the Defendants have violated Section 4b(a)(2) of the Act, 7 U.S.C. § 6b(a)(2) (2002).

An *ex parte* restraining order is necessary to protect evidence of the Defendants' wrongdoing from alteration or destruction until formal discovery can begin.   Moreover, immediate *ex parte* statutory relief is required to: (1) locate, identify, and freeze assets of Defendants, so that they can be preserved for restitution and/or civil monetary penalties should the Commission prevail on the merits; (2) preserve Defendants' books and records and provide the Commission with access to them so that the extent of Defendants' misconduct can be determined; and (3) appoint a temporary receiver to marshal assets for potential redress.

---

[86]      *See SEC v. Princeton Economic International Ltd.*, 73 F. Supp.2d 420 (S.D.N.Y. 1999) (where SEC and CFTC brought joint action); *CFTC v. World Wide Currencies, Inc.*, 1996 WL 680273 (S.D.N.Y. 1996).

14

**B.    The Commission's Evidence Also Justifies the Entry of a Preliminary Injunction**

The Commission's evidence of the Defendants' fraudulent conduct justifies the entry of a preliminary injunction continuing the relief granted in the *Ex Parte* Statutory Restraining Order and granting additional relief. The Commission is entitled to preliminary injunctive relief upon a showing that (i) the Act has been violated and (ii) the violation is likely to continue absent the requested injunctive relief.[87] Upon a showing that the Act has been violated, irreparable injury may be presumed.[88] Moreover, the court may infer a likelihood of future violations from the Defendants' past misconduct.[89]

Injunctive relief is appropriate in this case because, among other things, Defendants engaged in fraud in connection with the sale of forex futures contracts. Unless the Commission obtains an injunction preventing the Defendants from violating the Act, the Defendants are likely to continue their violations. In addition, without preliminary remedial ancillary relief, such as an accounting, and the transferring of assets,[90] any final judgment granting relief such as disgorgement, restitution, and civil monetary penalties would likely be frustrated. Accordingly, the Commission requests that the Court enter a preliminary injunction.

**C.    The Defendants' Activities are Subject to the Act's Jurisdiction**

Section 2(c)(2)(B) of the Act, 7 U.S.C. § 2(c)(2)(B) (2002), provides that the Commission shall have jurisdiction over an agreement, contract or transaction in foreign

---

[87]    *See SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998) (requirement of substantial likelihood of success that violation was committed and that it would continue); *SEC v. American Board of Trade*, 751 F.2d 529, 537 (2d Cir. 1984) (other standards noted including *prima facie* evidence of a violation and a "reasonable likelihood" or some "cognizable danger" that the violation will occur in the future).

[88]    It is a "now well-established rule that in actions for a statutory injunction, such as [an action brought by the Commission under Section 6c], the agency need not prove irreparable injury or the inadequacy of other remedies as required in private injunctive suits." *CFTC v. British American Options Corp.*, 560 F.2d 135, 141 (2d Cir. 1977).

[89]    *Id.* at 142.

[90]    *SEC v. Infinity Group Co.*, 27 F. Supp. 2d 559, 561 (E.D. Pa. 1998); *SEC v. Antar*, 831 F. Supp. 380, 398 (D.N.J. 1993).

15

currency that is a contract of sale of a commodity for future delivery, so long as the contract is "offered to, or entered into with, a person that is not an eligible contract participant" unless the counterparty, or the person offering to be the counterparty, is any one of a number of regulated entities. Section 1a(12)(A)(xi) of the Act, 7 U.S.C. § 1a(12)(A)(xi) (2002) defines an eligible contract participant as an individual who has total assets in excess of "(I) $10 million; or (II) $5 million and who enters into the agreement, contract, or transaction in order to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual." The Commission has jurisdiction over the contracts in issue because most, if not all, of the foreign currency futures transactions were offered, or entered into, with the Defendants' customers and these customers were not eligible contract participants.

Further, Section 2(c)(2)(B)of the Act, 7 U.S.C. § 2(c)(2)(B) (2002), rants the Commission jurisdiction over transactions involving non-eligible contract participants unless the counterparty of the retail customer is:

| | |
|---|---|
| (I) | a financial institution; |
| (II) | a broker or securities dealer or futures commission merchant... |
| (III) | an associated person of a broker or dealer..., |
| (IV) | an insurance company..., |
| (V) | a financial holding company, |
| (VI) | an investment bank holding company. |

Here, the Defendants traded foreign currency futures contracts on behalf of their customers with counterparties who were registered FCMs. The Act, however, has reserved fraud jurisdiction to the Commission with respect to transactions involving registered FCMs.[91]

---

[91]     7 U.S.C. § 2(c)(2)(C) (2002). See *CFTC v. Madison Deane, et. al., No. 03-CV-9128(*Nov. 18, 2003*)* (granting an ex parte statutory retraining order against a registered FCM charged with fraud violations under the Act). The Commission, however, has recently moved to vacate a lower court opinion, not binding in this jurisdiction, in the S.D. of Florida which erroneously held that the Commission does not have fraud jurisdiction over its own registered FCMs with respect to off-exchange foreign currency futures. *CFTC v. Next Fin'l Services Unlimited, Inc., No. 04-80562-CIV* (Jan. 27, 2005), *motion to vacate pending.*

16

Accordingly, the Commission has jurisdiction over these transactions.

**D.    Defendants Defrauded Customers in Violation of Section 4b(a)(2) of the Act**

    1. <u>Defendants Cheated and Defrauded Customers and Willfully Deceived Customers</u>

Defendants committed solicitation fraud in violation of Section 4b(a)(2) of the Act.[92]  To establish a violation for solicitation fraud under Section 4b(a)(2) of the Act the defendant must have made (1) a false or misleading representation or omission (2) of a material fact (3) with scienter (4) in connection with a futures transaction (5) for or on behalf of any other person.[93]

First, the Defendants made false or misleading representations regarding the number of persons employed by the Richmond Global entities as forex traders and forex research specialists, the amount of money being managed by the Richmond Global entities, the Richmond Global entities' history of generating profits for customers, the level of risk involved in forex trading and the commissions charged to customers by the Richmond Global entities.

Second, these misrepresentations were material. "A statement is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision."[94]  Courts have held that representations regarding profitability of futures trading and the risk of loss resulting from such trading are material.[95]  Further, it is clearly important to an investor's decision how much he or she will have to pay in commissions and whether similar accounts have profited.[96]  Accordingly, Defendants' representations constitute material misrepresentations and omissions.

---

[92]    7 U.S.C. § 6(b)(a)(2) (2002).

[93]    *See CFTC v. AVCO Financial Corp.*, 28 F. Supp. 2d 104, 115 (S.D.N.Y. 1998), *aff'd in relevant part sub nom, CFTC v. Vartuli*, 228 F.3d 94 (2d Cir. 2000).

[94]    *AVCO Financial Corp.*, 28 F. Supp. 2d at 115 *quoting Saxe v. E.F. Hutton & Co., Inc.*, 789 F.2d 105, 111 (2d Cir. 1986).

[95]    *Saxe*, 789 F.2d at 112; *AVCO Financial Corp.*, 28 F. Supp. 2d at 115-16.

[96]    *CFTC v. Skorupskas*, 605 F.Supp. 923, 932 (E.D. Mich. 1985) (defendants defrauded customers by soliciting investor funds for trading and then not trading those funds); *CFTC v. Muller*, 570 F.2d 1296, 1300-01 (5th Cir. 1978) (preliminary injunction affirmed where CFTC made a prima facie showing that defendant had misappropriated customer funds in violation of the Act).

17

Third, Defendants made these material misrepresentations with scienter. Scienter requires proof that the defendant committed the alleged wrongful acts "intentionally or with reckless disregard for his duties under the Act."[97]  Here, it is clear from the evidence that the Defendants intentionally made these material misrepresentations in order to induce customers to invest their funds. Defendants' continued representations that customers could profit despite the Defendants' knowledge that customer accounts were losing demonstrates that Defendants made these false and misleading claims with scienter.

Fourth, Defendants' material misrepresentations and omissions were made in connection with futures transactions. A representation is "'in connection with' futures trading 'if it relates to the risk of the trading.'"[98]  As set forth below, the contracts Defendants traded with the FCMs on behalf of their customers were futures contracts. Defendants' misrepresentations regarding profits and risk obviously related to this type of trading. Accordingly, Defendants' solicitations violated Sections 4b(a)(2) of the Act.

Fifth, Defendants' material misrepresentations and omissions were made in connection with futures transactions made or to be made on behalf of any other person. At least 160 customers sent money to the Defendants and then the Defendants sent that money to various FCMs (less a 2% management fee) for the purpose of buying and selling forex contracts. As set forth below, these contracts were futures contracts since the representations regarding profits and how the customer money was going to be invested related to the risk of the trading. Accordingly, the facts set forth below establish that the Defendants' solicitations violated

---

[97]     *Hammond v. Smith Barney, Harris Upham & Co.*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,617 at 36,657-59 (CFTC March 1, 1990) (*scienter* is a necessary element to establish futures fraud); *Do v. Lind-Waldock & Co.*, [1994-1996 Transfer Binder] Comm. Fut., L. Rep. (CCH) ¶ 26,516 at 43,321 (CFTC Sept. 27, 1995) (a reckless act is one where there is so little care that it is difficult to believe the [actor] was not aware of what he was doing).
[98]     *CFTC v. Vartuli*, 228 F.3d 94, 102 (2d Cir. 2000).

18

Section 4b(a)(2) of the Act.

### 2. Defendants Misappropriated Customer Funds

The misappropriation of investor funds has also been held to constitute "willful and blatant fraudulent activity" that violates Section 4b(a)(2) of the Act.[99]  The Defendants used the unauthorized commissions to pay for salaries of, expenses of and commissions to Richmond Global employees, thereby misappropriating customer funds.

### 3. The Defendants Willfully Made False Records

Section 4b(a)(2) also makes it unlawful for any person in connection with a customer order to willfully make or cause to be made to such other person any false report or statement or willfully to enter or cause to be entered for such person any false record thereof.[100]  Once a record is altered so that it reflects a transaction that did not occur, that record becomes a false record.[101]

Here, the evidence demonstrates that Defendants created account statements containing false information in order to perpetuate this scheme.  Customer account agreements generated by Defendants omitted references to the commissions the Richmond Global entities would charge, and account statements sent to customers disguised these undisclosed commissions as trading losses.  Thus, in any instance where the Defendants changed, altered or created account statements with false information, they created a false record in violation of Section 4b(a)(2) of the Act.

---

[99]     *CFTC v. Noble Wealth  Data Information Servs., Inc.*, 90 F. Supp. 676, 687 (D. Md. 2000) (defendants defrauded investors by diverting investor funds for operating expenses and personal use); *CFTC v. Morse*, 762 F.2d 60, 62 (8th Cir. 1985) (defendant's use of customer funds for personal use violated Section 4b of the Act); *Skorupskas*, 605 F.Supp. at 932;  *In re Clancy*, [1980-1982 Transfer Binder] Comm. Fut. L. Rep. (CCH)  ¶ 21,126 at 24,563 (CFTC Nov. 24, 1980) (converting customer funds to own use is fraudulent); *CFTC v. Cheung*, No. CIV. 5598, 1994 WL 583169, at * 1-2 (S.D.N.Y. Oct. 21, 1994) (preliminary injunction granted against defendant who solicited customers to trade in commodities and then embezzled and converted customer funds).

[100]     *See* Section 4b(a)(2) of the Act, 7 U.S.C. § 6b(a)(2)(2002) .

[101]     *See Reddy v. CFTC,* 191 F.3d 109 (2d Cir. 1999) (upholding ALJ's determination that alteration of records to show a trade that did not originally occur as denoted violates the Act's prohibition on creating a false record).

## E.    Controlling Person Liability

As controlling persons of the Richmond Global entities, Danio, Pappalardo and Turner are liable for all those they controlled who violated Section 4b(a)(2) of the Act pursuant to Section 13(b) of the Act. The primary objective of Section 13(b) is to "allow the Commission to reach behind the corporate entity to the controlling individuals of the corporation and to impose liability for violations of the Act directly on such individuals as well as the corporation itself."[102] Pursuant to Section 13(b) of the Act, a person must have exercised general control, *i.e.,* the power to direct the management and the policies of the firm, and "'possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, even if such power was not exercised.'"[103]

To be liable as a controlling person under Section 13(b) of the Act, a defendant must possess the requisite degree of control and either (1) knowingly induce, directly or indirectly, the acts constituting the violation or (2) fail to act in good faith.[104]  Knowing inducement requires a showing that "the controlling person had actual or constructive knowledge of the core activities that make up the violation at issue and allowed them to continue."[105]  In the alternative, a controlling person fails to act in good faith if, for example, he does not reasonably supervise and control employees or does not diligently enforce an adequate system of supervision. "Section [13(b)] therefore, is about power and imposing liability for those who fail to exercise it to

---

[102]    *CFTC v. R.J. Fitzgerald & Co., Inc.,* 310 F.3d 1321, 1334 (11th Cir. 2002) (quoting *JCC, Inc. v. CFTC,* 63 F.3d 1557, 1567 (11ᵗʰ Cir. 1995); *In re Spiegel,* [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,103 at 34,765 (CFTC Jan. 12, 1988) *citing* S. Rep. No. 384, 97th Cong., 2d Sess. 47 (1982).
[103]    *Monieson v. CFTC,* 996 F.2d 852, 859 (7th Cir. 1993) (*quoting Donohoe v. Consolidated Operating & Production Corp.,* 982 F.2d 1130, 1138 (7th Cir. 1992)).
[104]    *CFTC v. Baragosh,* 278 F.3d 319, 330 (4th Cir. 2002); *R.J. Fitzgerald & Co., Inc.,* 310 F.3d at 1334; *In re Apache Trading Corp.,* [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,251 at 38,794 (CFTC Mar. 11, 1992).
[105]    *R.J. Fitzgerald & Co., Inc.,* 310 F.3d at 1334 (citing *JCC, Inc.,* 63 F.3d at 1568); *In re Spiegel,* ¶ 24,103 at 34,767.

prevent illegal conduct."[106] To be liable, the controlling person must act recklessly; negligence alone is insufficient.[107]

Danio, Pappalardo and Turner were officers of the Richmond Global entities and were signatories on various bank accounts. They each fraudulently solicited customers and controlled their funds. By these stark facts, they possessed the requisite degree of control and both failed to act in good faith and knowingly induced the acts constituting the violation.

F.        **Richmond Global's Liability as Principal for the Acts of its Agents**

The Richmond Global entities are liable for the violations of Section 4b(a)(2) of the Act committed by their officers, employees and agents pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2002), and Section 1.2 of the Regulations, 17 CFR § 1.2 (2004). Under Section 2(a)(1)(B) of the Act and Section 1.2 of the Regulations, "the act, omission, or failure of any official, agent, or other person acting for any . . . corporation . . . within the scope of his employment or office shall be deemed the act, omission, or failure of such . . . corporation."[108] Accordingly, the Richmond Global entities are liable for the violations of Section 4b(a)(2) of the Act described above committed by Danio, Turner, Pappalardo and Vinokur and others because those violations were committed within the scope of their employment or office.[109]

G.        **Contracts Traded on Behalf of Richmond Global Customers were Futures Contracts**

The Defendants, for or on behalf of their customers, entered into foreign currency futures contracts with one of the three FCMs. When determining whether the foreign currency contracts traded on behalf of the Richmond Global customers were futures contracts, "[t]he transaction

---

[106]    *R.J. Fitzgerald & Co., Inc.,* 310 F.3d at 1334.
[107]    *Monieson,* 996 F.2d at 860; *In re Apache Trading,* ¶ 25,251 at 38,794-95.
[108]    7 U.S.C. § 2(a)(1)(B) (2002).
[109]    *Knight v. First Commercial Group, Inc.,* [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,942 at 44,554 (CFTC 1997).

21

must be viewed as a whole with a critical eye toward its underlying purpose."[110] Moreover, the Commissions's jurisdiction is not limited to "instruments with every attribute of a conventional futures contract."[111] Further, despite the absence of a bright-line test, there are two important characteristics common to futures contracts[112] and other characteristics that can be helpful in identifying futures contracts.

First, futures contracts are contracts for the purchase or sale of a commodity for delivery in the future at a price that is established at the time the contract is initiated.[113] Second, the ability to form offsetting contracts is essential since investors rarely take delivery against the contracts.[114] "In general, if delivery of the commodity is not an expectation, then the investment presumably has the character of a futures contract."[115]

Other characteristics common to futures contracts include standardized commodity units, margin requirements related to price movements, clearing organizations which guarantee counterparty performance and the absence of any right or interest by the customer in a particular lot or other commodity unit.[116]

The foreign currency contracts in question exhibit most, if not all, of the characteristics of futures contracts. First, the contracts involved the purchase and sale of foreign currency for future -- as opposed to immediate or deferred -- delivery.[117] The contracts provided for future

---

[110] *CFTC v. Co Petro Marketing Group, Inc.*, 680 F.2d 573, 581 (9th Cir. 1982); *see also CFTC v. National Coal Exchange, Inc.* [1980-1982 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,424 at 26,055 (W.D. Tenn. 1982)("substance rather than mere form must be accorded full legal significance" in evaluating whether an instrument is a futures contract).

[111] *See Transnor (Bermuda) Ltd. V. BP North America*, 738 F. Supp. 1472, 1492-93 (S.D.N.Y. 1990); *CFTC v. Co Petro Mktg Group Inc.*, 680 F. 2d 573, 579-81 (9th Cir. 1982).

[112] *CFTC v. Hanover Trading Corp.*, 34 F. Supp. 2d 203, 205 (S.D.N.Y. 1999), *citing Co Petro Marketing Group*, 680 F.2d at 581; *see also* Hobson Decl. at ¶ 24.

[113] *CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 772 (9th Cir. 1995); *In re Stovall*, [1977-1980 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,941 at 23,777 (CFTC 1979); *see* Hobson Dec. ¶ 12.

[114] *Noble Metals Int'l, Inc.*, 67 F.3d at 772; *see* Hobson Decl. at ¶¶ 12, 14, 17.

[115] *CFTC v. American Metal Exch. Corp.*, 693 F. Supp. 168, 192 (D.N.J. 1988); *see* Hobson Dec. ¶ 12.

[116] Hobson Decl. at ¶¶ 12-15.

[117] Hobson Decl. at ¶¶ 31-32.

delivery of a specific type of foreign currency, *i.e.* Japanese yen, British pounds, Euros, and other foreign currencies, with the price set at the time the contract was entered into.[118]  Second, the customers never intended or had the ability to take delivery of foreign currencies.[119]  These customers expected that all of the foreign currency contracts traded in their accounts would be offset since the contract between the FCMs and the Richmond Global Entities, which trade for the benefit of the ultimate retail customers, provided for offset..[120]  In fact, the contracts were always settled by an offsetting transaction and did not ever result in delivery of foreign currencies.[121]  There is no indication that the customers ever intended that their contracts be used to take delivery of any foreign currencies.  The customer accounts were not opened for a business or personal need to make or take delivery of foreign currencies, and there was no indication that customers were required to hold or possessed the requisite bank accounts or necessary credit to acquire or deliver currency against any of the contracts [122]  Further there is no indication that any such accounts were maintained by the Defendants on behalf of their customers.[123]  Last, the contracts sold on behalf of the customers were standardized,[124] customers were required to maintain certain margin requirements and did not obtain any right or interest in a particular lot of currency, and regulated FCMs were responsible for executing and clearing these trades.[125]

In sum, these contracts were futures contracts.[126]

---

[118]     Hobson Decl. at ¶ 26.

[119]     Rix Decl. at ¶ 32; Conrad Decl. at ¶ 6.

[120]     *Id.*

[121]     Hobson Decl. at ¶ 27. Rix Decl. at ¶ 32.

[122]     Rix Decl. at ¶ 32; Conrad Decl. at ¶ 6.

[123]     Hobson Decl. at ¶ 27

[124]     These contracts were effectively standardized and interchangeable with one another, *i.e.* contracts traded for these customers were traded in multiples of ten units of currency and delivery specifications such as location and timing were identical across the various contracts.

[125]     Hobson Decl. at ¶¶ 26-29.

[126]     Hobson Decl. at ¶ 31.

**H.    The Richmond Global Entities are Jointly and Severally Liable as a Common Enterprise**

The Richmond Global Entities are jointly and severally liable with each other for their

violations of the Act.  These entities constitute a common enterprise.

> When determining whether a common enterprise exists, courts look to a variety of factors, including:  common control, the sharing of office space and officers, whether business is transacted through a "maze of interrelated companies," the commingling of corporate funds and failure to maintain separation of companies, unified advertising, and evidence which "reveals that no real distinction existed between the Corporate Defendants."[127]

The Richmond Global entities held themselves out to the public as a single financial

services company, shared office space, telephone numbers, a website, personnel, officers and

even customers.[128]   In addition, funds of the various Richmond Global entities were often

commingled.[129]  Accordingly, the Richmond Global Entities are not distinct entities, but form a

common enterprise with no real distinction between them.  As a common enterprise, they are

jointly and severally liable for the fraud perpetrated in this matter.

---

[127]    *CFTC v. Noble Wealth Data Information Servs., Inc.*, 90 F. Supp. 676, 691 (D. Md. 2000) *quoting FTC v. Wolf*, 1996 WL 812940 at * 7 (S.D. Fla. Jan. 31, 1996) (citations omitted).

[128]    Rix Decl. at ¶ 5.

[129]    Richmond Global did not always deposit and return customer funds from the same Richmond Global entities. *See* Carletta Decl. at ¶ 17.

## V.    **CONCLUSION**

For the reasons set forth in this Memorandum and other accompanying papers filed in

support of this application and Plaintiffs' Complaint, this Court should grant the request for an *ex*

*parte* statutory restraining order, appointment of a temporary receiver and entry of a preliminary

injunction.

Respectfully submitted,

Date:  February 15, 2005
       New York, New York

ATTORNEYS FOR PLAINTIFF

Stephen J. Obie
Regional Counsel

By: Karin N. Roth [KR-2669]
Senior Trial Attorney

Steven Ringer [SR-9491]
Chief Trial Attorney

David W. MacGregor
Chief Trial Attorney

U.S. COMMODITY FUTURES TRADING
COMMISSION
140 Broadway, 19th Floor
New York, New York 10005
(646) 746-9743
(646) 746-9940 (facsimile)
kroth@cftc.gov

25