UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

U.S. COMMODITY FUTURES TRADING
COMMISSION,

                Plaintiff,

      v.

RICHMOND GLOBAL ASSOCIATES, LLC
*et al.*

                Defendants.

-------------------------------------------------------------x

05 CV 2181  (SAS)

**DECLARATION OF
KARIN N. ROTH IN SUPPORT
OF PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT
AGAINST DEFENDANTS
JOSEPH PAPPALARDO,
RONALD TURNER, AND MIRON
VINOKUR**

I, Karin N. Roth, do hereby declare under penalty of perjury as follows:

1.      I am a Trial Attorney in the Division of Enforcement of the U.S. Commodity

Futures Trading Commission ("Commission"), Plaintiff in this action. I am also a member of the

bar of this Court. I make this declaration in support of the Commission's motion for summary

judgment against Defendants Joseph Pappalardo ("Pappalardo"), Ronald Turner ("Turner"), and

Miron Vinokur ("Vinokur").

Procedural History

2.      On February 16, 2005, the Commission commenced this action by filing a

complaint (the "Complaint") under seal against Pappalardo, Turner, Vinokur and others, seeking

injunctive and other equitable relief and civil penalties arising from the Defendants' violations of

the Commodity Exchange Act, 7 US.C. §§ 1 *et seq.* and the Commission's Regulations

promulgated thereunder. *See* the Commission's Complaint, which is docket entry no. 5 on the

Court's docket in this matter. Also on February 16, 2005, the Court granted the Commission's

Application for an *ExParte* Statutory Restraining Order Freezing Defendants' Assets, Prohibiting Defendants from Destroying or Altering any Books, Records or other Documents and Appointing a Temporary Receiver and An Order to Show Cause why a Preliminary Injunction should not be Entered. *See Ex Parte* Restraining Order, docket entry no. 13. This Order states that it remains in full force and effect until further order of this Court. This matter was unsealed by Order entered on February 17, 2005 and docketed on February 23, 2005. *See* February 17, 2005 Order, docket entry no. 4.

3.    In March, 2005, Pappalardo, Turner and Vinokur filed one-sentence Answers in which they generally denied the allegations of the Complaint and did not assert any defenses. *See* docket entries no.s 16, 19, 20.

4.    In addition to Pappalardo, Turner and Vinokur, the Complaint named as Defendants Richmond Global Associates, LLC, Richmond Global Director, LLC, Richmond Global MCA, LLC, Richmond Global Managed Account, LLC, Richmond Global, Ltd., and RG Group Holdings, LLC (collectively the "Richmond Global Entities"), corporations that held themselves out to the public as a unitary financial services company that managed funds for retail customers in the foreign exchange ("forex") markets. The Complaint also named an additional individual Defendant, Vincenzo Danio a/k/a Vincent Danio ("Danio"), who was President of certain of the Richmond Global Entities. None of the corporate Defendants or Danio responded to the Complaint. Accordingly, upon application of the Plaintiff, on April 5 and 6, 2005 the Clerk of the Court issued certificates of default holding the Richmond Global Entities and Danio in default. *See* docket entries no.s 29-35.

5.    On April 13, 2005, the Court ordered the Clerk to place this case on the suspense docket until further notice. *See* docket entry no. 36. On January 9, 2006, the Court ordered this

2

case removed from suspense docket. *See* docket entry no. 46. This Order also required the non-defaulting parties to propose a discovery schedule and permitted the Commission access to the Defendants' books and records being maintained by the Court-appointed Receiver.

6.     On March 24, 2006, the Court issued a Joint Discovery Order in this action setting discovery deadlines and requiring, *inter alia,* that all dispositive motions be served by January 5, 2007. *See* Joint Discovery Order, docket entry no. 48.

7.     On April 27, 2006, the Commission served Requests for Admissions pursuant to Fed. R. Civ. P. 36(a) on Defendants Pappalardo and Turner. Copies of these Requests for Admissions (without their exhibits) are attached hereto as Exhibits A ("Pappalardo RFA") and B ("Turner RFA"). Neither Pappalardo nor Turner responded to the Commission's Requests for Admissions.

<u>Related Criminal Matter and Defendants' Guilty Pleas</u>

8.     In an indictment filed on February 10, 2005 in the U.S. District Court for the Southern District of New York (05 Cr. 157 (BSJ)), Pappalardo, Turner and Vinokur, along with Danio, were charged with one count of conspiracy to commit mail fraud and wire fraud, and with four counts of wire fraud in connection with the same fraudulent conduct that is the basis for the Commission's Complaint in the present case. See Indictment in U.S. v. Danio, et al., 05 Cr. 157 (BSJ) docket entry no. 1. Specifically, the Indictment charged that Pappalardo, Turner, Vinokur and Danio engaged in an illegal scheme to defraud customers who invested in the forex market through the Richmond Global Entities. The Indictment further charged that to effectuate this scheme, Pappalardo, Turner, Vinokur and Danio made, or caused sales brokers to make, various misrepresentations to potential retail customers to induce them to invest with the Richmond Global Entities for the purpose of trading in the forex market and that they provided customers

with false and fraudulent account statements that disguised commissions taken by the Richmond Global Entities as trading losses. In addition, the Indictment charged that Pappalardo, Turner, Vinokur and Danio caused customer funds, in five distinct instances, to be improperly transferred from one of the Richmond Global Entities' clearing brokers to a Richmond Global bank account. The indictment alleged that Pappalardo, Turner, Vinokur and Danio misappropriated approximately $981,500 of investors' funds.

9.      Vinokur pled guilty to Count One of the criminal indictment on November 2, 2005 before the Honorable Barbara S. Jones. Attached as Exhibit C is a copy of pertinent portions of the transcript of Vinokur's plea hearing, in which he admits to having defrauded Richmond Global investors.

10.     On March 3, 2006, Judge Jones sentenced Vinokur to a prison term of one year and one day, three years of supervised release, and an assessment of $100. The restitution portion of Vikokur's sentence was suspended but, as is indicated in the criminal judgment against him, restitution "will become part of the special conditions of [Vinocur's] supervised release." Attached as Exhibit D is a copy of the criminal judgment against Vinokur.

11.     Vinokur is currently incarcerated at Moshannon Valley Correctional Institution in Philipsburg, PA. His projected release date is April 11, 2007. Attached as Exhibit E is a printout from the Inmate Locator for the Federal Bureau of Prisons website, www.bop.gov, with these pertinent details.

12.     On October 10, 2005, Pappalardo consented to transfer the pending criminal indictment against him relating to his conduct at the Richmond Global Entities to the U.S. District Court for the Eastern District of New York for plea and sentencing. The criminal case against Pappalardo was docketed in the Eastern District as 05 CR 868.

13.    On June 28, 2006, Pappalardo pled guilty to Count One of the Richmond Global-related criminal indictment before the Honorable Cheryl L. Pollak, United States Magistrate Judge for the Eastern District of New York. Attached as Exhibit F is a copy of pertinent portions of the transcript of Pappalardo's plea hearing, in which he admits to having defrauded Richmond Global investors. At the same time Pappalardo also pled guilty to the extortionate collection of a debt in an unrelated criminal matter entitled *U.S. v. Kuretski et al.*, 05 CR 059 (RJD) that was pending in the Eastern District of New York. *See* Exhibit F.

14.    Pappalardo has yet to be sentenced for his criminally fraudulent conduct in connection with the Richmond Global Entities. *See* Exhibit G, Docket Sheet in *U.S. v. Pappalardo.*

15.    On October 10, 2005, Turner consented to transfer the pending criminal indictment against him relating to his conduct at the Richmond Global Entities to the U.S. District Court for the Eastern District of New York for plea and sentencing. The criminal case against Turner was docketed in the Eastern District as 05 CR 810. In the form consenting to transfer the case (attached as Exhibit H), Turner stated that he intended to plead guilty. Further proceedings in that matter have been sealed. *See* docket sheet attached as Exhibit I.

16.    Danio also pled guilty to Count One of the criminal complaint against him relating to his conduct at Richmond Global. Attached as Exhibit J is a copy of pertinent portions of the transcript of Danio's plea hearing, in which he admits to having defrauded Richmond Global investors. Danio was sentenced to thirty months in jail, three years of supervised release, and ordered to pay $400,000 in restitution to the Court appointed receiver for the Richmond Global Entities. *See* the criminal judgment against Danio, attached as Exhibit K.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at New York, New York on January 4, 2007

Karin N. Roth

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

U.S. COMMODITY FUTURES TRADING          :          05 Civ. 2181 (SAS)
COMMISSION                              :
                                        :
                                        :          **PLAINTIFF'S REQUEST FOR**
                     Plaintiff,         :          **ADMISSIONS TO DEFENDANT**
                                        :          **JOSEPH PAPPALARDO**
          v.                            :
                                        :
                                        :
RICHMOND GLOBAL ASSOCIATES, L.L.C.      :
et al.                                  :
                     Defendants.        :
                                        :
------------------------------------------------------------x

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure ("Federal Rules"),

Plaintiff Commodity Futures Trading Commission ("Commission") hereby requests that

Defendant Joseph Pappalardo ("Pappalardo") serve upon the undersigned sworn written answers

to each of the admissions set forth below, within 30 days after service hereof.  Any failure to

respond to such requests shall be deemed an admission thereof.

**A.      INSTRUCTIONS**

1.      Pursuant to Federal Rule 36(a), each matter of which an admission is requested has

been separately set forth.  If objection is made, the reasons therefore shall be stated.  The answer

shall specifically admit or deny the matter or set forth in detail the reasons why the answering

party cannot truthfully admit or deny the matter.  A denial shall fairly meet the substance of the

requested admission, and when good faith requires that a party qualify an answer or deny only a

part of the matter of which an admission is requested, the party shall specify so much of it as is

true and qualify or deny the remainder.

2.      An answering party may not give lack of information or knowledge as a reason for

failure to admit or deny unless the party states that the party has made reasonable inquiry and that

the information known or readily obtainable by the party is insufficient to enable the party to admit or deny.

3.    A party may not object to any request solely on the grounds that such request presents a genuine issue for trial.

4.    The discovery requested herein, unless otherwise specified (as, for example, by use of the word "ever" or the phrase "at any time" or "of any date"), and without regard to the tenses used in any interrogatory or request, covers the period from **December 2001 through February 2005**. To the extent that any answer varies with respect to any part of that period, a separate answer is required for each such part, with the pertinent dates indicated.

5.    Unless otherwise specified, any word used herein in the singular is also to be construed in the plural and vice versa and any use of the conjunctive is also to be construed in the disjunctive and vice versa. Any use of "any" is also to be construed as "all" and vice versa, and any use of "each" is also to be construed as "every" and vice versa.

6.    If any information called for by an admission is withheld by reason of a claim of privilege, state with specificity the information required by Local Rule 26.2

**B.**    **DEFINITIONS**

1.    These definitions incorporate by reference the Uniform Definitions in Discovery Requests set forth in Local Rule 26.3.

2.    The term "employee(s)" includes, but is not limited to, salespersons, office staff, office managers, secretaries, clerks, receptionists, associates and telemarketers.

3.    The term "control" is the power to direct the management and the policies of the firm, and to possess the power or ability to influence the specific transaction or activity even if such power was not exercised.

4.    The term "Richmond Global Entities" refers to Richmond Global Associates, LLC ("RG Associates"), Richmond Global Director, LLC ("RG Director"), Richmond Global MCA, LLC, Richmond Global Managed Account, LLC, Richmond Global, Ltd., RG Group Holdings, LLC.

## C.    REQUESTS FOR ADMISSIONS

1.    From at least December 2001 through February 2005, Pappalardo together with others solicited funds from customers purportedly to be used for trading foreign currency ("forex") contracts.

2.    Pappalardo or others under his control made misleading representations to potential retail customers over the telephone to attract customers to open accounts and to entrust funds to the Richmond Global Entities for purposes of trading foreign currency futures contracts.

3.    a.    Pappalardo responded on behalf of the Richmond Global Entities to at least one inquiry from the Better Business Bureau Serving Metropolitan New York ("BBB NY").

b.    Pappalardo signed an undated letter to a Mrs. Kent of the BBB NY attached as Exhibit 1.

c.    The undated letter to a Mrs. Kent of the BBB NY attached Exhibit 1 was written by Pappalardo in the normal course of the Richmond Global Entities' business.

d.    Exhibit 1 is an authentic copy of the letter signed by Pappalardo to Mrs. Kent of the BBB NY and maintained in conjunction with the normal course of the Richmond Global Entities' business.

4.    a.    Pappalardo responded on behalf of the Richmond Global Entities to at least one inquiry from the Pennsylvania Office of Attorney General, Bureau of Consumer Protection.

b.    Pappalardo signed the letter dated March 23, 2004 to Office of Attorney General, Bureau of Consumer Protection attached as Exhibit 2.

c.    The letter dated March 23, 2004 to Office of Attorney General, Bureau of Consumer Protection attached as Exhibit 2 was written by Pappalardo in the normal course of the Richmond Global Entities' business.

d.    Exhibit 2 is an authentic copy of the letter dated March 23, 2004 to Office of Attorney General, Bureau of Consumer Protection and maintained in conjunction with the normal course of the Richmond Global Entities' business.

5.    a.    Pappalardo responded on behalf of the Richmond Global Entities to at least one inquiry from the Louisiana Public Service Commission.

b.    Pappalardo signed the letter dated March 31, 2004 addressed to Brenda, Manager of the Do Not Call Program attached as Exhibit 3.

c.    Under Pappalardo's signature on Exhibit 3, he wrote his title as Vice President.

d.    The letter dated March 31, 2004 addressed to Brenda, Manager of the Do Not Call Program attached as Exhibit 3 was written by Pappalardo in the normal course of the Richmond Global Entities' business.

e.    Exhibit 3 is an authentic copy of the letter dated March 31, 2004 addressed to Brenda, Manager of the Do Not Call Program and was maintained in conjunction with the normal course of Richmond Global Entities' business.

d.    Exhibit 4 is a handwritten version of the letter dated March 31, 2004 addressed to Brenda, Manager of the Do Not Call Program in Exhibit 3 which Pappalardo signed.

4

6.    a.    Pappalardo has held himself out to the Richmond Global Entities' customers as the Vice President and Senior Account Manager of RG Associates.

b.    Exhibit 5 is a copy of at least one of Pappalardo's business cards at RG Associations.

7.    Pappalardo was an agent of the Richmond Global Entities.

8.    a.    Pappalardo signed at least one loan agreement as Vice President of RG Associates.

b.    Exhibit 6 is an authentic copy of a loan agreement between Dennis Weichert and RG Associates dated June 12, 2003 and was maintained in conjunction with the normal course of Richmond Global Entities' business.

c.    Pappalardo signed Exhibit 6 on behalf of RG Associates.

d.    Exhibit 7 is an authentic copy of a loan agreement between John E. Bacon ("Bacon") and RG Associates dated April 4, 2003 and was maintained in conjunction with the normal course of Richmond Global Entities' business.

e.    Pappalardo signed Exhibit 7 on behalf of RG Associates.

f.    Bacon sent a check, via federal express, in the amount of $3,000 specified in the loan agreement in Exhibit 7 to Pappalardo at RG Associates.  This check is attached as Exhibit 8

g.    Pappalardo mailed Bacon a check for $375 representing interest payments on the loan agreed to in Exhibit 7.

h.    Pappalardo signed check number 1269 for $375 made payable to Bacon on RG Asscociates's bank account at HSBC attached as Exhibit 9.

5

9.      Pappalardo signed at least one letter sent to customers as Vice President Senior Account Manager of RG Associates.

10.     a.      Pappalardo was a signatory on RG Associates' bank accounts.

b.      Pappalardo signed check number 1446 on RG Asscociates's bank account at HSBC attached as Exhibit 10.

c.      This check was provided as a legal retainer to Sichenzia, Ross, Friedman, Ference LLP to represent the Richmond Global Entities.

d.      Pappalardo signed the retainer agreement with Sichenzia, Ross, Friedman, Ference LLP on behalf of the Richmond Global Entities attached as Exhibit 11.

11.     Pappalardo has never been registered with the Commission in any capacity.

12.     Pappalardo, through the Richmond Global Entities' website, telephone solicitations and other materials, made false representations to prospective customers to induce these individuals to open accounts with the Richmond Global Entities.

13.     a.      At various times between December 2001 and February 2005, the Richmond Global Entities had a website whose address was www.richmondglobal.com.

b.      Exhibit 12 is a printout of certain pages of the Richmond Global Entities' website dated December 21, 2004.

c.      The Richmond Global Entities used this website to solicit potential customers.

14.     a.      Pappalardo or others under his control used prepared scripts when cold-calling potential customers of the Richmond Global Entities.

b.      Exhibit 13 is scripts used by the Richmond Global Entities employees for cold calling potential customers.

6

    c.    Exhibit 14 is handwritten scripts used by the Richmond Global Entities employees for cold calling potential customers.

    d.    Exhibit 15 is examples of scripts used by Richmond Global Entities' employee for call backs.

    e.    Exhibit 16 is an example of a script following up an initial cold call used by Richmond Global Entities employees.

    f.    Exhibit 17 is scripts obtained by a Richmond Global Entities which were developed by Walter Scott Lev, an unrelated firm.

15.    a.    Pappalardo or others under his control sent promotional materials to potential customers of the Richmond Global Entities.

    b.    Exhibit 18 is an example of one of the promotional brochures sent by Richmond Global Entities' employees to potential customers.

    c.    Exhibit 18 is an authentic copy of a brochure used by the Richmond Global Entities and maintained in conjunction with the normal course of the Richmond Global Entities' business.

16.    a.    Pappalardo or others under his control faxed coversheets to potential customers of the Richmond Global Entities with profit claims such as Exhibit 18.

    b.    Exhibit 19 is an example of fax coversheet used in the normal course of the Richmond Global Entities' business.

    c.    Exhibit 19 is an authentic fax coversheet used by the Richmond Global Entities and maintained in conjunction with the normal course of Richmond Global Entities' business.

7

17.    a.    To open a managed currency trading account, customers completed and signed account opening documents and sent them with their funds directly to the Richmond Global Entities.

b.    Pappalardo and other Richmond Global Entities employees mailed potential Richmond Global Entities' customers account opening document.

c.    Exhibit 20 is an example of the New Account Documents and Application Form package sent by Pappalardo and other Richmond Global Entities employees during 2004 to potential customers.

d.    Exhibit 21 is an authentic copy of the New Account Documents and Application Form package which was to be filled out by Richmond Global Entities' customers during 2004 and was maintained in conjunction with the normal course of Richmond Global Entities' business.

18.    a.    Included with the Richmond Global Entities account opening documentation was a power of attorney authorizing the Richmond Global Entities to trade on behalf of, or for the benefit of its customers.

b.    Exhibit 21 is an example of an Account Agreement sent by Pappalardo and other Richmond Global Entities employees during 2005 to potential customers.

c.    Exhibit 21 is an authentic copy of an Account Agreement sent by Pappalardo and other Richmond Global Entities employees during 2005 which was to be filled out by Richmond Global Entities' customers and was maintained in conjunction with the normal course of Richmond Global Entities' business.

8

19.    a.      Pappalardo and others under his control sent letters to customers of the Richmond Global Entities confirming the opening of the customer's new account and providing wire transfer instructions.

          b.      Exhibit 22 is an example of a Confirmation of New Trade Account letter sent by Pappalardo to a new customer of the Richmond Global Entities.

          c.      Exhibit 23 is an authentic copy of a Confirmation of New Trade Account letter sent to Marc Andrews which was maintained by the Richmond Global Entities in conjunction with the normal course of the Richmond Global Entities' business.

          d.      Exhibit 24 is an authentic copy of a Confirmation of New Trade Account letter sent to Solomon Ripstein/ ros Sandra Ripstein which was maintained by the Richmond Global Entities in conjunction with the normal course of Richmond Global Entities' business.

20.      Pappalardo promised his customers that he would be in regular telephone contact with customers about their account status, and would provide customers with account statements.

21.      After receiving customers' funds, Pappalardo and other Richmond Global Entities employees sent these funds, after deducting a disclosed two percent management fee, to one of three futures commission merchants ("FCMs"), after which the FCMs executed trades on behalf of the Richmond Global Entities' customers.

22.      At rates set by the Richmond Global Entities, the FCMs deducted additional commissions on executed transactions from the customer funds they held. These commissions, which were never disclosed to customers, were then paid directly to the Richmond Global Entities.

23.      Each of the FCMs provided the Richmond Global Entities with transaction records showing the profit/loss from each executed forex futures trade and showing the commission charged on the transaction and which was then returned to the Richmond Global Entities.

9

24.    The account statements issued by the Richmond Global Entities to the customers detailed only the customers' net cash position: the balance at the beginning of the period, customer deposits, customer withdrawals, profit or loss, management fees, and the balance at the end of the period. The statements did not provide any information regarding the forex futures trading executed on the customer's behalf or for the customer's benefit.

25.    Pappalardo or others under his control falsely represented to customers that the Richmond Global Entities employed as many as twelve researchers and analysts and had between $10 and $12 million under management in the forex market.

26.    The Richmond Global Entities did not employ researchers or analysts, and never had more than $1.2 million under management.

27.    Pappalardo or others under his control falsely represented to retail customers that the Richmond Global Entities generated profits as high as 40% annually, and that they would, in the future, generate profits of 45% annually.

28.    The Richmond Global Entities rarely generated any net profits for their customers trading in the forex market.

29.    Pappalardo or others under his control falsely represented to the Richmond Global Entities' customers that money invested in the forex market was like money placed in a bank account.

30.    Pappalardo knew that investments in the forex market were highly speculative and volatile.

31.    Pappalardo or others under his control misrepresented to the Richmond Global Entities' customers that stop-loss mechanisms were in place to limit trading losses to 10% of the customers' investments.

32.    Pappalardo knew that the Richmond Global Entities' customer losses were far larger than that were common in the forex industry.

33.    Pappalardo or others under his control falsely represented to the Richmond Global Entities' customers that the Richmond Global Entities charged customers only a 2% management fee and 10% of any profits generated through trading.

34.    The Richmond Global Entities charged customers undisclosed commissions ranging from approximately 16% to 39%.

35.    The Richmond Global Entities received the undisclosed commissions by instructing the FCMs executing the trades to deduct a portion of the customers' funds and to return those funds to the Richmond Global Entities as commissions.

36.    Commissions totaling approximately $981,500 were returned from the FCMs to the Richmond Global Entities.

37.    The Richmond Global Entities, Pappalardo and others then used the undisclosed commissions for their own purposes.

38.    In order to conceal the unauthorized commissions, the Richmond Global Entities, Pappalardo and others under his control issued false account statements to customers that were disguised commissions as trading losses.

39.    Pappalardo knew that the account statements he or others under his control mailed or faxed to Richmond Global Entities' customers were fraudulent.

40.    Pappalardo, for or on behalf of the Richmond Global Entities' customers, entered into foreign currency futures contracts with a FCM.

11

41.    The foreign currency futures contracts traded were for Japanese yen, British pounds, Euros, and other foreign currencies, with the price set at the time the contract was entered into.

42.    After the foreign currency futures contract position was established (or, in some cases, the same date the position was entered into), the position in the currency was terminated, offset at a price that reflected market conditions at that time.

43.    The foreign currency futures transactions executed by the FCMs were entered into and were for and behalf of, and for the benefit of the Richmond Global Entities' customers.

44.    The contract between the FCM and the Richmond Global Entities provided explicitly that the foreign currency futures contracts could be offset.

45.    Customers were required to maintain with the Richmond Global Entities certain margin requirements.

46.    There was no indication in any materials provided to customers by the Richmond Global Entities that physical currency was ever actually bought or sold for the customers.

47.    None of the Richmond Global Entities' customer accounts were opened for a business or personal need to make or take delivery of foreign currencies, and there was no indication that customers were required to hold, or possessed the requisite bank accounts or necessary credit to acquire or deliver, currency against any of the contracts purchased on their behalf.

48.    The Richmond Global Entities' customers never intended that their contracts be used to take delivery of any foreign currencies.

49.    The contracts traded for the Richmond Global Entities' customers were traded in multiples of ten units of currency and delivery specifications such as location and timing were

identical across the various contracts, and they were effectively standardized and interchangeable with one another. The transactions offered to these customers were entirely paper transactions.

50.    None of the Richmond Global Entities' customers or the Richmond Global Entities had assets in excess of $5 million dollars.

51.    The Richmond Global Entities' customers opened their accounts in order to speculate on price changes in foreign currencies.

52.    a.    The Richmond Global Entities were the subject of investigations conducted by certain state regulatory agencies and by the Commission.

b.    The State of Missouri, Office of the Secretary of State, Securities Division entered into a Consent Order with Pappalardo attached as Exhibit 25.

c.    Pappalardo was order in the Consent Order attached as Exhibit 25 to pay a fine of $1,000.

d.    Pappalardo signed the Consent Order attached as Exhibit 25 on September 15, 2004.

Dated:    New York, New York
         April 27, 2006

         U.S. COMMODITY FUTURES TRADING
         COMMISSION

         Karin N. Roth [KR 2669]
         Division of Enforcement
         U.S. Commodity Futures Trading Commission
         140 Broadway, 19th Floor
         New York, New York  10005
         Ph. (646) 746-9764
         Fax (646) 746-9940

13

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

|  |  |  |
|---|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION | : | 05 Civ. 2181 (SAS) |
|  | : |  |
|  | : | **PLAINTIFF'S REQUEST FOR** |
| Plaintiff, | : | **ADMISSIONS TO DEFENDANT** |
|  | : | **RONALD TURNER** |
| v. | : |  |
|  | : |  |
| RICHMOND GLOBAL ASSOCIATES, L.L.C. et al. | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

-------------------------------------------------------------x

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure ("Federal Rules"), Plaintiff Commodity Futures Trading Commission ("Commission") hereby requests that Defendant Ronald Turner ("Turner") serve upon the undersigned sworn written answers to each of the admissions set forth below, within 30 days after service hereof. Any failure to respond to such requests shall be deemed an admission thereof.

## A.   <u>INSTRUCTIONS</u>

1.      Pursuant to Federal Rule 36(a), each matter of which an admission is requested has been separately set forth. If objection is made, the reasons therefore shall be stated. The answer shall specifically admit or deny the matter or set forth in detail the reasons why the answering party cannot truthfully admit or deny the matter. A denial shall fairly meet the substance of the requested admission, and when good faith requires that a party qualify an answer or deny only a part of the matter of which an admission is requested, the party shall specify so much of it as is true and qualify or deny the remainder.

2.      An answering party may not give lack of information or knowledge as a reason for failure to admit or deny unless the party states that the party has made reasonable inquiry and

that the information known or readily obtainable by the party is insufficient to enable the party to admit or deny.

3.     A party may not object to any request solely on the grounds that such request presents a genuine issue for trial.

4.     The discovery requested herein, unless otherwise specified (as, for example, by use of the word "ever" or the phrase "at any time" or "of any date"), and without regard to the tenses used in any interrogatory or request, covers the period from **December 2001 through February 2005**. To the extent that any answer varies with respect to any part of that period, a separate answer is required for each such part, with the pertinent dates indicated.

5.     Unless otherwise specified, any word used herein in the singular is also to be construed in the plural and vice versa and any use of the conjunctive is also to be construed in the disjunctive and vice versa. Any use of "any" is also to be construed as "all" and vice versa, and any use of "each" is also to be construed as "every" and vice versa.

6.     If any information called for by an admission is withheld by reason of a claim of privilege, state with specificity the information required by Local Rule 26.2

**B.     DEFINITIONS**

1.     These definitions incorporate by reference the Uniform Definitions in Discovery Requests set forth in Local Rule 26.3.

2.     The term "employee(s)" includes, but is not limited to, salespersons, office staff, office managers, secretaries, clerks, receptionists, associates and telemarketers.

3.     The term "control" is the power to direct the management and the policies of the firm, and to possess the power or ability to influence the specific transaction or activity even if such power was not exercised.

4.    The term "Richmond Global Entities" refers to Richmond Global Associates, LLC ("RG Associates"), Richmond Global Director, LLC ("RG Director"), Richmond Global MCA, LLC, Richmond Global Managed Account, LLC, Richmond Global, Ltd., RG Group Holdings, LLC.

## C.    REQUESTS FOR ADMISSIONS

1.    From at least December 2001 through February 2005, Tuner together with others solicited funds from customers purportedly to be used for trading foreign currency ("forex") contracts.

2.    Turner or others under his control made misleading representations to potential retail customers over the telephone to attract customers to open accounts and to entrust funds to the Richmond Global Entities for purposes of trading foreign currency futures contracts.

3.    a.    Turner has held himself out to the Richmond Global Entities' customers as the President of RG Associates.

b.    Exhibit 1 is an authentic copy of a letter sent to Alexandros A. Volanis dated June 12, 2003 from Turner which was maintained by the Richmond Global Entities in conjunction with the normal course of Richmond Global Entities' business.

c.    Turner signed Exhibit 1 on behalf of RG Associates.

d.    Turner lists his title as President.

4.    Turner was signatory on bank accounts at HSBC maintained by RG Associates.

5.    Turner was an agent of the Richmond Global Entities.

6.    a.    Turner signed at least one letter sent to customers as President and Senior Account Manager of RG Director.

3

b.     Exhibit 2 is an authentic copy of an undated promotional letter mailed to potential customers of the Richmond Global Entities and was maintained in conjunction with the normal course of Richmond Global Entities' business.

7.     Turner has never been registered with the Commission in any capacity.

8.     Turner, through the Richmond Global Entities' website, telephone solicitations and other materials, made false representations to prospective customers to induce these individuals to open accounts with the Richmond Global Entities.

9.     a.     At various times between December 2001 and February 2005, the Richmond Global Entities had a website whose address was www.richmondglobal.com.

b.     Exhibit 3 is a printout of certain pages of the Richmond Global Entities' website dated December 21, 2004.

c.     The Richmond Global Entities used this website to solicit potential customers.

10.     a.     Turner or others under his control used prepared scripts when cold-calling potential customers of the Richmond Global Entities.

b.     Exhibit 4 is scripts used by the Richmond Global Entities employees for cold calling potential customers.

c.     Exhibit 5 is handwritten scripts used by the Richmond Global Entities employees for cold calling potential customers.

d.     Exhibit 6 is examples of scripts used by Richmond Global Entities' employee for call backs.

e.     Exhibit 7 is an example of a script following up an initial cold call used by Richmond Global Entities employees.

   f. Exhibit 8 is scripts obtained by a Richmond Global Entities which were developed by Walter Scott Lev, an unrelated firm.

  11. a. Turner or others under his control sent promotional materials to potential customers of the Richmond Global Entities.

   b. Exhibit 9 is an example of one of the promotional brochures sent by Richmond Global Entities' employees to potential customers.

   c. Exhibit 9 is an authentic copy of a brochure used by the Richmond Global Entities and maintained in conjunction with the normal course of the Richmond Global Entities' business.

  12. a. Turner or others under his control faxed coversheets to potential customers of the Richmond Global Entities with profit claims such as Exhibit 8.

   b. Exhibit 10 is an example of fax coversheet used in the normal course of the Richmond Global Entities' business.

   c. Exhibit 10 is an authentic fax coversheet used by the Richmond Global Entities and maintained in conjunction with the normal course of Richmond Global Entities' business.

  13. a. To open a managed currency trading account, customers completed and signed account opening documents and sent them with their funds directly to the Richmond Global Entities.

   b. Turner and other Richmond Global Entities employees mailed potential Richmond Global Entities' customers account opening document.

      c.     Exhibit 11 is an example of the New Account Documents and Application Form package sent by Turner and other Richmond Global Entities employees during 2004 to potential customers.

      d.     Exhibit 11 is an authentic copy of the New Account Documents and Application Form package which was to be filled out by Richmond Global Entities' customers during 2004 and was maintained in conjunction with the normal course of Richmond Global Entities' business.

14.    a.     Included with the Richmond Global Entities account opening documentation was a power of attorney authorizing the Richmond Global Entities to trade on behalf of, or for the benefit of its customers.

      b.     Exhibit 12 is an example of an Account Agreement sent by Pappalardo and other Richmond Global Entities employees during 2005 to potential customers.

      c.     Exhibit 12 is an authentic copy of an Account Agreement sent by Pappalardo and other Richmond Global Entities employees during 2005 which was to be filled out by Richmond Global Entities' customers and was maintained in conjunction with the normal course of Richmond Global Entities' business.

15.    a.     Turner and others under his control sent letters to customers of the Richmond Global Entities confirming the opening of the customer's new account and providing wire transfer instructions.

      b.     Exhibit 13 is an example of a Confirmation of New Trade Account letter sent by Turner to a new customer of the Richmond Global Entities.

c.    Exhibit 14 is an authentic copy of a Confirmation of New Trade Account letter sent to Bill Allen which was maintained by the Richmond Global Entities in conjunction with the normal course of the Richmond Global Entities' business.

16.    Turner promised his customers that he would be in regular telephone contact with customers about their account status, and would provide customers with account statements.

17.    After receiving customers' funds, Turner and other Richmond Global Entities employees sent these funds, after deducting a disclosed two percent management fee, to one of three futures commission merchants ("FCMs"), after which the FCMs executed trades on behalf of the Richmond Global Entities' customers.

18.    At rates set by the Richmond Global Entities, the FCMs deducted additional commissions on executed transactions from the customer funds they held. These commissions, which were never disclosed to customers, were then paid directly to the Richmond Global Entities.

19.    Each of the FCMs provided the Richmond Global Entities with transaction records showing the profit/loss from each executed forex futures trade and showing the commission charged on the transaction and which was then returned to the Richmond Global Entities.

20.    The account statements issued by the Richmond Global Entities to the customers detailed only the customers' net cash position: the balance at the beginning of the period, customer deposits, customer withdrawals, profit or loss, management fees, and the balance at the end of the period. The statements did not provide any information regarding the forex futures trading executed on the customer's behalf or for the customer's benefit.

21.     Turner or others under his control falsely represented to customers that the Richmond Global Entities employed as many as twelve researchers and analysts and had between $10 and $12 million under management in the forex market.

22.     The Richmond Global Entities did not employ researchers or analysts, and never had more than $ 1.2 million under management.

23.     Turner or others under his control falsely represented to retail customers that the Richmond Global Entities generated profits as high as 40% annually, and that they would, in the future, generate profits of 45% annually.

24.     The Richmond Global Entities rarely generated any net profits for their customers trading in the forex market.

25.     Turner or others under his control falsely represented to the Richmond Global Entities' customers that money invested in the forex market was like money placed in a bank account.

26.     Turner knew that investments in the forex market were highly speculative and volatile.

27.     Turner or others under his control misrepresented to the Richmond Global Entities' customers that stop-loss mechanisms were in place to limit trading losses to 10% of the customers' investments.

28.     Turner knew that the Richmond Global Entities' customer losses were far larger than that were common in the forex industry.

29.     Turner or others under his control falsely represented to the Richmond Global Entities' customers that the Richmond Global Entities charged customers only a 2% management fee and 10% of any profits generated through trading.

30.    The Richmond Global Entities charged customers undisclosed commissions ranging from approximately 16% to 39%.

31.    The Richmond Global Entities received the undisclosed commissions by instructing the FCMs executing the trades to deduct a portion of the customers' funds and to return those funds to the Richmond Global Entities as commissions.

32.    Commissions totaling approximately $981,500 were returned from the FCMs to the Richmond Global Entities.

33.    The Richmond Global Entities, Turner and others then used the undisclosed commissions for their own purposes.

34.    In order to conceal the unauthorized commissions, the Richmond Global Entities, Turner and others under his control issued false account statements to customers that were disguised commissions as trading losses.

35.    Turner knew that the account statements he or others under his control mailed or faxed to Richmond Global Entities' customers were fraudulent.

36.    Turner, for or on behalf of the Richmond Global Entities' customers, entered into foreign currency futures contracts with a FCM.

37.    The foreign currency futures contracts traded were for Japanese yen, British pounds, Euros, and other foreign currencies, with the price set at the time the contract was entered into.

38.    After the foreign currency futures contract position was established (or, in some cases, the same date the position was entered into), the position in the currency was terminated, offset at a price that reflected market conditions at that time.

39.    The foreign currency futures transactions executed by the FCMs were entered into and were for and behalf of, and for the benefit of the Richmond Global Entities' customers.

40.    The contract between the FCM and the Richmond Global Entities provided explicitly that the foreign currency futures contracts could be offset.

41.    Customers were required to maintain with the Richmond Global Entities certain margin requirements.

42.    There was no indication in any materials provided to customers by the Richmond Global Entities that physical currency was ever actually bought or sold for the customers.

43.    None of the Richmond Global Entities' customer accounts were opened for a business or personal need to make or take delivery of foreign currencies, and there was no indication that customers were required to hold, or possessed the requisite bank accounts or necessary credit to acquire or deliver, currency against any of the contracts purchased on their behalf.

44.    The Richmond Global Entities' customers never intended that their contracts be used to take delivery of any foreign currencies.

45.    The contracts traded for the Richmond Global Entities' customers were traded in multiples of ten units of currency and delivery specifications such as location and timing were identical across the various contracts, and they were effectively standardized and interchangeable with one another. The transactions offered to these customers were entirely paper transactions.

46.    None of the Richmond Global Entities' customers or the Richmond Global Entities had assets in excess of $5 million dollars.

47.    The Richmond Global Entities' customers opened their accounts in order to speculate on price changes in foreign currencies.

10

48.    The Richmond Global Entities were the subject of investigations conducted by certain state regulatory agencies and by the Commission.

Dated:        New York, New York
              April 27, 2006

U.S. COMMODITY FUTURES TRADING
COMMISSION

Karin N. Roth [KR 2669]
Division of Enforcement
U.S. Commodity Futures Trading Commission
140 Broadway, 19th Floor
New York, New York  10005
Ph. (646) 746-9764
Fax (646) 746-9940

Exhibit C

5B2HVINP

1 | UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

2 | ------------------------------x

3 | UNITED STATES OF AMERICA,

4 |            v.                              05 Cr. 157 (BSJ)

5 | MIRON VINKOR,

6 |                  Defendant.

7 | ------------------------------x

8 |
                                    New York, N.Y.
9 |                                 November 2, 2005
                                    4:05 p.m.

10 |
Before:

11 |
                          HON. BARBARA S. JONES

12 |
                                            District Judge

13 |
                          APPEARANCES

14 |
MICHAEL J. GARCIA
15 |       United States Attorney for the
          Southern District of New York
16 | ROBERTO FINZI
          Assistant United States Attorney

17 |
BENNETT M. EPSTEIN
18 |       Attorney for Defendant

19 |

20 |

21 |

22 |

23 |

24 |

25 |

5B2HVINP

1          THE DEFENDANT:  No, I do not.

2          THE COURT:  And you understand by entering a plea of

3    guilty you are giving up your right to a trial and the other

4    rights I have just described?

5          THE DEFENDANT:  Yes, I do, your Honor.

6          THE COURT:  Do you have a copy of the indictment in

7    front of you?

8          MR. EPSTEIN:  No, we don't, Judge.

9          MR. FINZI:  I can provide one, your Honor.

10          THE COURT:  All right.

11          Have you read this indictment, Mr. Vinkor, and gone

12    over it with Mr. Epstein?

13          THE DEFENDANT:  Yes, I have.

14          THE COURT:  I am now going to explain to you what you

15    are charged with in Count One of the indictment and what the

16    maximum possible penalties are.

17          Count One charges that from in or about December of

18    2001 to in or about February of 2005, you conspired with others

19    to commit mail and wire fraud.

20          Do you understand that that is what the charge is in

21    Count One?

22          THE DEFENDANT:  I do.

23          THE COURT:  Now, that particular crime carries a

24    maximum sentence of five years in prison, a maximum term of

25    supervised release of three years, and a maximum fine of

5B2HVINP

1   $250,000 or twice the gross monetary gain derived from the

2   offense or twice the gross monetary loss to persons other than

3   yourself resulting from the offense, and there is a mandatory

4   $100 special assessment.

5          Do you understand those are the maximum possible

6   penalties?

7          THE DEFENDANT:  I do, your Honor.

8          THE COURT:  Do you also understand that I must order

9   restitution to any of the victims of the fraud that may have

10  lost money?

11         THE DEFENDANT:  Of course.

12         THE COURT:  Now, you also know that if I accept your

13  guilty plea, that may deprive you of valuable civil rights,

14  such as the right to vote, the right to hold public office, the

15  right to serve on a jury, and the right to possess any kind of

16  firearm?

17         THE DEFENDANT:  Yes.

18         THE COURT:  Under the current law there are sentencing

19  guidelines, Mr. Vinkor, as well as other factors that are set

20  forth in the sentencing statutes that judges must consider in

21  determining what a reasonable sentence would be for you.

22         Have you spoken to Mr. Epstein about the guidelines

23  and those other factors?

24         THE DEFENDANT:  Yes, I have.

25         THE COURT:  And do you understand that I have

5B2HVINP

1    discretion, while taking into account the guidelines and the

2    other factors, to sentence you to any period of incarceration

3    between zero and the statutory maximum of five years in prison?

4              Do you understand that?

5              THE DEFENDANT:  Yes.

6              THE COURT:  Do you also know that if anyone has

7    attempted to predict what your sentence will be, that that

8    prediction could be wrong?

9              THE DEFENDANT:  Yes.

10             THE COURT:  And do you understand that nobody can give

11   you any assurance of what your sentence will be because I have

12   to decide what it is going to be and I can only do that after I

13   have seen the presentence report, done my own calculation of

14   the guidelines, and considered all of the factors?

15             THE DEFENDANT:  Yes, your Honor.

16             THE COURT:  Do you understand that?

17             THE DEFENDANT:  Yes.

18             THE COURT:  Do you also know that even if your

19   sentence is different from what Mr. Epstein or anyone else may

20   have told you that it will be or if it is different from what

21   you hope for or expect, you are still bound by your guilty plea

22   and will not be allowed to withdraw your plea of guilty?

23             THE DEFENDANT:  Of course.

24             THE COURT:  Do you know that?

25             THE DEFENDANT:  Yes.

5B2HVINP

1      THE COURT:  Now, as part of your plea agreement with

2   the government, you and the government have agreed to what each

3   of you believes the appropriate guideline range for your

4   sentence is, and that particular range in this case is 24 to 30

5   months.

6          Are you aware of that agreement on your part with the

7   government?

8      THE DEFENDANT:  Yes, I am, your Honor.

9      THE COURT:  Do you also know, though, that the

10  Probation Department isn't bound by that agreement and I'm not

11  bound by it?

12     THE DEFENDANT:  I do, your Honor.

13     THE COURT:  And you understand I may impose whatever

14  sentence I believe is appropriate under all the circumstances

15  and that if you receive a higher sentence, you will have no

16  right to withdraw your plea?

17     THE DEFENDANT:  I understand that.

18     THE COURT:  Now, do you also understand that as part

19  of your plea agreement you are giving up or waiving your right

20  to appeal your sentence or to challenge it in any way if I

21  sentence you within the agreed upon range of 24 to 30 months or

22  below that?

23         Do you understand you have given up your right to

24  appeal?

25     THE DEFENDANT:  Yes, your Honor.

5B2HVINP

1        THE COURT:  Mr. Finzi, do you wish me to put the DNA

2   provision on the record?

3        MR. FINZI:  Your Honor, I have got it on my checklist.

4   I am not sure how much sense it makes in a case like this, but

5   if it is not more than a question, I'd ask that you do that.

6        THE COURT:  Mr. Vinkor, are you also aware of the fact

7   that in your plea agreement you have waived any right you may

8   have to require DNA testing of any physical evidence that may

9   be in the possession of the government?

10       Do you know that?

11       THE DEFENDANT:  Yes.

12       THE COURT:  Do you also understand that because you

13  have given up that right, if the government does possess any

14  physical evidence in this case, they don't have to preserve it,

15  they likely will not preserve it, and it will not be available

16  for DNA testing in the future?

17       THE DEFENDANT:  Yes.

18       THE COURT:  Would you take a look at your agreement.

19  Did you read through this and talk to Mr. Epstein about it?

20       THE DEFENDANT:  I have.

21       THE COURT:  Do you fully understand it?

22       THE DEFENDANT:  I do, your Honor.

23       THE COURT:  And did you sign it?

24       THE DEFENDANT:  Yes, I have, your Honor.

25       THE COURT:  Is there anything at all that you

5B2HVINP

1    understand about your plea and your sentence that isn't in this

2    agreement?

3                THE DEFENDANT:  I understand everything.

4                THE COURT:  Has anything been left out of it?

5                THE DEFENDANT:  Not at all.

6                THE COURT:  Is there any understanding that you have

7    that is not written down?

8                THE DEFENDANT:  No, your Honor.

9                THE COURT:  Other than the plea agreement, has anybody

10    made you any promises or has anybody threatened you or forced

11    you in any way to plead guilty this afternoon or to enter into

12    the plea agreement?

13                THE DEFENDANT:  No, your Honor.

14                THE COURT:  Mr. Finzi, would you state the elements of

15    the crime charged.

16                MR. FINZI:  Certainly, your Honor.

17                As your Honor alluded to, the count that Mr. Vinkor is

18    pleading guilty to is a conspiracy count.

19                The elements of conspiracy are that two or more people

20    entered into an unlawful agreement, the object of which was to

21    commit mail and wire fraud in this case; second, that the

22    defendant knowingly and willfully became a member of that

23    conspiracy; third, that the defendant or another coconspirator

24    undertook an act in furtherance of that conspiracy; and fourth,

25    that some act in furtherance of the conspiracy be undertaken in

5B2HVINP

1   the Southern District of New York.

2          With respect to the objects, the underlying objects of

3   the conspiracy, which here are wire fraud and mail fraud, the

4   government would show, first, that on or about the time alleged

5   in the indictment the defendant devised or participated in a

6   scheme or artifice to defraud; second, that the defendant

7   knowingly and willfully devised or participated in that scheme

8   with knowledge of its fraudulent nature and with the specific

9   intent to defraud; and third, with respect to mail fraud, that

10   it involved the use of the mails and with respect to wire

11   fraud, that it involved the use of an interstate wire.

12          THE COURT:  Thank you, Mr. Finzi.

13          Mr. Vinkor, the reason that I asked the assistant to

14   state the elements of the crime with which you are charged and

15   you are intending to plead guilty is because that is what the

16   government has to prove, each and every one of those elements

17   beyond a reasonable doubt.

18          Knowing that, do you still wish to go forward with

19   your plea?

20          THE DEFENDANT:  Yes, I do, your Honor.

21          THE COURT:  Would you summarize your evidence against

22   this defendant, Mr. Finzi.

23          MR. FINZI:  Certainly, your Honor.

24          If this case went to trial, the government would show,

25   mostly through the testimony of victim witnesses, that the

5B2HVINP

1    defendant was part of a group operating under a name, an

2    umbrella of groups operating under the name Richmond Global

3    that sold interests in commodities to individual investors, and

4    in the course of doing that, mostly making cold calls to

5    prospective investors, they inflated the returns, diminished or

6    understated the risk of the investment, and made a series of

7    false promises about the operations of the entity itself and

8    its performance.

9            The government would show that through, again, the

10   testimony of victim witnesses, possibly a cooperating witness,

11   and documentary evidence seized in the course of the

12   investigation.

13           THE COURT:  All right.  Thank you.

14           MR. FINZI:  Thank you, your Honor.

15           THE COURT:  All right.  Mr. Vinkor, tell me in your

16   own words what you did that makes you believe that you are

17   guilty of the charge in the indictment in Count One.

18           THE DEFENDANT:  During the period of March 2003 to

19   February 2005, I engaged with others in a scheme to defraud

20   investors in a company known as Richmond Global Associates,

21   where I was employed as a salesman.

22           THE COURT:  Could you just go back over that last

23   sentence again.  I couldn't hear you.

24           THE DEFENDANT:  To defraud investors in a company

25   known as Richmond Global Associates.

5B2HVINP

1          THE COURT:  Right.

2          THE DEFENDANT:  Where I was employed as a salesman.

3          I helped sell investments in the foreign exchange

4    currency market knowing that representations made by myself and

5    others were, you know, with respect to positive performance and

6    optimistic predictions, the existence of a stop loss program

7    and other representations used to sell and hold onto

8    investments were untrue.

9          During the scheme, I used the telephone and the U.S.

10   mails and spoke to investors who were located in Southern

11   District of New York.

12         THE COURT:  Could you tell me in your own words a

13   little bit more about what the falsehoods were.  I think you

14   said something about --

15         THE DEFENDANT:  Such as a stop loss, to defraud more

16   investors, used the stop loss to sell to investors, telling

17   them that they have a limited loss liability.

18         THE COURT:  And that wasn't true?

19         THE DEFENDANT:  And that was untrue, your Honor.

20         THE COURT:  And you also told them about positive

21   results that were not true, is that right?

22         THE DEFENDANT:  That is correct, your Honor.

23         THE COURT:  When you entered into this illegal

24   agreement with others to defraud these investors, where was

25   this?

5B2HVINP

```
 1              THE DEFENDANT:  The location?

 2              THE COURT:  The location?

 3              THE DEFENDANT:  Staten Island, New York.

 4              THE COURT:  Did some of the mailings and wires come

 5    into the Southern District of New York, which would be in

 6    Manhattan?

 7              THE DEFENDANT:  I don't believe so.

 8              THE COURT:  Is there any venue issue here, Mr. Finzi?

 9              MR. FINZI:  I don't believe there is, your Honor.

10              If I could have a second to confer with Mr. Epstein.

11              THE COURT:  OK.

12              (Pause)

13              MR. FINZI:  Your Honor, I think there are two answers

14    to the question.  One is certainly other members of the

15    conspiracy, the government would be prepared to show that other

16    members of the conspiracy made calls and sent faxes to

17    individual investors in the Southern District of New York.  But

18    beyond that, and just out of an abundance of caution, I think

19    if we asked Mr. Epstein if he would waive any venue challenge,

20    my assumption is he would agree.

21              MR. EPSTEIN:  We don't contest the appropriateness of

22    the venue, your Honor.

23              THE COURT:  I actually believe that the law is that a

24    guilty plea is an automatic waiver with respect to venue.

25              In any event, so the record is completely clear, you
```

5B2HVINP

1    are not contesting venue, correct?

2          MR. EPSTEIN:  Correct.

3          THE COURT:  And the government has represented, which

4    you don't contest, that there were, I believe you said calls

5    and/or faxes into Manhattan by other coconspirators, right, Mr.

6    Finzi?

7          MR. FINZI:  That is correct, both calls and faxes,

8    your Honor.

9          THE COURT:  Is there anything else you want me to ask

10   this defendant other than the following question, which is that

11   when you entered into this agreement or conspiracy with those

12   other people to defraud investors, did you know that what you

13   were doing was wrong and illegal?

14         THE DEFENDANT:  I did find that out, yes.

15         THE COURT:  You did?

16         THE DEFENDANT:  I did.

17         THE COURT:  You did know it at the time, yes?

18         THE DEFENDANT:  Not at the beginning but at the end,

19   yes.

20         THE COURT:  So sometime during the period of time --

21         THE DEFENDANT:  Yes.

22         THE COURT:  -- while you were engaged in this you

23   figured out and you knew it was wrong and illegal, is that

24   right?

25         THE DEFENDANT:  That is correct, your Honor.

5B2HVINP

1    THE COURT:  But you stayed in it, right?

2    THE DEFENDANT:  I have, your Honor.

3    THE COURT:  Anything else, Mr. Finzi?

4    MR. FINZI:  No, your Honor.  Thank you.

5    THE COURT:  Mr. Vinkor, are you pleading guilty

6  because you are guilty of the crime?

7    THE DEFENDANT:  Yes.

8    THE COURT:  How do you now plead to Count One of the

9  indictment?  Guilty or not guilty?

10    THE DEFENDANT:  Guilty.

11    THE COURT:  You have acknowledged to me that you are

12  guilty as charged in Count One of the indictment.  I'm

13  satisfied that you know your rights and that you are waiving

14  them knowingly and voluntarily.  So I find your plea is knowing

15  and voluntary.  I find it is supported by an independent basis

16  in fact containing each of the essential elements of the

17  offense, and I accept your guilty plea and enter a judgment of

18  guilty on Count One of indictment 05 Cr. 157.

19    I am going to order the customary presentence

20  investigation report.

21    Do we have a sentencing date?

22    THE DEPUTY CLERK:  90 days would be February 2, 2006.

23    THE COURT:  What time?

24    MR. EPSTEIN:  Your Honor, is it possible to request --

25  I have been asked by Mr. Vinkor, he is very interested in

5B2HVINP

1    getting this behind him.  Is it possible to request a

2    sentencing in approximately six weeks so that he is able to

3    begin whatever sentence the court imposes around the middle of

4    January?

5           THE COURT:  So you want an expedited sentencing so he

6    can begin the sentence?

7           MR. EPSTEIN:  Yes, your Honor.  If that is not an

8    undue burden on the court, we would request that.

9           THE COURT:  It is not an undue burden on me.

10          MR. EPSTEIN:  Or the Probation Department.  The court

11   broadly speaking.

12          THE COURT:  I think as long as you make yourselves

13   available for interview --

14          MR. EPSTEIN:  Of course.

15          THE COURT:  -- and follow the other requirements for

16   expedited sentencing, we can do that.

17          Any objection from the government?

18          MR. FINZI:  No.  For what it is worth, your Honor, I

19   will, as soon as they report, do my best to get them the

20   information they need from me as quickly as possible.

21          My experience with them has been if they do require an

22   extra week or so, they are not shy about it.  They will ask for

23   it and we will deal with it.

24          THE COURT:  Six weeks would put us square in the

25   middle of December, Mr. Epstein.

5B2HVINP

1          MR. EPSTEIN:  Yes, your Honor.

2          THE COURT:  Your client wants to be sentenced and

3    surrender immediately?

4          MR. EPSTEIN:  I believe at the time we would ask for

5    self-surrender in the hopes that he could be designated within

6    approximately four weeks after the sentencing.

7          THE COURT:  That would get him into the middle of

8    January.

9          MR. EPSTEIN:  Yes, your Honor.

10         THE COURT:  After the holidays.  I just want to make

11   sure everybody thought this through.

12         MR. EPSTEIN:  Yes, that is what our working assumption

13   is, if it can be done.

14         THE COURT:  Mid-December.

15         THE DEPUTY CLERK:  Approximately six weeks, December

16   15.

17         MR. EPSTEIN:  That is mid-December.

18         What time?

19         THE DEPUTY CLERK:  4:30.

20         THE COURT:  Sentencing, then, will be December 15th at

21   4:30.  I will order an expedited sentence.

22         Mr. Vinkor, you will be interviewed by the Probation

23   Department and, of course, you have the right to have

24   Mr. Epstein with you.

25         THE DEFENDANT:  Of course.

5B2HVINP

1          THE COURT:  I do encourage you to be as candid with

2    them as you can possibly be.  Those reports are very important

3    in terms of what my decision will be as to your sentence.

4          Let me also advise you, and I have every expectation

5    you will show up on your sentencing date, but if you don't, you

6    could be guilty of another crime, bail jumping, and it has its

7    own fine and potential prison term which would be in addition

8    to the sentence you are going to receive for this particular

9    crime.

10          Do you understand that?

11          THE DEFENDANT:  Yes, I do, your Honor.

12          THE COURT:  Anything else?

13          MR. FINZI:  Nothing for the government, your Honor.

14    Thank you.

15          MR. EPSTEIN:  No.  Thank you, your Honor.  Have a good

16    evening.

17          THE COURT:  Good night then.

18          (Adjourned)

19

20

21

22

23

24

25

# Exhibit D

AO 245B    (Rev. 06/05) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

| SOUTHERN | District of | NEW YORK |

| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| MIRON VINOKUR | Case Number:    05 CR. 157 - 04 (BSJ) |
| | USM Number:    57429-054 |
| | Bennett Epstein |
| | Defendant's Attorney |

**THE DEFENDANT:**

X pleaded guilty to count(s)    One (1)

☐ pleaded nolo contendere to count(s)
which was accepted by the court.

☐ was found guilty on count(s)
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. §371 | Conspiracy to Commit Mail and Wire Fraud | Jan. 2005 | 1 |

   The defendant is sentenced as provided in pages 2 through    6    of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

X Count(s)    all open    ☐ is    X are    dismissed on the motion of the United States.

   It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

| USDC SDNY<br>DOCUMENT<br>ELECTRONICALLY FILED<br>DOC #:<br>DATE FILED: _____ | 3/3/2006 |
| | Date of Imposition of Judgment |
| | |
| | Signature of Judge |
| | |
| | Hon. Barbara S. Jones, U.S.D.J. |
| | Name and Title of Judge |
| | 3/27/06 |
| | Date |

AO 245B    (Rev. 06/05) Judgment in Criminal Case
        Sheet 2 — Imprisonment

DEFENDANT:          MIRON VINOKUR                                          Judgment — Page    2    of    6
CASE NUMBER:        05 CR. 157 - 04 (BSJ)

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a
total term of:

**One (1) year and one (1) day**

☐   The court makes the following recommendations to the Bureau of Prisons:

☐   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

    ☐   at _____ ☐ a.m. ☐ p.m.    on _____

    ☐   as notified by the United States Marshal.

X   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    X   before 2 p.m. on      April 14, 2006      .

    ☐   as notified by the United States Marshal.

    ☐   as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____ , with a certified copy of this judgment.

                                            _____
                                              UNITED STATES MARSHAL

                                  By _____
                                          DEPUTY UNITED STATES MARSHAL

AO 245B    (Rev. 06/05) Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page    3    of    6

DEFENDANT:        MIRON VINOKUR
CASE NUMBER:    05 CR. 157 - 04 (BSJ)

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

   **Three (3) years**

   The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

- ☐ The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

- X The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

- X The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

- ☐ The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

- ☐ The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

   If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

   The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B    (Rev. 06/05) Judgment in a Criminal Case
            Sheet 3A — Supervised Release

Judgment—Page ___4___ of ___6___

DEFENDANT:        MIRON VINOKUR
CASE NUMBER:      05 CR. 157 - 04 (BSJ)

## ADDITIONAL SUPERVISED RELEASE TERMS

The defendant is to report to the nearest Probation Office within 72 hours of release from custody.

The defendant shall obey the immigration laws and comply with the directives of the Bureau of Immigration and Customs Enforcement.



|  |  | Judgment — Page | 5 | of | 6 |
|--|--|--|--|--|--|

DEFENDANT:       MIRON VINOKUR
CASE NUMBER:     05 CR. 157 - 04 (BSJ)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | **Fine** | **Restitution** |
|--|--|--|--|
| TOTALS | $  100.00 | $ | $ |

☐  The determination of restitution is deferred until _____ .  An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|--|--|--|--|
| | | | |

| TOTALS | $ | $0.00 | $ | $0.00 |
|--|--|--|--|--|

☐  Restitution amount ordered pursuant to plea agreement  $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐  the interest requirement is waived for the  ☐  fine  ☐  restitution.

    ☐  the interest requirement for the  ☐  fine  ☐  restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

Case 1:05-cv-02181-SAS    Document 58    Filed 02/08/2007    Page 56 of 56
AO 245B    Rev. 06/05) Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page __6__ of __6__

DEFENDANT:    MIRON VINOKUR
CASE NUMBER:    05 CR. 157 - 04 (BSJ)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

A    X    Lump sum payment of $ __100.00__ due immediately, balance due

      ☐    not later than _____ , or
      ☐    in accordance    ☐ C,    ☐ D,    ☐    E, or    ☐ F below; or

B    ☐    Payment to begin immediately (may be combined with    ☐ C,    ☐ D, or    ☐ F below); or

C    ☐    Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
      _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D    ☐    Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
      _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
      term of supervision; or

E    ☐    Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
      imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F    ☐    Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐    Joint and Several

      Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount,
      and corresponding payee, if appropriate.

☐    The defendant shall pay the cost of prosecution.

☐    The defendant shall pay the following court cost(s):

☐    The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

# Exhibit E



**FEDERAL BUREAU OF PRISONS**
www.bop.gov

AN AGENCY OF THE
U.S. DEPARTMENT OF JUSTICE

HOME

## Inmate Locator

### Locate a Federal Inmate
(includes all inmates from 1982 to present)

| Name | Register Number | Age | Race | Sex | Release Date Actual / Projected | Location |
|------|-----------------|-----|------|-----|-------------------------------|----------|
| 1. MIRON VINOKUR | 57429-054 | 27 | White | M | 04-11-2007 | MOSHANNON VALLEY CI |

Results 1 - 1 of 1

🔍 New Search     ❓ FAQs     🔒 Privacy

Home  |  About  |  Inmate Locator  |  Prison Facilities  |  Careers
Inmate Matters  |  Policy / Forms  |  Doing Business  |  News / Information

Accessibility | Browser Requirements | Disclaimer | Privacy Policy | Search | Site Map

---

🖨 Printer Friendly Version

### Related Documents
(Links open in a new window)

- Admission & Orientation Program
- Inmate Legal Activities Policy
- Release of Information Policy
- Telephone Regulations
- Victim & Witness Notification Program
- Visiting Regulations
- Visitor Information Form

- Inmate Locator
- Visiting - General Info
  - Visiting Hours
  - Who Can Visit?
  - Background Checks
  - Business Visits
  - Special Circumstances
  - Visiting Room Procedures
  - Conjugal Visits
- Locate Inmates Released Before 1982
- Who is a "Federal" Inmate?



## Prison Facilities

- Facility Locator
- Address Directory
- Prison Types/General Info.
- Community Corrections
- Maps of Facilities by Region
  - Mid-Atlantic Region
  - North Central Region
  - Northeast Region
  - South Central Region
  - Southeast Region
  - Western Region
- Weekly Population Report

🖨 Printer Friendly Version

**Facility Type Abbreviations**

| | |
|---|---|
| **CCM** | Community Corrections Management Office |
| **CI** | Correctional Institution* |
| **CO** | Central Office |
| **DC** | Detention Center* |
| **FCC** | Federal Correctional Complex |
| **FCI** | Federal Correctional Institution |
| **FDC** | Federal Detention Center |
| **FMC** | Federal Medical Center |
| **FPC** | Federal Prison Camp |
| **FTC** | Federal Transfer Center |

## CI Moshannon Valley
## Contact Information

Approximately 15 percent of the Bureau's inmate population are confined in secure facilities operated primarily by private corrections companies and to a lesser extent by state and local governments, and in privately-operated community corrections centers. Contract facilities help the Bureau manage its population and are especially useful for meeting the needs of low security, specialized populations like sentenced criminal aliens. Staff of the Correctional Programs Division in Central Office provide oversight for privately-operated facilities.

### Inmate Mail/Parcels

Use this address when sending correspondence and parcels to inmates confined at this facility. Inmate funds may also be sent directly to this address.

**INMATE NAME & REGISTER NUMBER**
CI MOSHANNON VALLEY
CORRECTIONAL INSTITUTION
P.O. BOX 2000
PHILIPSBURG, PA 16866

### Physical Address (Do not use for mail unless it is the same as the mailing address listed.)

Use this address for in-person visits.

CI MOSHANNON VALLEY
CORRECTIONAL INSTITUTION
555 CORNELL DRIVE
PHILIPSBURG, PA 16866
MapQuest® Map and Directions[1]

Phone: 814-768-1200
Fax: 814-342-5900

BOP: CI Moshannon Va... by Contact in Institution

E-mail address:  __MVC/GENERAL@BOP.GOV__[2]

[1]*Discretion is advised: In some cases MapQuest® may not find the exact address.*
[2]*This e-mail address should be used only if you have questions that are specific to this location. For general questions, go to our _Contact Us page_.*

**Shipping**

Use this address when shipping freight and non-USPS parcels. At most facilities, freight deliveries are generally processed through the warehouse.

**STAFF NAME**
CI MOSHANNON VALLEY
CORRECTIONAL INSTITUTION
ATTN: WAREHOUSE
555 CORNELL DRIVE
PHILIPSBURG, PA  16866

**Staff Mail**

Use this address when sending correspondence and parcels to staff.

**STAFF NAME**
CI MOSHANNON VALLEY
CORRECTIONAL INSTITUTION
P.O. BOX 1000
PHILIPSBURG, PA  16866

If you feel that any of the above information is incorrect, please _let us know_. Thanks!

# Exhibit F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X        **Docket#**
UNITED STATES OF AMERICA,          :        05-cr-59
                                   :
      - versus -                   :        U.S. Courthouse
                                   :        Brooklyn, New York
JOSEPH PAPPALARDO,                 :
                  Defendant        :        June 28, 2006
------------------------------X

TRANSCRIPT OF CRIMINAL CAUSE FOR PLEADING
BEFORE THE HONORABLE CHERYL L. POLLAK
UNITED STATES MAGISTRATE JUDGE

A   P.   P   E   A   R   A   N   C   E   S:

**For the Government**:          **Roslynn R. Mauskopf, Esq.**
                                 United States Attorney

                          BY:    **Tanya Hill, Esq.**
                                 Assistant U.S. Attorney
                                 225 Cadman Plaza East
                                 Brooklyn, New York  11201



**For the Defendant**:          **Louis Ruggiero, Esq.**




Official Transcriber:           **Rosalie Lombardi**
                                     **L.F.**


**Transcription Service**:      **Transcription Plus II**
                                823 Whittier Avenue
                                New Hyde Park, N.Y.  11040
                                (516) 358-7352

Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

7

## Proceedings

1          THE COURT:  In your view, is he capable of

2   understanding the nature of these proceedings?

3          MR. RUGGIERO:  Yes.

4          THE COURT:  Do you have any doubt as to his

5   competence to plead at this time?

6          MR. RUGGIERO:  No.

7          THE COURT:  Have you advised him of the maximum

8   sentence and the fine that can be imposed as a result of

9   his plea to these two counts?

10         MR. RUGGIERO:  Yes, I have.

11         THE COURT:  And have you discussed with him the

12  operation of the sentencing guidelines and the recent

13  supreme court decisions regarding the guidelines?

14         MR. RUGGIERO:  Yes, extensively.

15         THE COURT:  Okay.

16         Mr. Pappalardo, do you feel that you have had

17  enough time to discuss your case with your attorney?

18         THE DEFENDANT:  Yes, your Honor.

19         THE COURT:  And are you satisfied to have him

20  represent you?

21         THE DEFENDANT:  Yes, your Honor.

22         THE COURT:  All right.  Now there are two

23  indictments in this case.  The superseding indictment out

24  of the Eastern District of New York is the first one I am

25  going to show you.  Have you seen the superseding

Transcription Plus II        Rosalie Lombardi

8

**Proceedings**

1   indictment before?

2          THE DEFENDANT: Yes, your Honor.

3          THE COURT: Okay. And there's also an

4   indictment issued out of the Southern District of New

5   York. Have you seen this indictment, as well?

6          THE DEFENDANT: Yes, your Honor.

7          THE COURT: Okay.

8          Have you had an opportunity to discuss the

9   charges in both of these indictments with your attorney?

10          THE DEFENDANT: Yes, your Honor.

11          THE COURT: Now, with respect to the charge in

12   the Eastern District of New York, it's my understanding

13   that you seek to plead guilty today to Count Six.

14          Is that correct, counsel?

15          MR. RUGGIERO: Yes, your Honor.

16          THE COURT: Okay.

17          Count Six reads in or about and between January

18   2002 and December 2002, both dates being approximate and

19   inclusive within the Eastern District of New York and

20   elsewhere, you together with others, did knowingly and

21   intentionally conspire to participate in the use of

22   extortionate means to collect an extension of credit from

23   John Doe Number One and John Doe Number Two, individuals

24   whose identities are known to the grand jury.

25          First of all, Mr. Pappalardo, do you understand

Transcription Plus II        Rosalie Lombardi

9

**Proceedings**

1    what a conspiracy is?

2              THE DEFENDANT:  Yes, your Honor.

3              THE COURT:  Basically, it is an agreement

4    between two or more people to do something unlawful and

5    in this case, you are charged with agreeing with others

6    to use extortionate means to collect this extension of

7    credit from these two individuals.

8              Do you understand the charge?

9              THE DEFENDANT:  Yes, your Honor.

10             THE COURT:  Okay.  Now, that's the charge in

11   the indictment filed in the Eastern District of New York.

12   There's a separate charge -- and again, I understand

13   you're seeking to plead guilty to Count One in the

14   southern district indictment.  This is a little more

15   complex.  It charges you with a conspiracy to commit mail

16   fraud and wire fraud in connection with the operation of

17   a series of entities under a variety of Richmond Global

18   names; Richmond Global Limited being a New York

19   corporation which was registered as a commodity pool

20   operator with the National Futures Association.

21             As I understand the charge, you are charged

22   along with others from in and about December 2001 through

23   in or about January 2005, with engaging in an illegal

24   scheme to defraud customers who invested in the ForEx

25   (sic) market through the Richmond Global entities.

Transcription Plus II          Rosalie Lombardi

10

### Proceedings

1      And in connection with this scheme, you and

2  your co-defendants are charged with making or causing

3  Richmond Global sales brokers to make false, fraudulent

4  representations to potential retail customers to induce

5  those customers to open accounts with and entrust their

6  funds with Richmond Global for the purpose of trading in

7  the For Ex market and by providing these customers with

8  false and fraudulent account statements that disguised

9  commissions taken by Richmond Global as trading losses.

10      Now, there's a series of misrepresentations and

11  actions taken in furtherance of this scheme.  I guess my

12  question, Ms. Hill, is what exactly is overt act or overt

13  acts that the defendant is going to be pleading to or

14  allocuting to today; do we know?

15      MS. HILL:  We've discussed it.

16      MR. RUGGIERO:  He's prepared an allocution,

17  your Honor, which basically incorporates all of the overt

18  acts in the conspiracy --

19      THE COURT:  Okay.

20      MR. RUGGIERO:  -- for the period during which

21  he was a part of the conspiracy.  His membership in the

22  conspiracy began in March of 2003 and lasted until

23  February '05.  In other words, he became an employee of

24  the company in March of 2003 and that was the date of his

25  first involvement in the conspiracy.

Transcription Plus II          Rosalie Lombardi

11

## Proceedings

1          THE COURT:  So, the conspiracy charges that in

2    or about December 2001 through January 2005, in the

3    Southern District of New York and elsewhere, you,

4    together with others, did knowingly and lawfully

5    willfully combined, conspired, confederated, and agreed

6    together and with each other to commit mail fraud and

7    wire fraud.  And you're charged in a series of overt

8    acts.  Overt Act(f) on or about September 16, 2004, you

9    spoke over the phone to a prospective investor located in

10   Pennsylvania in order to induce that investor to invest

11   in the ForEx market through Richmond Global.

12          Overt Act(g) charges you with on or about

13   September 24, 2004, speaking over the phone again to the

14   same investor in order to induce him to invest --

15          THE DEFENDANT:  Yes, your Honor.

16          THE COURT:  -- through Richmond Global.  On or

17   about the same date, September 24 -- this is Overt Act

18   (h), you spoke over the phone to an undercover officer

19   identified as UC-2 in order to induce that individual to

20   invest in the ForEx market.

21          THE DEFENDANT:  Yes, your Honor.

22          THE COURT:  Overt Act(j) on or about September

23   30, 2004, holding yourself out as Ron Turner (phonetic),

24   you're alleged to have spoken over the phone to another

25   undercover, UC-3 in order to induce him to invest through

Transcription Plus II          Rosalie Lombardi

12

**Proceedings**

1   Richmond Global.

2           THE DEFENDANT:  Yes, your Honor.

3           THE COURT:  Overt Act(m), on or about October

4   12, 2004, holding yourself out again as Ron Turner, you

5   spoke over the phone to UC-3 again --

6           THE DEFENDANT:  Yes, your Honor.

7           THE COURT:  -- in order to induce him to

8   invest.  Over Act(q) on or about December 2, 2004, again

9   holding yourself out as Ron Turner spoke to UC-3 in

10  Asheville, North Carolina --

11          THE DEFENDANT:  Yes, your Honor.

12          THE COURT:  -- in order to get him to invest.

13  And I think that's all of the ones that relate to the

14  mail fraud and wire fraud overt acts relating to you.

15          Did I miss any?

16          MR. RUGGIERO:  I don't believe so.

17          THE COURT:  Okay.  And I take it you understand

18  what you have been charged with here?

19          THE DEFENDANT:  Yes, your Honor.

20          THE COURT:  Okay.

21          I want to make sure before you enter your plea

22  here that you understand the rights that you will be

23  giving up if you decide to plead guilty to these charges.

24  If you were to persist in pleading not guilty, under the

25  Constitution and the laws of the United States, you would

Transcription Plus II       Rosalie Lombardi

24

**Proceedings**

1   questions that you would like to ask me about the charges

2   or your rights or the plea agreement or anything else

3   before we proceed?

4              THE DEFENDANT:  No, your Honor.

5              THE COURT:  Are you ready to plead at this

6   time?

7              THE DEFENDANT:  Yes, your Honor.

8              THE COURT:  Counsel, do you know of any reason

9   why the defendant should not plead guilty?

10             MR. RUGGIERO:  No.

11             THE COURT:  Are you aware of any viable legal

12  defense to the charges?

13             MR. RUGGIERO:  No, your Honor.

14             THE COURT:  Let's start with the eastern

15  district charge in superseding indictment 05-cr-59-S-1

16  and I'm talking again about Count Six.  Mr. Pappalardo,

17  what is your plea to Count Six; guilty or not guilty?

18             THE DEFENDANT:  Guilty.

19             I want to turn now to Count One in the southern

20  district indictment.  You understand that this charge is

21  pending in the Southern District of New York.  That's

22  across the river in Manhattan.  The only way that you can

23  plead guilty to this charge here in the eastern district

24  is if you are willing to waive venue; that is, waive your

25  right to be tried in the southern district and agree to

Transcription Plus II        Rosalie Lombardi

25

**Proceedings**

1    be tried or proceed here in the eastern district.

2                First of all, do you understand that concept?

3                THE DEFENDANT:  Yes, your Honor.

4                THE COURT:  And have you discussed this with

5    Mr. Ruggiero?

6                THE DEFENDANT:  Yes, your Honor.

7                THE COURT:  And are you willing at this time

8    waive venue and agree to proceed with this charge here in

9    the Eastern District of New York?

10               THE DEFENDANT:  Yes, your Honor.

11               THE COURT:  That being said, what is your plea

12   to Count One of 05-cr-157; guilty or not guilty?

13               THE DEFENDANT:  Guilty, your Honor.

14               THE COURT:  Are you making this plea of guilty

15   voluntarily and of your own free will?

16               THE DEFENDANT:  Yes, your Honor.

17               THE COURT:  Has anyone threatened or forced you

18   to plead guilty to this count?

19               THE DEFENDANT:  No, your Honor.

20               THE COURT:  Has anyone made any promise to you

21   what your sentence will be on this count?

22               THE DEFENDANT:  No, your Honor.

23               THE COURT:  All right.

24               I read or summarized the two charges for you

25   earlier.  I want you now to tell me in your own words

Transcription Plus II        Rosalie Lombardi

26

**Proceedings**

1   exactly what it is that you did in connection with each

2   of these charges.  And you can start with whichever one

3   you wish.

4              THE DEFENDANT:  Okay.  or the eastern district,

5   Count Six --

6              THE COURT:  Count Six.

7              THE DEFENDANT:  -- in 2002 in Staten Island, I

8   accompanied my co-defendant to collect an unlawful debt

9   owed to him.  My purpose was to go there to intimidate

10  the person who owed the money into paying by my presence

11  -- my mere presence.

12             THE COURT:  Okay.  This was some time between

13  January and December of 2002?

14             THE DEFENDANT:  Yes.

15             THE COURT:  Okay.

16             THE DEFENDANT:  Yes, your Honor.

17             THE COURT:  And you had agreed with this person

18  to go to collect this debt for him?

19             THE DEFENDANT:  Not for him, with him.

20             THE COURT:  With him; right.  I mean you agreed

21  to go with him so that he could collect the debt; right?

22             THE DEFENDANT:  Yes, your Honor.

23             THE COURT:  That's what I meant.  Okay.

24             Anything else I should inquire on this one?

25             MS. HILL:  (inaudible) Staten Island

Transcription Plus II        Rosalie Lombardi

27

**Proceedings**

1  (inaudible).

2            THE COURT:  Okay.  All right.

3        Tell me now about Count One.

4            THE DEFENDANT:  Okay.  I was vice president of

5  Richmond Global Associates from March of 2003 to February

6  2005.  I agreed with my co-defendants to get investors in

7  Richmond Global Associates by providing them with false

8  and fraudulent account statements that disguised

9  commissions taken by Richmond Global as trade losses.

10           I also gave false information, minimizing the

11  risk to induce investors.  Meaning that when I was on the

12  phone, I would lessen the risk and make it appear better

13  than what it was.

14           THE COURT:  Okay.  And where were you working

15  out of?

16           THE DEFENDANT:  Richmond Global -- it was an

17  office out of New Dorp Plaza in Staten Island.

18           THE COURT:  In Staten Island?

19           THE DEFENDANT:  Yes.

20           THE COURT:  Okay.

21           THE DEFENDANT:  And also we used the mail and

22  telephones to make these false statements.

23           THE COURT:  Okay.  Well, you've told me that

24  you've spoken to people over the phone --

25           THE DEFENDANT:  Yes.

Transcription Plus II        Rosalie Lombardi

29

**Proceedings**

1          MS. HILL:  No, your Honor.

2          THE COURT:  All right.

3          Based on the information given to me, I find

4    that the defendant is acting voluntarily, fully

5    understands his rights and the consequences of his plea

6    and that there is a factual basis for the plea.

7          I will recommend to Judge Dearie that he accept

8    your plea of guilty to Count Six of the eastern district

9    indictment and Count One of the southern district

10   indictment.

11         What happens now, Mr. Pappalardo, is you're

12   going to be meeting with someone from the probation

13   department to prepare the presentence report.  I urge you

14   to cooperate with them, obviously with counsel's advice.

15         Once that report is prepared, then a date will be set

16   for sentencing.

17         I see that Mr. Pappalardo is out on bail.  The

18   conditions of bail shall remain in effect pending

19   sentencing.  Is that appropriate?

20         MR. RUGGIERO:  Thank you.

21         MS. HILL:  And I think probation (inaudible).

22         THE COURT:  Oh, okay.

23         PRETRIAL SERVICES OFFICER:  It's Marty Giordino

24   (phonetic) with pretrial services, your Honor.

25         Since the beginning of supervision, the

Transcription Plus II          Rosalie Lombardi

30

## Proceedings

1  defendant (inaudible) that the reporting conditions be

2  modified as directed by pretrial services.

3          THE COURT:  Okay.  What were they originally?

4          MS. HILL:  (inaudible).

5          THE COURT:  Okay.

6          PRETRIAL SERVICES:  (inaudible).

7          THE COURT:  Okay.  So you're not going to have

8  to come and report in person any longer.  You're going to

9  have to report by phone.  But if you don't, you know, we

10  may have to revisit the issue of bail.  Okay?

11          THE DEFENDANT:  Yes, your Honor.  Thank you.

12          THE COURT:  Okay.  So, I will grant your

13  request to change it as directed by pretrial services.

14  If you feel it's necessary to bring him in, that's up to

15  you.  Okay?

16          MS. HILL:  Thank you, your Honor.

17          THE COURT:  Thank you.

18          MR. RUGGIERO:  Thank you, your Honor.

19          Okay?  Anything else, counsel?

20              (Matter concluded)

21                  -oOo-

22

23

24

25

# Exhibit G

# U.S. District Court
## Eastern District of New York, Brooklyn (Brooklyn)
## CRIMINAL DOCKET FOR CASE #: 1:05-cr-00059-RJD-3

Case title: USA v. Turner

Date Filed: 02/23/2005

Assigned to: Judge Raymond J. Dearie

**Defendant**

**Joseph Pappalardo** (3)

represented by **Gregory E. Cooper**
Law Offices of Gregory E. Cooper
20 Vesey Street
Suite 400
New York, NY 10007
(212) 608-4828
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Lawrence F. Ruggiero**
Law Offices of Lawrence F. Ruggiero
167 East 61st Street
Suite 17E
New York, NY 10021
212-406-2910
Email: lawruggiero@mindspring.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
| --- | --- |
| COLLECTION OF CREDIT BY EXTORTION (6) | |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| None | |

**Highest Offense Level (Terminated)**

None

**Complaints**                                              **Disposition**

None

---

**Plaintiff**

**USA**                              represented by    **Patricia E Notopoulos**
                                                      United States Attorneys Office
                                                      225 Cadman Plaza East
                                                      Brooklyn, NY 11201
                                                      (718) 254-6354
                                                      Fax: 718-254-6478
                                                      Email: patricia.notopoulos@usdoj.gov
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/17/2005 | 13 | SUPERSEDING INDICTMENT as to Christian Kuretski (1) count(s) 1, 2, 3-4, 5, 6, 7, Ronald Turner (2) count(s) 1s, 6s, 7s-8s, Joseph Pappalardo (3) count(s) 6. (Chee, Alvin) (Entered: 02/23/2005) |
| 02/18/2005 | 24 | Minute Entry for proceedings held before Cheryl L. Pollak: Arraignment as to Joseph Pappalardo (3) Count 6 held on 2/18/2005. AUSA Patricia Notopoulos, Gregory Cooper for deft. Deft enters plea of not guilty to all counts. Order of speedy trial entered from 2/18/05 to 3/11/05. Status conference set for 3/11/05 before Judge Dearie. (Tape #: 05/39 (95-1594).) (Chee, Alvin) (Entered: 02/23/2005) |
| 02/18/2005 | 25 | CJA 20 as to Joseph Pappalardo: Appointment of Attorney Gregory E. Cooper for Joseph Pappalardo. Signed by Judge Cheryl L. Pollak on 2/18/05. (Chee, Alvin) (Entered: 02/23/2005) |
| 02/18/2005 | 26 | ORDER TO CONTINUE - Ends of Justice as to Joseph Pappalardo: Time excluded from 2/18/05 until 3/11/05. Signed by Judge Cheryl L. Pollak on 2/18/05. (Chee, Alvin) (Entered: 02/23/2005) |
| 02/18/2005 | 27 | ORDER Setting Conditions of Release and Bond as to Joseph Pappalardo. Deft released on $250,000 unsecured bond. Bail limits: EDNY and SDNY. Deft may go to District of NJ to seek employment upon notice to PTS. Deft shall avoid contact with victims of extortion and any witnesses. Deft to surrender passports by 2/23/05. Deft must report to PTS once per week (appearance at SDNY PTS is acceptable). Deft to undergo random drug testing. Bond to be co-signed by mother-Sally Pappalardo by 2/25/05 . Signed by Judge Cheryl L. Pollak on 2/18/05. (Chee, Alvin) (Entered: 02/23/2005) |
| 02/22/2005 | 28 | Minute Entry for proceedings held before Viktor V. Pohorelsky: Bond Signing as to Joseph Pappalardo held on 2/22/2005. 1 Surety sworn and advised of bond obligations. Sally Pappalardo signed bond. (Tape #: 05/39 (4494-4706).) (Chee, Alvin) (Entered: 02/23/2005) |

| 02/22/2005 | 29 | ORDER Setting Conditions of Release and Bond as to Joseph Pappalardo: Copy of document #27 with the signature of one additional surety- Sally Pappalardo. (Chee, Alvin) (Entered: 02/23/2005) |
|---|---|---|
| 03/11/2005 | 32 | Minute Entry for proceedings held before Raymond J. Dearie: Status Conference as to Ronald Turner, Christian Kuretski, Joseph Pappalardo held on 3/11/2005. AUSA Tanya Hill and Trish Notopoulos, Robert Jones for Stanley Cohen for deft Kuretski, Robert Koppelman for deft Turner, Greg Cooper and Lawrence Ruggiero for deft Pappalardo. All prior counsel are relieved with the thanks of the Court. Notice of appearances filed on behalf of all three defts. Discussion held. Court: Case is designated as complex. As to defts Turner and Pappalardo, defense counsel request that the bond be modified to allow defts to travel to New Jersey for work purposes. Court: Counsel are directed to put this in writing. Next court date: 5/6/05 at 12:15 PM. (Court Reporter : Marsha Diamond.) (Chee, Alvin) (Entered: 03/21/2005) |
| 03/11/2005 | 35 | NOTICE OF ATTORNEY APPEARANCE: Lawrence F. Ruggiero appearing for Joseph Pappalardo. (Chee, Alvin) (Entered: 03/22/2005) |
| 03/11/2005 | 36 | Letter dated 3/11/05 from AUSA Patricia Notopoulos to defense counsel furnishing discovery. (Chee, Alvin) (Entered: 04/01/2005) |
| 04/15/2005 | 37 | Seizure Warrant Returned Executed in case as to Ronald Turner, Christian Kuretski, Joseph Pappalardo. One (1) 1999 Porsche 911 Carrera bearing VIN # WPOCA2992X5655878 seized on 4/12/05. (Chee, Alvin) (Entered: 04/18/2005) |
| 04/21/2005 | 38 | Letter dated 4/12/05 from AUSA Patricia Notopoulos to defense counsel disclosing financial records from various banks and brokerage accounts pursuant to Rule 16 of the FRCrP. (Chee, Alvin) (Entered: 04/25/2005) |
| 05/06/2005 | 39 | Minute Entry for proceedings held before Raymond J. Dearie: Status Conference as to Ronald Turner, Christian Kuretski, Joseph Pappalardo held on 5/6/2005. AUSA Tanya Hill, Robert Koppleman for deft Turner, Lawrence Ruggiero for deft Pappalardo. Counsel for deft Kuretski not present. Mr. Cohn advised to write a letter to the Court explaining his absence. Clerk advised him of the next date: 7/25/05 at 2:15 PM. (Chee, Alvin) (Entered: 05/11/2005) |
| 05/06/2005 | 40 | Letter dated 5/6/05 from AUSA Patricia Notopoulos, Esq. to defense counsel disclosing the attached list of tape recorded conversations pursuant to Rule 16 of the FRCrP. (Chee, Alvin) (Entered: 05/11/2005) |
| 05/13/2005 | 42 | NOTICE of Intent to Use Evidence by Ronald Turner, Christian Kuretski, Joseph Pappalardo *Government Rule 16 Letter* (Notopoulos, Patricia) (Entered: 05/13/2005) |
| 06/16/2005 | 43 | Sealed document. (Chee, Alvin) (Entered: 06/24/2005) |
| 08/10/2005 | 45 | Letter from Jennifer Schantz to Judge Dearie Regarding proposed Stipulation and Order (Attachments: # 1)(Schantz, Jennifer) (Entered: 08/10/2005) |

| 08/25/2005 | 46 | STIPULATION AND ORDER as to Ronald Turner, Christian Kuretski, Joseph Pappalardo: Mr. DeGerolamo represents that he is the sole owner of $25,138.41 currently under restraint in the bank accounts. The US agrees to release $25,138.41 to Mr. DeGerolamo. The US shall file an amended restraining order, in the form annexed hereto as Attachment A, which restrains $180,000 now on deposit at the MHV bank account and releases the remainder of the funds on deposit in that account to Mr. DeGerolamo. The amended restraining order also shall release all restraints upon the M&T bank account. MHV bank account is directed to issue a check from the MHV bank account payable to Mr. DeGerolamo in the amount of $14,254.18 and to continue restraining the remaining $180,000 on deposit in that account. Mr. DeGerolamo shall withdraw his motion for return of property dated 6/15/05. Each party shall bear its own costs and attorneys' fees, and no attorneys' fees shall be paid pursuant to 28 U.S.C. 2465(b)(1)(a), pursuant to the Equal Access to Justice Act, or pursuant to any other statute. C/M . Ordered by Judge Raymond J. Dearie on 8/25/05. (Chee, Alvin) (Entered: 08/26/2005) |
| --- | --- | --- |
| 09/12/2005 | 47 | Mail Returned as Undeliverable. Document #46 sent to Gail Laser, Esq. at 260 Madison Avenue, New York, NY returned on 9/12/05. RTS: Not Deliverable as addressed. (Chee, Alvin) (Entered: 09/19/2005) |
| 09/23/2005 | 48 | Letter dated 9/23/05 from AUSA Tanya Hill to Hon. Raymond J. Dearie advising the Court that the parties have agreed to adjourn the status conference scheduled for 9/23/05, and to reschedule the matter for 11/18/05 at 12:30 PM. (Chee, Alvin) (Entered: 09/26/2005) |
| 02/07/2006 | 55 | SEALED ENVELOPE.(Vaughn, Terry) (Entered: 02/07/2006) |
| 05/30/2006 | 56 | Sealed document containing Order dated 5/30/06. (Chee, Alvin) (Entered: 06/01/2006) |
| 06/28/2006 | 58 | Consent to Have Plea Taken Before MJ as to Joseph Pappalardo. Ordered by Judge Cheryl L. Pollak on 6/28/06. (Chee, Alvin) (Entered: 07/17/2006) |
| 06/28/2006 | 59 | Minute Entry for proceedings held before Cheryl L. Pollak: Pleading as to Joseph Pappalardo held on 6/28/2006. AUSA Tanya Hill; Lawrence Ruggiero for deft. Deft sworn and waives trial before District Court. Plea entered by Joseph Pappalardo (3) Guilty Count 6. Sentencing to be set by Probation. Bail continued for deft. (Tape#: 12:10-12:42.) (Chee, Alvin) (Entered: 07/17/2006) |
| 08/25/2006 | 60 | TRANSCRIPT of Pleading before MJ Pollak as to Joseph Pappalardo for date of 6/28/06. Official Transcriber: Rosalie Lombardi. (Chee, Alvin) (Entered: 08/28/2006) |

| PACER Service Center |
| --- |
| Transaction Receipt |

| 01/04/2007 09:46:13 | | | |
|---|---|---|---|
| **PACER Login:** | cf0164 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:05-cr-00059-RJD Starting with document: 1 Ending with document: 150 |
| **Billable Pages:** | 3 | **Cost:** | 0.24 |

# Exhibit H

MJSELECT

# U.S. District Court
## Eastern District of New York, Brooklyn (Brooklyn)
## CRIMINAL DOCKET FOR CASE #: 1:05-cr-00059-RJD-2

Case title: USA v. Turner                                 Date Filed: 02/23/2005

Assigned to: Judge Raymond J. Dearie

### Defendant

Ronald Turner (2)                     represented by    **Joel S. Cohen**
                                                        Joel S. Cohen, P.C.
                                                        Glory China Tower
                                                        11 East Broadway
                                                        11th Floor
                                                        New York, NY 10038
                                                        (212) 571-8899
                                                        Fax: (212) 571-9065
                                                        Email: jcesq99@aol.com
                                                        *TERMINATED: 03/11/2005*
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*
                                                        *Designation: CJA Appointment*

                                                        **Robert Koppelman**
                                                        Robert Koppelman, Attorney at Law
                                                        585 West End Avenue
                                                        New York, NY 10024
                                                        (212) 577-6580
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*
                                                        *Designation: Retained*

### Pending Counts                                      ### Disposition

INTERFERENCE WITH
COMMERCE BY THREAT OR
VIOLENCE
(1-2)

CONSPIRACY TO DEFRAUD THE
UNITED STATES
(1s)

COLLECTION OF CREDIT BY
EXTORTION
(6s)

INTERFERENCE WITH
COMMERCE BY THREAT OR
VIOLENCE
(7s-8s)

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                                    **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**                                          **Disposition**

None

---

**Plaintiff**

**USA**                          represented by **Patricia E Notopoulos**
United States Attorneys Office
225 Cadman Plaza East
Brooklyn, NY 11201
(718) 254-6354
Fax: 718-254-6478
Email: patricia.notopoulos@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/26/2005 | 11 | SEALED INDICTMENT as to Ronald Turner (1) count(s) 1-2. (Bowens, Priscilla) (Entered: 01/26/2005) |
| 02/17/2005 | 12 | Order to Unseal Case as to Ronald Turner, Christian Kuretski, and Joseph Pappalardo: The superseding indictment is unsealed. Signed by Judge Cheryl L. Pollak on 2/17/05. (Confirmed with AUSA Tayna Hill that this order unseals entire case). (Chee, Alvin) (Entered: 02/23/2005) |
| 02/17/2005 | 13 | SUPERSEDING INDICTMENT as to Christian Kuretski (1) count(s) 1, 2, 3-4, 5, 6, 7, Ronald Turner (2) count(s) 1s, 6s, 7s-8s, Joseph Pappalardo (3) count(s) 6. (Chee, Alvin) (Entered: 02/23/2005) |
| 02/18/2005 | 19 | UNSEALING ORDER as to Ronald Turner: The superseding indictment is unsealed . Signed by Judge Cheryl L. Pollak on 2/18/05. (Chee, Alvin) (Entered: 02/23/2005) |

| 02/18/2005 | 20 | Minute Entry for proceedings held before Cheryl L. Pollak: Arraignment as to Ronald Turner (2) Count 1-2,1s,6s,7s-8s held on 2/18/2005. AUSA Patricia Notopoulos, Joel Cohen for deft. Deft enters plea of not guilty to all counts. Order of speedy trial entered from 2/18/05 to 3/11/05. Hearing adjourned to 3/1/05 at 2 PM for bond signing. Status conference set for 3/11/05 before Judge Dearie. (Tape #: 05/39 (95-1594).) (Chee, Alvin) (Entered: 02/23/2005) |
|---|---|---|
| 02/18/2005 | 21 | CJA 20 as to Ronald Turner: Appointment of Attorney Joel S. Cohen for Ronald Turner. Signed by Judge Cheryl L. Pollak on 2/18/05. (Chee, Alvin) (Entered: 02/23/2005) |
| 02/18/2005 | 22 | ORDER TO CONTINUE - Ends of Justice as to Ronald Turner: Time excluded from 2/18/05 until 3/11/05. Signed by Judge Cheryl L. Pollak on 2/18/05. (Chee, Alvin) (Entered: 02/23/2005) |
| 02/18/2005 | 23 | ORDER Setting Conditions of Release and Bond as to Ronald Turner: Deft released on $250,000 PRB. Bail limits: EDNY and SDNY. Deft to surrender all passports and shall not apply for any other passport. Deft is subject to home detention with electronic monitoring and may re-apply for bail in two weeks. Deft not to have contact with any victim or witness and any investor of Grady and Hatch and/or Great Eastern except through criminal attorney . Signed by Judge Cheryl L. Pollak on 2/18/05. (Chee, Alvin) (Entered: 02/23/2005) |
| 03/01/2005 | 30 | Minute Entry for proceedings held before Marilyn D. Go: Bond Modification as to Ronald Turner held on 3/1/2005. AUSA Patricia Notopoulos, Joel Cohen for deft. Bond modified. Electric monitoring vacated. Deft subject to random home visits by PTS, must report to PTS once per week. Property posted on bond, executed by 3/2/05. (Tape #05/44 (1955-4191).) (Chee, Alvin) (Entered: 03/07/2005) |
| 03/01/2005 | 31 | MODIFIED ORDER Setting Conditions of Release as to Ronald Turner: Deft released on $250,000 secured bond. Bail limits: EDNY and SDNY. Deft subject to random visits by PTS. Deft to report to PTS once a week. Electronic monitoring vacated. Deft to avoid contact with any investor of Great Eastern and Grady and Hatch except through criminal attorney. Additional suretor added. Signed by Judge Marilyn D. Go on 3/1/05. (Chee, Alvin) (Entered: 03/07/2005) |
| 03/11/2005 | 32 | Minute Entry for proceedings held before Raymond J. Dearie: Status Conference as to Ronald Turner, Christian Kuretski, Joseph Pappalardo held on 3/11/2005. AUSA Tanya Hill and Trish Notopoulos, Robert Jones for Stanley Cohen for deft Kuretski, Robert Koppelman for deft Turner, Greg Cooper and Lawrence Ruggiero for deft Pappalardo. All prior counsel are relieved with the thanks of the Court. Notice of appearances filed on behalf of all three defts. Discussion held. Court: Case is designated as complex. As to defts Turner and Pappalardo, defense counsel request that the bond be modified to allow defts to travel to New Jersey for work purposes. Court: Counsel are directed to put this in writing. Next court date: 5/6/05 at 12:15 PM. (Court Reporter : Marsha Diamond.) (Chee, Alvin) (Entered: 03/21/2005) |

| 03/11/2005 | 34 | NOTICE OF ATTORNEY APPEARANCE: Robert Koppelman appearing for Ronald Turner. (Chee, Alvin) (Entered: 03/22/2005) |
|---|---|---|
| 03/11/2005 | 36 | Letter dated 3/11/05 from AUSA Patricia Notopoulos to defense counsel furnishing discovery. (Chee, Alvin) (Entered: 04/01/2005) |
| 04/15/2005 | 37 | Seizure Warrant Returned Executed in case as to Ronald Turner, Christian Kuretski, Joseph Pappalardo. One (1) 1999 Porsche 911 Carrera bearing VIN # WPOCA2992X5655878 seized on 4/12/05. (Chee, Alvin) (Entered: 04/18/2005) |
| 04/21/2005 | 38 | Letter dated 4/12/05 from AUSA Patricia Notopoulos to defense counsel disclosing financial records from various banks and brokerage accounts pursuant to Rule 16 of the FRCrP. (Chee, Alvin) (Entered: 04/25/2005) |
| 05/06/2005 | 39 | Minute Entry for proceedings held before Raymond J. Dearie: Status Conference as to Ronald Turner, Christian Kuretski, Joseph Pappalardo held on 5/6/2005. AUSA Tanya Hill, Robert Koppleman for deft Turner, Lawrence Ruggiero for deft Pappalardo. Counsel for deft Kuretski not present. Mr. Cohn advised to write a letter to the Court explaining his absence. Clerk advised him of the next date: 7/25/05 at 2:15 PM. (Chee, Alvin) (Entered: 05/11/2005) |
| 05/06/2005 | 40 | Letter dated 5/6/05 from AUSA Patricia Notopoulos, Esq. to defense counsel disclosing the attached list of tape recorded conversations pursuant to Rule 16 of the FRCrP. (Chee, Alvin) (Entered: 05/11/2005) |
| 05/13/2005 | 42 | NOTICE of Intent to Use Evidence by Ronald Turner, Christian Kuretski, Joseph Pappalardo *Government Rule 16 Letter* (Notopoulos, Patricia) (Entered: 05/13/2005) |
| 06/16/2005 | 43 | Sealed document. (Chee, Alvin) (Entered: 06/24/2005) |
| 08/10/2005 | 45 | Letter from Jennifer Schantz to Judge Dearie Regarding proposed Stipulation and Order (Attachments: # 1)(Schantz, Jennifer) (Entered: 08/10/2005) |
| 08/25/2005 | 46 | STIPULATION AND ORDER as to Ronald Turner, Christian Kuretski, Joseph Pappalardo: Mr. DeGerolamo represents that he is the sole owner of $25,138.41 currently under restraint in the bank accounts. The US agrees to release $25,138.41 to Mr. DeGerolamo. The US shall file an amended restraining order, in the form annexed hereto as Attachment A, which restrains $180,000 now on deposit at the MHV bank account and releases the remainder of the funds on deposit in that account to Mr. DeGerolamo. The amended restraining order also shall release all restraints upon the M&T bank account. MHV bank account is directed to issue a check from the MHV bank account payable to Mr. DeGerolamo in the amount of $14,254.18 and to continue restraining the remaining $180,000 on deposit in that account. Mr. DeGerolamo shall withdraw his motion for return of property dated 6/15/05. Each party shall bear its own costs and attorneys' fees, and no attorneys' fees shall be paid pursuant to 28 U.S.C. 2465(b)(1)(a), pursuant to the Equal Access to Justice Act, or pursuant to any other statute. C/M . Ordered by Judge Raymond J. Dearie |

| | | on 8/25/05. (Chee, Alvin) (Entered: 08/26/2005) |
|---|---|---|
| 09/12/2005 | 47 | Mail Returned as Undeliverable. Document #46 sent to Gail Laser, Esq. at 260 Madison Avenue, New York, NY returned on 9/12/05. RTS: Not Deliverable as addressed. (Chee, Alvin) (Entered: 09/19/2005) |
| 09/23/2005 | 48 | Letter dated 9/23/05 from AUSA Tanya Hill to Hon. Raymond J. Dearie advising the Court that the parties have agreed to adjourn the status conference scheduled for 9/23/05, and to reschedule the matter for 11/18/05 at 12:30 PM. (Chee, Alvin) (Entered: 09/26/2005) |
| 10/26/2005 | 49 | Letter dated 10/14/05 from Richard Shanley, Esq. to Hon. Raymond J. Dearie requesting a modification of deft Turner's conditions of pre-trial release to substitute personal appearance at Pre-trial Services to weekly check-in by telephone. (Chee, Alvin) (Entered: 10/31/2005) |
| 11/01/2005 | 50 | Sealed Document. (Chee, Alvin) (Entered: 11/08/2005) |
| 02/07/2006 | 55 | SEALED ENVELOPE.(Vaughn, Terry) (Entered: 02/07/2006) |
| 05/30/2006 | 56 | Sealed document containing Order dated 5/30/06. (Chee, Alvin) (Entered: 06/01/2006) |
| 07/10/2006 | 57 | ORDER as to Ronald Turner: Application granted. Mr. Turbner's pre-trial release conditions are modified to permit him to travel to Antigua from 7/8/06 to 7/16/06. Ordered by Judge Raymond J. Dearie on 7/6/06. ( Endorsed on letter dated 7/6/06 from Richard J. Shanley, Esq.) (Permaul, Jenny) (Entered: 07/10/2006) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 01/04/2007 09:47:51 | | |
| **PACER Login:** | cf0164 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:05-cr-00059-RJD Starting with document: 1 Ending with document: 100 |
| **Billable Pages:** | 3 | **Cost:** | 0.24 |

# Exhibit I

**UNITED STATES DISTRICT COURT**
SOUTHERN DISTRICT OF NEW YORK
OFFICE OF THE CLERK
U.S. COURTHOUSE
FOLEY SQUARE, NEW YORK, NEW YORK 10007



FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT, E.D.N.Y.

★ OCT 5 2005 ★

BROOKLYN OFFICE

Re: United States of America
vs.

*Ronald Turner*

Case No. *05 CR 157 (BSS)* DEARIE, J.

**CR05    810**

Dear Clerk:

The above defendant/s have consented to the disposition
of this case in your district.

Pursuant to Rule 20 of the Rules of Criminal Procedure,
we are transmitting a certified copy of the information and
waiver of indictment together with certified copies of the
defendants' consent to the transfer of the proceeding to your
district for plea and sentence.

Please acknowledge your receipt on the enclosed copy of
this letter.

Very truly yours,

J. MICHAEL McMAHON, ACTING CLERK

BY *Jackie Adams*
        DEPUTY CLERK

Certified Mail# *8467 3664 3047*

-------------------------------------------------------------------
-------------------------------------------------------------------

RECEIPT IS ACKNOWLEDGED OF THE DOCUMENTS DESCRIBED HEREIN AND
ASSIGNED CASE NUMBER:

_____

DATE:_____       CLERK, UNITED STATES DISTRICT COURT

                             By:_____
                                      Deputy Clerk

*810
RJD (Pollak*

In the United States District Court

for the ___SOUTHERN_____ District of ___NEW YORK_____

DOC # 20

United States of America

v.

RONALD TURNER

U.S. DISTRICT COURT
FILED

OCT __ 2005

S. D. OF N.Y.

DEARIE, J.

Criminal No. 05 Cr. 0157 (BSJ)

Consent to Transfer of Case

for Plea and Sentence

*(Under Rule 20)*

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★    OCT 0 5 2005    ★

BROOKLYN OFFICE

I, ___RONALD TURNER_____, defendant, have been informed that a ___INDICTMENT_____ (indictment,

*information, complaint*) is pending against me in the above designated cause. I wish to plead ___GUILTY_____

*(guilty, nolo contendre)* to the offense charged, to consent to the disposition of the case in the ___EASTERN_____

District of ___NEW YORK_____ in which I ___AM UNDER ARREST_____ *(am under arrest, am held)* and to waive

trial in the above captioned District.

Dated: __9/21/05___, 19___ at _____

__Ronald T_____
(Defendant)

_____
(Witness)

A TRUE COPY
J. MICHAEL McMAHON, CLERK

BY _Jackie Adams____
DEPUTY CLERK

_____
(Counsel for Defendant)

Approved

BY: _____
ACTING UNITED STATES ATTORNEY
PURSUANT TO 28 C.F.R. 0.136

_Michael J. Garcia____
United States Attorney for the

___SOUTHERN_____ District of
NEW YORK

_____
United States Attorney for the

___EASTERN_____ District of
NEW YORK

## RULE 20- TRANSFER NOTICE

| TO: MICHAEL J. GARCIA U.S. ATTORNEY | DISTRICT S.D.N.Y. | DATE SEPTEMBER 14, 2005 |
|---|---|---|
| NAME OF SUBJECT RONALD TURNER | STATUTE VIOLATED 18 U.S.C. §371 | FILE DATE (Initials and Number) |

### PART A - DISTRICT OF ARREST
(05)                         S 10 EARIE, J

- [ ] The above-named subject has been apprehended in this jurisdiction and indicates amenability to Rule 20 disposition of the charges pending against him in your district. Kindly indicate whether you are agreeable to Rule 20 disposition and forward two certified copies of indictment or information if any.

- [ ] Enclosed is certified copy of waive of indictment executed by defendant. Kindly file criminal information and forward two certified copies thereof.

- [X] Enclosed is Consent to Transfer form executed in duplicate (one copy for your files) by defendant and the United States Attorney in the district of arrest. Kindly add your consent and have the Clerk of your district transmit the papers in the proceedings or certified copies thereof to the Clerk of the court in this district in accordance with Rule 20.

  Docket No. _05-CR-059(S-1)(R.J.D.)_

- [ ] Other (Specify):

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ OCT 0 5 2005 ★

BROOKLYN OFFICE

- [ ] The above-named defendant entered a plea of guilty under Rule 20.

  DATE OF PLEA            DATE OF SENTENCE            SENTENCE

| FROM (Signature and Title) _Tanya Y. Hill_ ROSLYNN R. MAUSKOPF by Tanya Y. Hill U.S. ATTORNEY, E.D.N.Y. | ADDRESS ONE ST. ANDREW'S PLAZA NEW YORK, NY 10007 |
|---|---|

### PART B - DISTRICT OF OFFENSE

- [X] I am agreeable to Rule 20 disposition.

- [ ] I am not agreeable to Rule 20 disposition. Defendant's appearance is desired at
  on            at            o'clock.
  (kindly notify me of any anticipated delay.)

- [X] Enclosed are two certified copies fo indictment or information. Docket No. _05 Cr. 0157_

- [ ] Please have defendant execute waiver of indictment.

- [ ] Other (Specify):

A TRUE COPY
J. MICHAEL McMAHON, CLERK

BY _____
DEPUTY CLERK

| SIGNATURE (Name and Title) _Michael J. Garcia_ MICHAEL J. GARCIA | DISTRICT S.D.N.Y. | DATE SEPTEMBER 14, 2005 |
|---|---|---|

See United States Attorneys Manual 9 - 14,000 for an explanation of procedures under Rules 7 & 20, Federal Rules of Criminal Procedure.

Form OBD-101
(Previous Editions are Obsolete.)                SEP 1978

This form was electronically produced by Elite Federal Forms, Inc.

# Exhibit J

5CLDDANP

PLEA

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,                    New York, N.Y.

4          v.                                   05 Cr. 157 (BSJ)

5  VINCENZO DANIO,

6              Defendant.

7  ------------------------------x

8
                                                December 21, 2005
9                                               1:30 p.m.

10

11 Before:

12                 HON. BARBARA S. JONES,

13                                      District Judge

14                        APPEARANCES

15 MICHAEL J. GARCIA
        United States Attorney for the
16      Southern District of New York
   BY:  ROBERTO FINZI
17      Assistant United States Attorney

18 JAMES R. FVOCCARO, JR.
        Attorney for Defendant
19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5CLDDANP
PLEA

1    these rights?

2            THE DEFENDANT:  No, your Honor.

3            THE COURT:  OK.  Do you understand that when you enter

4    a guilty plea, you are giving up your right to a jury trial and

5    the other rights that I have just described?

6            THE DEFENDANT:  Yes, your Honor.

7            THE COURT:  Do you have a copy of the Indictment in

8    front of you?

9            THE DEFENDANT:  Yes, I do.

10           THE COURT:  OK.  Have you gone over this Indictment

11   with your lawyer and discussed it with him?

12           THE DEFENDANT:  Yes, your Honor.

13           THE COURT:  OK.  Now, I am going to explain to you

14   what the maximum possible penalties are and also exactly what

15   you are charged with in Count One.

16           Count One of the Indictment charges that from in or

17   about December 2001 to in or about February of 2005, you

18   conspired with others to commit mail and wire fraud.

19           Do you understand that that's the basic charge in

20   Count One?

21           THE DEFENDANT:  Yes, your Honor.

22           THE COURT:  OK.  Now, that particular charge carries a

23   maximum sentence of five years in prison, a maximum term of

24   supervised release of three years, a maximum fine of the

25   greatest of $250,000 or twice the gross monetary gain derived

5CLDDANP
PLEA

1   from the offense or twice the gross monetary loss to persons

2   other than yourself resulting from the offense.

3          There is also a mandatory $100 special assessment.

4          Do you understand those are the maximum possible

5   penalties for the crime you are about to plead guilty to?

6          THE DEFENDANT:  Yes, your Honor.

7          THE COURT:  All right.  Now, I have mentioned

8   supervised release.  I want to explain to you that if you

9   receive a term of imprisonment, when you are released, you will

10  be subject to monitoring and there will be terms that you have

11  to live up to while you are on supervised release.  You have to

12  comply with them, and if you don't comply with them, then you

13  can be returned to prison after a hearing in front of me, or

14  another judge, without a jury trial for the full time of your

15  supervised release.

16         Do you understand that?

17         THE DEFENDANT:  Yes, your Honor.

18         THE COURT:  All right.  And of course, as a part of

19  your sentence, I will also order restitution to any person or

20  entity who was injured as a result of your criminal conduct.

21  Are you aware of that?

22         THE DEFENDANT:  Yes, your Honor.

23         THE COURT:  OK.  Now, do you also understand that if I

24  accept your plea of guilty, that may deprive you of valuable

25  civil rights such as the right to vote, the right to hold

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5CLDDANP

PLEA

1  calculation in the agreement, I am not bound by that agreement

2  and that calculation; do you understand that?

3          THE DEFENDANT:  Yes, your Honor, I do.

4          THE COURT:  And do you know I can impose whatever

5  sentence I believe is appropriate under the circumstances, the

6  statutory considerations and the guidelines?  Do you know that?

7          THE DEFENDANT:  Yes, I do, your Honor.

8          THE COURT:  All right.  Now, in addition, as part of

9  your plea agreement, do you also understand that you have

10  agreed with the government that you won't appeal or challenge

11  your sentence in any way if I sentence you within the range of

12  30 to 37 months; do you understand that?

13          THE DEFENDANT:  Yes, your Honor, I do.

14          THE COURT:  All right.  So that includes not only

15  direct appeal if I sentence you within 30 to 37 months, you

16  have given up your right to directly appeal that and you have

17  given up any right to challenge it under 2255 or 2241; do you

18  understand that?

19          THE DEFENDANT:  Yes, your Honor, I do.

20          THE COURT:  OK.  Would you take a look at your

21  agreement.  Have you signed that?

22          THE DEFENDANT:  Yes, I have, your Honor.

23          THE COURT:  And did you talk to Mr. Fvoccaro about the

24  agreement before you signed it?

25          THE DEFENDANT:  Yes, I did.

5CLDDANP

PLEA

1          THE COURT:  And do you understand it?

2          THE DEFENDANT:  Yes, your Honor, I do understand it.

3          THE COURT:  All right.  Is everything that you

4    understand about your plea and sentence contained in the

5    written agreement?

6          THE DEFENDANT:  Yes, it is.

7          THE COURT:  All right.  Has anybody made any promises

8    to you other than what is in the plea agreement or has anybody

9    forced you or threatened you in any way to get you to enter the

10   plea agreement or to plead guilty this afternoon?

11         THE DEFENDANT:  No, your Honor.

12         THE COURT:  OK.  Mr. Finzi, was there any other part

13   of the plea agreement you wanted me to cover?

14         MR. FINZI:  Your Honor, our usual practice has been

15   with respect to the DNA waiver.  I don't know if it makes much

16   sense in a case like this.  What have other assistants been

17   asking you to do?

18         THE COURT:  I guess, for the most part, they have been

19   asking me to do it.

20         MR. FINZI:  In that case --

21         THE COURT:  Despite the fact that there may not be any

22   evidence with your DNA on it, Mr. Danio, I will just bring to

23   your attention the fact that in this agreement you have also

24   waived your right, given up your right, any right that you

25   might have to require DNA testing of any physical evidence in

5CLDDANP
PLEA

1  the possession of the government.  Are you aware of the fact

2  that that is in your agreement?

3          THE DEFENDANT:  Yes, your Honor.

4          THE COURT:  OK.  And do you understand that that also

5  means that having given up that right, if there is any physical

6  evidence in this case, it will not be preserved by the

7  government and it will not be available for DNA testing in the

8  future; do you understand that?

9          THE DEFENDANT:  Yes, your Honor, I do.

10          THE COURT:  OK.  Mr. Finzi, would you put the elements

11  for Count One, the offense in Count One, on the record, please.

12          MR. FINZI:  Yes, your Honor.

13          Count One charges a conspiracy under Title 18, U.S.

14  Code, Section 371.  In order to prove a conspiracy at trial,

15  the government would have to show three things beyond a

16  reasonable doubt:  First, that two or more people entered into

17  an unlawful agreement whose object was to commit mail and wire

18  fraud in this case; second, that the defendant became a member

19  of that conspiracy knowingly and willfully; and, third, that

20  the defendant or another co-conspirator undertook an overt act

21  in furtherance of the conspiracy.

22          Finally, the government would have to show that some

23  act either by the defendant or by a co-conspirator was

24  committed in the Southern District of New York.

25          With respect to the objects of that conspiracy, mail

5CLDDANP

PLEA

1  fraud and wire fraud, the first two elements are the same.  The

2  government would have to show that at or about the time alleged

3  in the Indictment, the defendant devised a scheme or artifice

4  to defraud or to obtain money by false or fraudulent pretenses;

5  second, that the defendant knowingly and willfully devised and

6  participated in this scheme to defraud with knowledge of its

7  fraudulent nature and with the specific intent to defraud.

8         Then with respect to the wire fraud count, the

9  government would have to show the use of interstate wires; and

10  with respect to the mail fraud count, the government would have

11  to show that the United States mails were used in furtherance

12  of the scheme.

13         THE COURT:  All right.  Mr. Danio, I asked Mr. Finzi

14  to go through those elements for you because that is what the

15  government would have to prove, each and every one of those

16  elements, to a jury beyond a reasonable doubt before you can be

17  convicted.

18         Knowing that, do you still wish to go forward with

19  your plea?

20         THE DEFENDANT:  Yes, your Honor, I do.

21         THE COURT:  OK.  Would you summarize your evidence,

22  Mr. Finzi.

23         MR. FINZI:  Sure, your Honor.

24         If this case went to trial, the government would show

25  through documentary evidence and the testimony of eyewitnesses,

5CLDDANP
PLEA

1  including victims, that between roughly December of 2001 and

2  about February of 2005, I think, the defendant participated

3  with others in a scheme to raise money, investments, from

4  investors by making false representations about the nature of

5  the investment that was being made.  The false representations

6  included false statements about the nature of the business,

7  about the commissions being charged and about the

8  profitability, both past and future, of the investments to be

9  made.

10      THE COURT:  All right.  Thank you.

11      Mr. Danio, would you tell me in your own words what

12  you did that makes you believe that you are guilty of the

13  charge in Count One.

14      THE DEFENDANT:  Yes, your Honor.

15      MR. FVOCCARO:  Judge, he has a prepared allocution, if

16  that is all right, your Honor.

17      THE COURT:  That's fine.

18      Have you gone over that, and is it true, Mr. Danio?

19  Is it accurate, what you are about to read to me?

20      THE DEFENDANT:  Yes, it is, your Honor.

21      THE COURT:  OK.  Go ahead.

22      THE DEFENDANT:  From on or about December of 2001,

23  through about February of 2005, within New York and -- the

24  Southern District and elsewhere, I, together with others,

25  engaged in a scheme to mislead customers who invested in the

5CLDDANP
                              PLEA

1    Forex market through various Richmond Global entities.

2            THE COURT:  I'm sorry, the Forex market through what?

3            MR. FVOCCARO:  He said, "through the various Richmond

4    Global entities."  Those were the entities through which they

5    raised money, Judge.

6            THE COURT:  If you could just slow down a little,

7    Mr. Danio, so the reporter can hear you, and raise your voice a

8    little.  OK?

9            THE DEFENDANT:  So to effect this scheme, I made

10   misleading representations to potential retail customers over

11   the telephone to attract customers to open accounts and which

12   entrusted funds to Richmond Global for the purpose of trading

13   in the Forex market.

14           I also provided these customers through the mail with

15   misleading account statements that disguised commissions taken

16   by Richmond Global as trading losses.

17           MR. FVOCCARO:  That is it, your Honor.

18           THE COURT:  All right.  So the mailings you just told

19   me were false because they disguised commissions as trading

20   losses, is that right?

21           THE DEFENDANT:  That is correct, Judge.

22           THE COURT:  And you knew that that's what those

23   mailings did, right; you knew they were false?

24           THE DEFENDANT:  Yes, your Honor, I knew they were

25   misleading.

5CLDDANP

PLEA

1      THE COURT:  All right.  What about the false

2  statements that you yourself made?  Give me an example.

3      THE DEFENDANT:  If you had invested with the company,

4  you would make a deposit -- if you had invested into the

5  market, into Richmond Global, to trade in the Forex market, the

6  spot Forex market, currency market, if you had a trading cost

7  of $100 and a loss of $100, it did not detail in deep

8  description that it was one or the other, it came in one

9  column, and effectively not allowing the client to make a true

10  judgment call on how effective the trading tool was.

11      THE COURT:  Mr. Finzi, is the allocution sufficient

12  for your purposes?

13      MR. FINZI:  I think it is with respect to the

14  mailings, your Honor.

15      I think the question your Honor was asking went more

16  to the initial part of solicitation of investors.

17      THE COURT:  Right.

18      MR. FINZI:  Maybe a way to phrase it is to ask

19  Mr. Danio to say what kind of things were misrepresented to

20  potential investors at the time he sought the initial

21  investment.

22      THE COURT:  All right.  Mr. Danio, you did tell me

23  that you would tell people false -- you would make false

24  representations to people to get them to invest.  Can you give

25  me an example of one or two of those things?

5CLDDANP
                                    PLEA

1           THE DEFENDANT:  I, together with others, made

2     exaggerations of employees or staff, the potential downside or

3     potential upside, misleading to the better side of

4     profitability.

5           THE COURT:  So, in other words, you told them you were

6     a bigger company than you really were; is that what you are

7     saying?

8           THE DEFENDANT:  Yes.

9           THE COURT:  OK.  And you also told them that their

10    profit would be higher than you really believed, is that right;

11    or what are you trying to tell me?

12          THE DEFENDANT:  No, that's not right, your Honor, not

13    that it would be higher than they were but that it would be a

14    less risky investment for that type of upside potential that we

15    had described.

16          THE COURT:  All right.  And you knew that was false,

17    isn't that right?

18          THE DEFENDANT:  Yes, I knew that was misleading.

19          THE COURT:  OK.  Anything else?

20          MR. FINZI:  One final thing, your Honor, with respect

21    to venue, if you could just confirm --

22          THE COURT:  You did say in New York.

23          Was this in Manhattan?

24          THE DEFENDANT:  I believe, the Southern District and

25    New York, your Honor.

5CLDDANP
                                    PLEA

1          THE COURT:  OK.  The Southern District is a bunch of

2   places.  Was it in Manhattan; New York, New York?

3          THE DEFENDANT:  Yes, your Honor.

4          THE COURT:  OK.  Yes?

5          THE DEFENDANT:  Yes, your Honor.

6          THE COURT:  OK.  Very good.

7          Mr. Danio, when you were speaking to these potential

8   investors and telling them lies and when you sent out some of

9   the materials that you did that had misrepresentations in them,

10  did you know that what you were doing was wrong and illegal?

11         THE DEFENDANT:  Yes, your Honor, it was not right or

12  ethical.

13         THE COURT:  Are you pleading guilty to the conspiracy

14  charge because you are guilty of that crime?

15         THE DEFENDANT:  Yes, I together with others.

16         THE COURT:  OK.  How do you now plead to Count One of

17  the Indictment, guilty or not guilty?

18         THE DEFENDANT:  Guilty, your Honor.

19         THE COURT:  OK.  You have acknowledged to me that you

20  are in fact guilty as charged in the Indictment in Count One.

21  I am satisfied you know your rights and that you are waiving

22  them knowingly and voluntarily.  Accordingly, I find your plea

23  is knowing and voluntary.  I find it is supported by an

24  independent basis in fact containing each of the essential

25  elements of the offense.  I accept your guilty plea and enter a

5CLDDANP

PLEA

1    judgment of guilty on Count One.

2        All right.  I am going to order the presentence

3    investigation report.

4        The Probation Department, Mr. Danio, is going to want

5    to interview you in connection with that report.  It is very

6    important in my decision as to what your sentence will be.  So,

7    please, be truthful and accurate with the probation officer.

8    Your counsel will have a right to be there with you, if he

9    wishes to, and you both have a right to examine the report

10   before the sentencing so that you can comment on it, and I urge

11   you to take advantage of that.

12       Do we have a sentencing date?

13       THE CLERK:  90 days would be March 21st at 4:30.

14       THE COURT:  Is that convenient for counsel?

15       MR. FVOCCARO:  That is fine, your Honor.

16       THE COURT:  March 21 at 4:30.

17       All right.  I gather, Mr. Danio is out on a bond?

18       MR. FINZI:  Yes, your Honor.

19       THE COURT:  And you will want that continued,

20   Mr. Finzi?

21       MR. FINZI:  Yes, your Honor.

22       THE COURT:  OK.  Mr. Danio, I just want to advise you,

23   I have every expectation that you will be here on March 21.

24   However, I need to tell you that if you don't show up, you

25   could be guilty of bail-jumping, and that could subject you to

5CLDDANP

PLEA

1    an additional fine and/or a prison term above and beyond

2    whatever you will be sentenced to with respect to these

3    charges.  Do you understand that?

4              THE DEFENDANT:  Yes, your Honor, I understand that.

5              THE COURT:  OK.  Unless there is anything else, then,

6    we are adjourned.

7              MR. FVOCCARO:  Thank you, Judge.

8              MR. FINZI:  Thank you, your Honor.

9              THE COURT:  March 21.

10

11                              -   -   -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit K

Judgment — Page __2__ of __6__

DEFENDANT:        VICENZO DANIO
CASE NUMBER:      05 CR. 157 – 01 (BSJ)

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

**Thirty (30) months**

X   The court makes the following recommendations to the Bureau of Prisons:
    **It is recommended that the defendant be designated to the Federal Prison Camp at Lewisburg or at a facility as close to the New York City metropolitan area as possible.  It is also recommended that the defendant be allowed to participate in the 500 hour residential drug treatment program provided by the Bureau of Prisons.**

☐   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

    ☐   at _____  ☐ a.m.  ☐ p.m.  on _____

    ☐   as notified by the United States Marshal.

X   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    X   before 2 p.m. on    January 9, 2007                .

    ☐   as notified by the United States Marshal.

    ☐   as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEFUTY UNITED STATES MARSHAL



AO 245B    (Rev. 06/05) Judgment in a Criminal Case
Sheet 3 — Supervised Release

| | Judgment—Page | 3 | of | 6 |

DEFENDANT:         VICENZO DANIO
CASE NUMBER:       05 CR. 157 - 01 (BSJ)

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

**Three (3) years**

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

X   The above drug testing condition is suspended due to the imposition of a special condition requiring drug treatment or testing. (Check, if applicable.)

X   The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

X   The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐   The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

☐   The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)   the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)   the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)   the defendant shall support his or her dependents and meet other family responsibilities;

5)   the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)   the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)   the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)   the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B    (Rev. 06/05) Judgment in a Criminal Case
            Sheet 3A — Supervised Release

| | | Judgment—Page | 4 | of | 6 |

DEFENDANT:        VICENZO DANIO
CASE NUMBER:      05 CR. 157 - 01 (BSJ)

## ADDITIONAL SUPERVISED RELEASE TERMS

The defendant will participate in a program approved by the United States Probation Office, which program may include testing to determine whether the defendant has reverted to using drugs or alcohol. The Court authorizes the release of available drug treatment evaluations and reports to the substance abuse treatment provider, as approved by the Probation Officer. The defendant will be required to contribute to the costs of services rendered (co-payment), in an amount determined by the probation officer, based on ability to pay or availability of the third-party payment.

The defendant is to report to the nearest Probation Office within 72 hours of release from custody.

It is recommended that the defendant be supervised by the district of residence.

AO 245B    (Rev. 06/05) Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page    5    of    6

DEFENDANT:       VICENZO DANIO
CASE NUMBER:     05 CR. 157 - 01 (BSJ)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $  100.00 | $ | $  400,000.00 |

☐   The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case* (AO 245C) will be after such determination.

X   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss\*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| John W. Moscow, Esq.<br>Rosner Moscow & Napierala<br>26 Broadway, 22nd Floor<br>New York, NY 10004-1808 | $400,000.00 | $400,000.00 | 100% |
| **TOTALS** | $      $400,000.00 | $      $400,000.00 | |

☐   Restitution amount ordered pursuant to plea agreement  $ _____

☐   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐   The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐   the interest requirement is waived for the   ☐ fine   ☐ restitution.

☐   the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 06/05) Judgment in a Criminal Case
Sheet 6 – Schedule of Payments

DEFENDANT:    VICENZO DANIO
CASE NUMBER:   05 CR. 157 - 01 (BSJ)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

A   X   Lump sum payment of $ ___100.00___ due immediately, balance due

        ☐   not later than _____ , or
        X   in accordance with   ☐ C,   ☐ D,   ☐ E, or   X  F below; or

B   ☐   Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

C   ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D   ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

E   ☐   Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F   X   Special instructions regarding the payment of criminal monetary penalties:

        Restitution shall be paid in the amount of 10% of defendant's gross monthly income beginning 30 days from defendant's release from custody. Restitution will be made payable to Clerk of the Court, U.S.D.C.-S.D.N.Y., then forwarded to the receiver who will send prorated distribution to the victim.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

        Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.